# In the United States Court of Federal Claims

**No. 22-1814C**
**Filed: October 29, 2026**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| **GXO GOVERNMENT SERVICES, LLC,** | * |
| **Plaintiff,** | * |
| **v.** | * |
| **UNITED STATES,** | * |
| **Defendant.** | * |
| * * * * * * * * * * * * * * * * * * | * |

**Stephen McBrady,** Crowell & Moring LLP, Washington, DC, for plaintiff. With him were **Charles Baek,** Crowell & Moring LLP, Washington, DC; and **John Nakoneczny**, Crowell & Moring LLP, Washington, DC.

**Vincent de Paul Phillips, Jr.**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. With him were **Deborah A. Bynum**, Assistant Director, Commercial Litigation Branch; **Patricia M. McCarthy**, Director, Commercial Litigation Branch; and **Brett A. Shumate**, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC. **Wendy A. Harris**, Commercial and Appellate Litigation, U.S. Postal Service Law Department, Washington, DC, of counsel.

## O P I N I O N

**HORN, J.**

Plaintiff, GXO Government Services, LLC (GXO),[1] filed suit in the United States Court of Federal Claims to challenge a September 30, 2022 United States Postal Service

---

[1] At the time of the contract award relevant to the above captioned case, GXO was doing business as XPO Logistics Supply Chain of New Jersey, Inc. On November 1, 2017, XPO Logistics Supply Chain of New Jersey, Inc. changed its name to XPO Logistics Supply Chain of New Jersey, LLC. On October 4, 2021, XPO Logistics Supply Chain of New Jersey, LLC changed its name to GXO Logistics of New Jersey, LLC. On December 3, 2021, GXO Logistics of New Jersey, LLC changed its name to GXO Government Services, LLC. Neither party contests that plaintiff, GXO Government Services, LLC, is the same legal entity that was awarded the contract at issue in the above captioned case, XPO Logistics Supply Chain of New Jersey, Inc., nor does either party question if there

(USPS) Contracting Officer's Final Decision, which denied GXO's certified claim, pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109 (2018) and the Tucker Act, 28 U.S.C. § 1491 (2018). GXO seeks an award in the amount of $3,943,200.00 "for payments improperly withheld" by defendant under Contract No. 5CLOSV-19-B-001, plus any applicable CDA interest. After defendant filed an answer, the parties engaged in discovery and filed Cross-Motions for Summary Judgment pursuant to Rule 56 (2024) of the Rules of the United States Court of Federal Claims (RCFC). The parties' Cross-Motions for Summary Judgment have been fully briefed and the court has held oral argument.

## FINDINGS OF FACT

According to plaintiff's complaint, "GXO is a global logistics company that provides supply chain management solutions in both private and public sectors, including for agencies at the national, regional, and local levels." On November 1, 2018, the USPS awarded GXO an Indefinite Delivery, Indefinite Quantity (IDIQ) contract, No. 5CLOSV-19-B-0001, to provide "Peak Annex services" for a Christmas Terminal Handling Operation (CTHO) in Atlanta, Georgia. (the Master Contract).[2] The Master Contract indicated a base period of performance of November 1, 2018 to December 31, 2020, with "one (1) two (2) year option period" from November 1, 2021 to December 21, 2022.[3]

---

is privity of contract between plaintiff and defendant. The court refers to plaintiff as "GXO" in this Opinion.

[2] As discussed more fully below, the Master Contract attached, and incorporated by reference, several attachments, including, as relevant to the case currently before the court, the Statement of Work (SOW) and "Attachment E – Volume Data 2017 and FY18 – FY22 Projected." In their submissions to the court, the parties sometimes refer to the Master Contract and all its attachments, including the SOW, collectively, as "the CTHO Contract." In this Opinion, the court refers to the Master Contract and each attachment, individually, when discussing the contents of a particular document. Otherwise, for the sake of consistency with the parties' chosen terminology, the court will refer to the Master Contract and its attachments, collectively, as the "CTHO Contract."

[3] The court notes that the record before the court is entirely inconsistent with respect to the periods of performance under the Master Contract. As indicated above, the Master Contract stated: "Base period of 11/1/2018 – 12/31/2020 with one (1) two (2) year option period from 11/1/2021 – 12/21/2022." Notably, this so-called "two (2) year option period" covered only approximately fourteen months and did not cover the period between "1/1/2021" to "10/31/2021." Adding further confusion, Modifications 1, 2, and 5 to the Master Contract are not in the record currently before the court. With respect to those modifications that are in the record currently before the court, Modification 3 to the Master Contract stated: "The purpose of this modification is to exercise the one (1) two (2) year option period covering 1/1/2021 – 12/31/2022, pursuant to Clause 2-20. The operational periods of performance are listed below: Option Year 1 (FY22): 11/1/2021 – 12/31/2021. Option Year 2 (FY23): 11/1/2022 – 12/31/2022." The period listed in Modification 3 did

According to the Master Contract, delivery orders were to be issued "per year per site" against the Master Contract. Each delivery order constituted an order to proceed with services and included a specific period of performance. Attached to, and incorporated into, the Master Contract, among other documents, were the Statement of Work (SOW) and Attachment E – "Volume Data 2017 and FY19 – 22 Projected."[4]

In the parties' Joint Statement of Facts, GXO and defendant agreed to a description of the mail processing operation performed by GXO pursuant to the CTHO Contract. Pursuant to the CTHO Contract, GXO provided mail processing services for Priority and First Class Mail for the USPS. GXO was required to sort Priority and First Class Mail received from local USPS origin facilities for shipment to USPS destinations nationwide, as well as to receive mail from nationwide USPS origins and sort that mail for shipment to local USPS facilities. GXO also was required to provide the facility, staffing, and equipment necessary to support the mail processing operation. The CTHO facility operated 24 hours a day, seven days a week, except on a specific number of days identified in the CTHO Contract, such as Christmas Eve and Christmas Day. As discussed more fully below, GXO and defendant dispute what constituted an "operational day" at the CTHO facility. GXO asserts that "[a]n operational day spanned from 12:00 p.m. on one day to 11:59 a.m. the following day." (alteration added). Defendant asserts that "the relevant operational day in terms of GXO's processing obligations began around 7:00 p.m. each evening and concluded by 4:00 a.m. the following morning," which, according to defendant, "corresponded with when the Postal Services retail operations concluded each day."

---

cover a full two-year period, including the period between "1/1/2021" to "10/31/2021" that was missing from the period of performance identified in the Master Contract, but the period listed in Modification 3 also extended ten days beyond the option period of performance identified in the Master Contract, which purportedly ended on "12/21/2022." Modification 4 to the Master Contract stated that it was issued for the purpose of "updat[ing] the schedule of service for the Atlanta, GA Peak Annex for the FY21 season" and stated that "[t]he period of performance end date is hereby updated from 12/31/2020 to 2/28/2021, and the operational POP [period of performance] is hereby updated from 12/24/2020 to 2/19/2021." (alterations added). Additionally, Modification 6 to the Master Contract was issued to "extend the term of the option period in the following manner, 11/1/2021 – 10/31/2023." In their submissions to the court, the parties do not attempt to explain the inconsistencies between the various periods of performance identified in the contract documents.

[4] As GXO notes in its Motion for Summary Judgment, "[t]here is a discrepancy between the title of Attachment E in the [Master] Contract's List of Attachments and as it's referred to in the Statement of Work." (alterations added). The Master Contract labeled Attachment E as "Volume Data 2017 and FY19 – 22 Projected," whereas the SOW labeled Attachment E as "Volume Data – 2017 and 2018 Projected." Moreover, as discussed below, the parties agreed in the Joint Statement of Facts submitted to the court that Attachment E "was updated periodically."

According to the parties' Joint Statement of Facts, the first step for processing the mail at the CTHO facility started when mail arrived at the CTHO facility on inbound trucks at the Platform Inbound. According to the table in Part II, Section 5.1 of the SOW,[5] which is reproduced in this Opinion below, the Platform Inbound operation had a Critical Entry Time of 2:15 A.M. and a Clearance Time of 2:25 A.M. At the Platform Inbound, GXO employees would unload mail from the inbound trucks and take the mail to the Primary Bullpen (also known as the Primary Sort or Primary Operation).[6] At the Primary Bullpen, GXO employees would manually sort the mail, by hand, based on the first digit of the five-digit ZIP code. The table in Part II, Section 5.1 of the SOW indicates that the Primary Bullpen operation had a Critical Entry Time of 2:30 A.M. and a Clearance Time of 3:00 A.M. After completing the Primary Bullpen operation, GXO employees were to take the mail to either the Secondary Bullpen operation (also known as the Secondary Sort or Secondary Operation) or to the SWYB operation[7] for mail traveling by airplane. At the Secondary Bullpen operation, GXO employees would manually sort the mail pieces based on the first three digits of the five-digit ZIP code. According to the table in Part II, Section 5.1 of the SOW, the Secondary Bullpen operation had a Critical Entry Time of 3:15 A.M. and a Clearance Time of 3:45 A.M. After the Secondary Bullpen operation was complete, the mail was taken in containers to the Platform Outbound operation, a staging area by the outbound loading dock where the processed containers of mail awaited collection by an outbound truck. The Platform Outbound operation area "had lanes on the

---

[5] The table in Part II, Section 5.1 of the SOW identified the "Critical Entry Time (CET)" and "Clearance Time (CT)" for each of the mail processing operations under the CTHO Contract: Platform Inbound, Primary Bullpens, Scan Where You Band (SWYB), Secondary Bullpens, and Platform Outbound. The SOW defined "Critical Entry Time" as "[t]he latest time that committed mail must be available to an operation if the mail is to complete the planned distribution and/or processing in the operation by its Clearance Time." (alteration added). The SOW defined "Clearance Time" as "[t]he latest time committed mail must complete an operation if it is to meet the Critical Entry Time for the next required operation." (alteration added). The court notes that the definition of Critical Entry Time and the definition of Clearance Time are mutually dependent, as the definition of Critical Entry Time uses the term "Clearance Time," and the definition of Clearance Time uses the term "Critical Entry Time."

[6] During contract performance, mail was occasionally referred to as being "in prime" either in the SOW or in correspondence between GXO and defendant. GXO and defendant agreed that "in prime" meant "mail is in the Primary Sort Operation (A.K.A., 'Primary Bullpen')."

[7] Mail that went through the SWYB operation did not go through the Secondary Bullpen operation. Mail from the SWYB operation dispatched from that operation directly onto trucks heading to the airport where the mail would then be loaded onto airplanes. According to the table in Part II, Section 5.1. of the SOW, the SWYB operation had a Critical Entry Time of 3:15 A.M. and a Clearance Time of 3:45 A.M.

workroom floor for the staging of mail for dispatch[8] via an outbound truck" with "different lanes correspond[ing] to different outbound destinations." (alteration and footnote added). According to the table in Part II, Section 5.1 of the SOW, the Platform Outbound operation had a Critical Entry Time of 4:00 A.M. and a Clearance Time of 10:00 A.M., with an asterisk next to the 10:00 A.M. Clearance Time that corresponded to the following note: "The outbound platform CT [Clearance Time] is contingent upon the scheduled departure of the last truck." (alteration added). In the parties' Joint Statement of Facts, the parties agreed that the USPS was responsible for managing the outbound truck schedules. Although USPS employees were present at the outbound dock and could determine whether or not to release a truck to depart, USPS employees did not load the mail onto the outbound trucks, rather, once an outbound truck arrived to collect the waiting mail, GXO employees were responsible for physically loading the mail onto the appropriate outbound truck traveling to the mail's corresponding destination.

According to the Master Contract, in order to be paid for mail processing services, GXO had to "provide documentation showing services were requested, contents were delivered, and an invoice with the cost breakdown." The parties' Joint Statement of Facts stipulated that GXO was paid, in part, based on the number of individual pieces of mail that GXO processed. The parties agreed that the USPS did not pay GXO for any overtime wages that GXO paid to its employees, nor did GXO pay the USPS for any overtime wages that the USPS paid to its employees. If an outbound truck was delayed in departing from the CTHO facility, GXO was responsible for paying any subsequent "PS [Postal Service] 5466 (Late Slip)" that resulted from such a delay. (alteration added).

The Master Contract included certain contract clauses in full, as well as incorporated additional contract clauses by reference. The Master Contract contained the following clause regarding the acceptance of services:

> **CLAUSE 2-1 INSPECTION AND ACCEPTANCE (MARCH 2006)**
>
> a. The supplier must be able to demonstrate that the supplies and services being provided conform to contract requirements. The Postal Service may require correction of defects and nonconformance at no cost to the Postal Service. If the supplier fails or refuses to correct the defects or nonconformance the Postal Service may, in addition to any other remedies provided by this contract:

---

[8] As discussed more fully below, one of the primary disputes in the case currently before the court is the meaning of the terms "dispatch" and "dispatched," which are not specifically defined in the SOW. The SOW utilizes the words "dispatch" and "dispatched" throughout in varying verb tenses. Adding to the confusion of the meaning of the terms "dispatch" and "dispatched," the SOW also uses the phrases: "dispatch operations," "dispatch secondary bullpen," "transportation dispatch lane," "dispatch times," as well as two capitalized terms that are defined in Part III of the SOW: "Dispatch Performance" and "Quality Dispatch."

(1) Acquire replacement supplies or services from other sources at the supplier's expense; or

(2) Accept the supplies or services at a reduced price.

b. The Postal Service may revoke acceptance if nonconforming performance is accepted:

(1) because it has not been discovered before acceptance, as a result of the difficulty of discovery or because of the supplier' [sic] assurances, or

(2) on the basis of a reasonable assumption that it would be cured.

c. The Postal Service has the same rights and duties upon revocation as upon rejection. Revocation of acceptance must occur within a reasonable time after the contracting officer discovers the deficiency.

d. The Postal Service, at its option, may at any stage in the performance of this contract, monitor the supplier's activities and efforts in performing the contract, to assure itself that contract requirements are being met. Such Postal Service oversight in no way relieves the supplier from its responsibility to perform in accordance with contract requirements.

(capitalization and emphasis in original; alteration added). The Master Contract's "Order of Precedence" clause provided:

Any inconsistencies in this solicitation or contract will be resolved by giving precedence in the following order:

(1) The schedule of Supplies/Services section of PS Form 8203[9];

(2) The Statement of Work (SOW) or Statement of Objectives (SOO) (if there are both, the SOO takes precedence over the SOW) and any accompanying Postal Service appendices, attachments, or addenda, to the SOW or SOO;

(3) The Post Service provisions and clauses in the Terms and Conditions;

(4) Other Postal Service-provided attachments to this solicitation or contract;
(5) Supplier-provided attachments to this contract, such as computer software license agreements, end user licensing agreements, or technical proposals; and

[9] According to defendant, a "PS Form 8203" is another name for a delivery order.

(6) The remainder of PS Form 8203.

(footnote added). The Master Contract also contained the following clause regarding excusable delays:

> **CLAUSE B-19 EXCUSABLE DELAYS (MARCH 2006)**
>
> a. Except with respect to defaults of subcontractors, the supplier will not be in default by reason of any failure in performing this contract in accordance with its terms (including any failure by the supplier to make progress in the prosecution of the work that endangers performance) if the failure arises out of causes beyond the control and without the fault or negligence of the supplier. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the government in its sovereign capacity or of the Postal Service in its contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of the supplier.

(capitalization and emphasis in original). See also UNITED STATES POSTAL SERVICE, SUPPLYING PRINCIPLES AND PRACTICES (2018) at 511.

As indicated above, attached to, and incorporated into, the Master Contract, among other documents, was the SOW. The SOW began with "**PART I GENERAL INFORMATION**." (capitalization and emphasis in original). Part I, Section 2.0 of the SOW stated in part:

> The supplier will provide the facility, staffing and equipment necessary to support a manual Build/Break sort operation for Priority and First Class Mail received from local USPS origin facilities for shipment to designated USPS destinations nationwide. The CTHO will also require the supplier to coordinate receipt of mail from nationwide USPS origins and sort this mail for shipment to the local destinating facilities.

(capitalization in original). As particularly relevant to the dispute currently before the court in the above captioned case, Part I, Section 2.0 of the SOW also contained the following language, which the parties refer to as the "Penalty Provision,"[10] and which states:

---

[10] As discussed more fully below, although the parties dispute whether the language in Part I, Section 2.0 of the SOW stating that "[t]he supplier will be penalized $1200.00 per container that fails to be dispatched on time," (alteration added), should be construed as a permissible liquidated damages clause, as suggested by defendant, or should be construed as an unenforceable penalty, as suggested by plaintiff, both parties repeatedly refer to the language in Part I, Section 2.0 of the SOW as "the penalty provision" in their correspondences with each other and in their submissions to the court. Therefore, for the purposes of this Opinion, the court also refers to the language in Part I, Section 2.0 of the

> The Postal Service expects 100% on-time dispatch performance and 100% distribution accuracy for all mail tendered to and sorted by the supplier. The USPS will be responsible for 80% VAP[11] before 02:00 am to help insure [sic] timely clearance every night. The supplier will be penalized $1200.00 per container that fails to be dispatched on time.

(capitalization in original; alteration and footnote added). Part I, Section 2.0 of the SOW continued:

> The Postal Service expects ≥ 98% OEN (Origin Enroute) package scanning for all parcels and mail that contains a readable bar-coded identifier. USPS will provide the scanners and supporting equipment. Training will be provided by the supplier for the use of the scanner.
>
> The supplier will be required to "set up" the facility beginning on 1 November of each annual POP [Period of Performance] and to be ready for start of operations beginning on the first operational POP date as outlined above.

(capitalization in original; alteration added).

Part II of the SOW was titled "**REQUIREMENTS**." (capitalization and emphasis in original). Part II of the SOW contained Section 5.1, titled "Operations," which included the following table[12] and language:

> The supplier will be responsible for all operations and services, including but not limited to: truck dock operations, mail sorting operations, package scanning, and security. The supplier will manage inbound and outbound build/break operations to receive, scan, unload, sort, load and dispatch mail at the Atlanta CTHO facility. The supplier must process and scan all mail units tendered by the USPS in an efficient and expeditious manner to meet the departure requirements specified in these requirements.

---

SOW as the "Penalty Provision," without inferring an automatic conclusion as to whether it should be considered a liquidated damages provision or a penalty provision, which is discussed in this Opinion below.

[11] According to the parties' Joint Statement of Facts, although not defined in the SOW or in the Master Contract, both parties understood at the time of contracting that "VAP" stood for "Volume Arrival Profile." Moreover, the parties' Joint Statement of Facts stated that the "requirement that the USPS was responsible for delivering 80% of the Volume Arrival Profile before 2:00 a.m. meant that a certain portion of the mail needed to arrive before 2:00 a.m. on any given day to help ensure that GXO was able to timely sort the mail each night."

[12] The court refers to table below as "the table in Part II, Section 5.1 of the SOW" throughout this Opinion.

The table below identifies the operation's Critical Entry Time (CET) and Clearance Time (CT). This is for FY 18 and may have changes according to any clearance times from the airlines.[13]

| Operations | Critical Entry Time (CET) | Clearance Time (CT) |
|---|---|---|
| Platform Inbound | 0215 | 0225 |
| Primary Bullpens | 0230 | 0300 |
| SWYB/Air Ops | 0315 | 0330 |
| Secondary Bullpens | 0315 | 0345 |
| Platform Outbound | 0400 | 1000* |

The clearance time of all outgoing Priority and First Class Mail SPRs (small Parcels and Rolls) is 0345 (3:45 AM). **The supplier must provide sufficient staffing and resources to make all applicable clearance times**.

**NOTE**: The outbound platform CT is contingent upon the scheduled departure of the last truck.

(all emphasis and capitalization in original; footnote added). As indicated above, the table in Part II, Section 5.1 of the SOW indicated that the Clearance Time for the Platform Outbound operation "is contingent upon the scheduled departure of the last truck." Accordingly, the USPS provided GXO with an "Outbound Truck Departure Schedule" which indicated the scheduled departures of the outbound trucks leaving from the Platform Outbound for a given fiscal year. An illustrative sample of the scheduled departures for the fiscal year 2022 period of performance, which spanned from November 1, 2021 to October 31, 2022, and which is the fiscal year period of performance at issue in the above captioned case, is reproduced below. In its Motion for Summary Judgment, GXO notes that "[t]he trucks were scheduled to collect the sorted mail from the CTHO facility throughout the day, with the majority of trucks traveling on long-haul routes departing in the morning hours after 4:00 a.m." (alteration added).

[13] There is no indication in the record currently before the court that the Clearance Times or Critical Entry Times listed in the table in Part II, Section 5.1 of the SOW were ever changed by the parties.

## Illustrative Sample of Scheduled Departures for Fiscal Year 2022 (November 1, 2021 to October 31, 2022)

Site ID: 303CX
Site Name: ATLANTA CHRISTMAS AX
Direction: Outbound
Trip Type: HCR

| To | Dock Doors | Route | Trip | Scheduled Time |
|---|---|---|---|---|
| ATLTH ATLANTA THS | 18, 19, 20 | 301BC | '539 | 0:01 |
| 30Z ATLANTA (GA) NDC | 18, 19, 20 | 301CC | '579 | 0:50 |
| ATLTH ATLANTA THS | 18, 19, 20 | 301BC | '541 | 1:00 |
| 33ISC MIAMI FL ISC | 18, 19, 20 | 303M6 | '3003 | 1:00 |
| ATLTH ATLANTA THS | 18, 19, 20 | 301BC | '545 | 1:20 |
| 30Z ATLANTA (GA) NDC | 18, 19, 20 | 301CC | '585 | 1:40 |
| ATLTH ATLANTA THS | 18, 19, 20 | 301BC | '543 | 2:00 |
| ATLTH ATLANTA THS | 18, 19, 20 | 301BC | '547 | 2:20 |
| 800TH DENVER TRANSFER HUB | 18, 19, 20 | 300BC | '553 | 3:00 |
| 350AX BIRMINGHAM ANNEX B | 2,3, 4 | 300U1 | '565 | 3:00 |
| 070PM GREATER NEWARK (NJ) P&DC | 26,27, 29 | 300ZE | '17 | 3:00 |
| 75H SOUTHERN AREA (TX) STC | 39, 40,42 | 302M6 | '508 | 3:00 |
| ATLTH ATLANTA THS | 18, 19, 20 | 301BC | '549 | 3:20 |
| 20H CAPITAL METRO (MD) STC | 18, 19, 20 | 207L4 | '10 | 3:30 |
| 308 AUGUSTA GA P&DF | 13, 14, 15 | 300U0 | '551 | 3:30 |
| 30Z ATLANTA (GA) NDC | 18, 19, 20 | 301CC | '581 | 3:30 |
| 32Z JACKSONVILLE (FL) NDC | 13, 14, 15 | 300L1 | '551 | 4:00 |
| 144PM NORTHWEST ROCHESTER (NY) P&DC | 31, 32,33 | 300L4 | '553 | 4:00 |
| 350AX BIRMINGHAM ANNEX B | 2,3, 4 | 300U1 | '563 | 4:00 |
| 07Z NJI (NJ) NDC | 26, 27, 29 | 300ZE | '30 | 4:00 |
| 773 NORTH HOUSTON (TX) P&DC | 39, 40, 42 | '30115 | '3001 | 4:00 |
| 310AX MACON HOLT AVE ANNEX | 13, 14, 15 | 301U0 | '558 | 4:00 |
| 190 PHILADELPHIA P&DC | 26, 27, 29 | 303L7 | '601 | 4:00 |
| 017AX NORTHEAST AREA CROSSDOCK | 26, 27, 29 | 303Y0 | '553 | 4:00 |
| 150PM PENNWOOD PLACE (PA) P&DC | 31, 32, 33 | 303Y1 | '551 | 4:00 |
| 250 CHARLESTON P&DC (WV) | 26, 27, 29 | 303Y1 | '553 | 4:00 |
| 330CX UNITED STATES POSTAL SERVICE (South FL) | 10, 11, 12 | '33113 | '552 | 4:00 |
| 549 OSHKOSH P&DF WI | 39, 40, 42 | 531BC | '518 | 4:00 |
| 30Z ATLANTA (GA) NDC | 18, 19, 20 | 301CC | '587 | 4:20 |
| 117PM BETHPAGE (NY) P&DC | 26, 27, 29 | 300ZE | '11 | 4:30 |
| 360 MONTGOMERY P&DC | 2, 3, 4 | '30195 | '551 | 4:30 |
| 30H ATLANTA (GA) STC | 18, 19, 20 | 302M9 | '1 | 4:30 |
| 48Z DETROIT (MI) NDC | 35, 36 | 303ZE | '1 | 4:30 |
| 530PC MILWAUKEE MPA | 39, 40, 42 | 531BC | '504 | 4:30 |
| 60Z CHICAGO (IL) NDC | 35, 36 | '60717 | '604 | 4:30 |
| 070PM GREATER NEWARK (NJ) P&DC | 26, 27, 29 | 300ZE | '13 | 4:45 |
| 207CA SHERRIF ROAD | 26, 27, 29 | 207L4 | '552 | 5:00 |
| 220 NORTHERN VA (VA) P&DC | 26, 27, 29 | 207L4 | '556 | 5:00 |
| 30122 LITHIA SPRINGS | 18, 19, 20 | '30132 | '551 | 5:00 |
| 75H SOUTHERN AREA (TX) STC | 39, 40, 42 | 302M6 | '506 | 5:00 |
| 335DC YBOR CITY (FL) P&DC | 13, 14, 15 | 335B2 | '2 | 5:00 |
| 337CA ST PETERSBURG XMAS ANNEX | 10, 11, 12 | 335B2 | '552 | 5:00 |
| 680AN OMAHA P&DC CHRISTMAS AX | 39, 40, 42 | 680L2 | '502 | 5:00 |
| 75Z DALLAS (TX) NDC | 39, 40, 42 | 302M6 | '1 | 5:05 |
| 32Z JACKSONVILLE (FL) NDC | 13, 14, 15 | 322L0 | '552 | 5:30 |
| 530PC MILWAUKEE MPA | 39, 40, 42 | '60717 | '706 | 5:30 |
| 290 COLUMBIA (SC) P&DC | 31, 32, 33 | 300U3 | '551 | 5:45 |
| 070PM GREATER NEWARK (NJ) P&DC | 26, 27, 29 | 300ZE | '553 | 5:45 |
| 377 KNOXVILLE TN P&DC | 18, 19, 20 | '30193 | '3001 | 5:45 |
| 787CA AUSTIN CHRISTMAS ANNEX | 39, 40, 42 | 780AH | '502 | 5:45 |
| 800TH DENVER TRANSFER HUB | 18, 19, 20 | 300BC | '551 | 6:00 |

| To | Dock Doors | Route | Trip | Scheduled Time |
|---|---|---|---|---|
| 320 JACKSONVILLE (FL) P&DC | 13, 14, 15 | 300L1 | '2 | 6:00 |
| 32Z JACKSONVILLE (FL) NDC | 13, 14, 15 | 300L1 | '553 | 6:00 |
| 290 COLUMBIA (SC) P&DC | 31, 32, 33 | 300U3 | '3007 | 6:00 |
| 462KA INDIANAPOLIS MPA | 35, 36 | 300UE | '4601 | 6:00 |
| 327CA MID-FLORIDA CHRISTMAS ANNEX | 10, 11, 12 | '30116 | '551 | 6:00 |
| 430 COLUMBUS (OH) P&DC | 35,36 | 303EE | '551 | 6:00 |
| 250 CHARLESTON P&DC (WV) | 26, 27, 28 | 303Y1 | '3001 | 6:00 |
| 310AX MACON HOLT AVE ANNEX | 13, 14, 15 | 310U0 | '560 | 6:00 |
| 334 WEST PALM BEACH FL P&DC | 18, 19, 20 | '33113 | '902 | 6:00 |
| 372CX NASHVILLE CHRISTMAS ANNEX | 18, 19, 20 | 370N3 | '554 | 6:00 |
| 38Z MEMPHIS (TN) NDC | 13, 14, 15 | '50318 | '554 | 6:00 |
| 30Z ATLANTA (GA) NDC | 18, 19, 20 | 301CC | '583 | 6:10 |
| 30H ATLANTA (GA) STC | 18, 19, 20 | 301L4 | '3001 | 6:20 |
| 240 ROANOKE (VA) P&DC | 26, 27, 28 | 240NZ | '554 | 6:30 |
| 30H ATLANTA (GA) STC | 18, 19, 20 | '30023 | '3010 | 6:30 |
| 740 TULSA (OK) P&DC | 39, 40, 42 | 300BC | '557 | 6:30 |
| 403 LEXINGTON (KY) P&DC | 31, 32, 33 | 300FE | '551 | 6:30 |
| 270CA GREENSBORO CHRISTMAS AX | 26, 27, 28 | 300L0 | '551 | 6:30 |
| 750 NORTH TEXAS (TX) P&DC | 39, 40, 42 | 302M6 | '510 | 6:30 |
| 640AX KANSAS CITY TRANSFER HUB | 35, 36 | 302M9 | '551 | 6:30 |
| 48Z DETROIT (MI) NDC | 35, 36 | 303ZE | '551 | 6:30 |
| 30H ATLANTA (GA) STC | 18, 19, 20 | '30115 | '3003 | 6:35 |
| 190CA PHILADELPHIA L&DC CHRISTMAS AX | 26, 27, 29 | 303L7 | '551 | 6:45 |
| 190CA PHILADELPHIA L&DC CHRISTMAS AX | 26, 27, 29 | 192M8 | '558 | 7:00 |
| 30H ATLANTA (GA) STC | 18, 19, 20 | 233AC | '502 | 7:00 |
| 230AN RICHMOND CHRISTMAS ANNEX | 26, 27, 29 | '30016 | '551 | 7:00 |
| 280AN CHARLOTTE CMAS ANX (NP) | 26, 27, 29 | '30023 | '553 | 7:00 |
| 296 GREENVILLE (SC) P&DC | 18, 19, 20 | '30023 | '555 | 7:00 |
| 440 CLEVELAND (OH) P&DC | 35, 36 | 300FE | '553 | 7:00 |
| 276CA RALEIGH CHRISTMAS ANNEX | 26, 27, 28 | 300L0 | '553 | 7:00 |
| 144PM NORTHWEST ROCHESTER (NY) P&DC | 31, 32, 33 | 300L4 | '551 | 7:00 |
| 462KA INDIANAPOLIS MPA | 35, 36 | 300UE | '501 | 7:00 |
| 46H INDIANAPOLIS STC | 35, 36 | 300UE | '503 | 7:00 |
| 365AN MOBILE AL ANNEX | 2, 3, 4 | '30197 | '553 | 7:00 |
| 30Z ATLANTA (GA) NDC | 18, 19, 20 | 301CC | '589 | 7:00 |
| 75H SOUTHERN AREA (TX) STC | 39, 40, 42 | 302M6 | '504 | 7:00 |
| 495AX GRAND RAPIDS PROCESSING ANNEX | 31, 32, 33 | 303ZE | '553 | 7:00 |
| 373 CHATTANOOGA TN P&DC | 18, 19, 20 | 370N3 | '556 | 7:00 |
| 30H ATLANTA (GA) STC | 18, 19, 20 | 450M4 | '552 | 7:00 |
| 310 MACON (GA) P&DC | 13, 14, 15 | 310U0 | '2 | 7:15 |
| 701AX ST ROSE MAIL PROCESSING CENTER | | '30115 | '551 | 7:30 |
| 325 PENSACOLA FL P&DC | 2, 3, 4 | '30197 | '551 | 7:30 |
| 350AX BIRMINGHAM ANNEX B | 2, 3, 4 | 301M6 | '555 | 7:30 |
| 60H BUSSE (IL) STC | 35, 36 | '60717 | '552 | 7:30 |
| 63Z SAINT LOUIS (MO) NDC | 35, 36 | 632Y1 | '552 | 7:45 |
| 170 HARRISBURG (PA) P&DC | 31, 32, 33 | 170P2 | '552 | 8:00 |
| 350AX BIRMINGHAM ANNEX B | 2, 3, 4 | 300U1 | '105 | 8:00 |
| 33ISC MIAMI FL ISC | 10, 11, 12 | 303M6 | '3001 | 8:00 |
| 017AX NORTHEAST AREA CROSSDOCK | 26, 27, 29 | 303Y0 | '555 | 8:00 |
| 360 MONTGOMERY P&DC | 2, 3, 4 | '30195 | '3001 | 8:10 |
| 117PM BETHPAGE (NY) P&DC | 26, 27, 29 | 300ZE | '551 | 8:30 |

Moreover, Part II of the SOW contained Section 6.0, titled "**Operational Functions**," (capitalization and emphasis in original), which detailed the specific functions GXO was required to perform, and which used the undefined term "dispatch," in its various verb tenses, throughout. Section 6.0 of the SOW included, among other subsections, the following:

**6.1 Daily Functions Performed by the CTHO:**

**Personnel**: The supplier will be responsible for providing the necessary personnel to meet, scan and direct the inbound/outbound trucks, unload/load containers and loose mail, transport the containers and loose mail to the sort area, induction area or directly to outbound trucks.

**6.2 Operations:**

The supplier will be responsible for providing the following operations:

1. **OUTBOUND SORT OPERATION**
    a. Originating Priority Mail operation (Piece Distribution)
    b. Originating First Class Mail operation (Handling Unit distribution)
    c. Target Mail operation
2. **INBOUND SORT OPERATION**
    a. Destinating Priority Mail operation (Handling Unit Distribution)
    b. Destinating First Class Mail operation (dock transfer)
    c. Destinating MIXED (Priority and First Class) primary operation
3. **DOCK OPERATION**
4. **REWRAP OPERATION**
5. **QUALITY CONTROL and CONTAINER AUDIT REPORTING**
6. **SUPPORT and SUPPLIES**
7. **INFORMATION and REPORTING SYSTEM**
8. **RECYCLE AND REUSE OF ALL MTE** [Mail Transport Equipment]

**6.3 Outbound Sort Operation:**

The CTHO facility will receive truckloads of containerized and/or palletized Priority and First Class Mail SPRs (Small Parcels and Rolls) from the local USPS originating facilities. The mail type can consist of Outsides, Parcels, Flats, Letters and SPRs. Containers can also consist of all tray types and sacks.

The supplier will scan and direct this mail to the outbound sort operation within the CTHO facility. The outbound sort operation will consist of three separate operations:

a. Originating Priority Mail Operation
b. Originating First Class Mail Operation
c. Target Mail Operations.

**6.4 Originating Priority and First Class Mail Operations:**

. . .

**Bullpen Operations:**

Bullpen operations can apply to both primary and/or secondary sorting operations.

**Primary Operation:**

The supplier will have a primary operation where MIXED containers of originating Priority Mail and First Class Mail are primed for the appropriate secondary bullpen(s). The primary bullpen operation is designed with the purpose to allow the originating Priority Mail and First Class Mail to flow into the appropriate secondary bullpen.

The primary bullpen operation will be based on the first digit of the 5-digit ZIP Code. The CTHO supplier will have a minimum of five (5) primary bullpens and the container and zip range makeup is as follows but not limited to:

| Primary Bullpen Preferred Setup | | | | | |
|---|---|---|---|---|---|
| **Container #** | **Zip Range** | **Container #** | **Zip Range** | **Container #** | **Zip Range** |
| Container 0 | 000-099 | Container 3 | 300-399 | Container 6 | 600-699 |
| Container 1 | 100-199 | Container 4 | 400-499 | Container 7 | 700-799 |
| Container 2 | 200-299 | Container 5 | 500-599 | Container 8 | 800-899 |
| | | | | | |
| **Container #** | **Zip Range** | **Container #** | **Zip Range** | **Container #** | **Zip Range** |
| Container 9 | 900-999 | | | No Zips | |
| Foreign | Foreign | | | Rewrap | |
| Canada | Canada | | | | |

**Secondary Operation**:

The supplier will have a secondary bullpen(s) operation for the piece distribution of originating Priority Mail and First Class Mail received from both USPS originating facilities and the CTHO facility primary operation. It is in this secondary bullpen(s) operation that the originating Priority Mail and First Class Mail is processed to the appropriate ADC [Area Distribution Center] separation into the appropriate container for dispatch.

. . .

The supplier will sort all FGN (Foreign) and Canada Mail that is received on the dock to a sorting and dispatch secondary bullpen set up near the transportation dispatch lane that will transport the container/pallets onto its intended vehicle once it is separated and containerized.

. . .

**Dispatch:**

The supplier will dispatch Priority Mail to the appropriate truck. Each placard will identify the truck and/or destination the Priority Mail and First Class Mail is dispatched.

**Load Sequence of Mail on the Trailer:**

The supplier must load mail containers in accordance with truck loading plans provided by USPS. The supplier must maintain the current truck load plan on the dock for ease of reference.

**6.5 Originating First Class Mail Operation (Handling Unit Distribution)**

**General Information**:

It is the responsibility of the supplier to keep the Priority Mail and First Class Mail in separate containers for dispatch when directed by the USPS.

Originating First Class Mail will be dispatched on surface long haul transportation departing the CTHO facility. CTHO will receive originating First Class Mail containers from USPS origin facilities for the destinations served by the surface long haul transportation.

. . .

**First Class Mail Missent to the CTHO facility:**

If the CTHO facility receives misdirected First Class Mail, the supplier should immediately dispatch that mail to the Atlanta NDC/STC [National Distribution Center/Sorting and Transfer Center].

**Dispatch:**

The supplier will dispatch First Class Mail to the appropriate truck.

**Load Sequence of Mail on the Trailer:**

The supplier must load mail containers in accordance with truck loading plans provided by USPS. The supplier must maintain the current truck load plan on the dock for ease of reference.

. . .

**6.7 Inbound Sort Operation:**

The CTHO will receive truckloads of containerized Priority Mail (parcels, flats and outsides) and First Class Mail (letter trays, flat tubs, sacks) from other USPS originating facilities nationwide. The supplier will direct this destinating mail to the inbound sort operation within the CTHO facility. The inbound sort operation will consist of three separate operations:

a) Destinating Priority Mail Operation
b) Destinating First Class Mail Operation

c) Destinating MIXED Primary operations

**6.8 Destinating Priority Mail Operation**

**General Information:**

It is the responsibility of the supplier to keep the Priority Mail and First Class Mail in separate containers for dispatch when directed by USPS.

. . .

**Dispatch:**

The supplier will dispatch destinating Priority Mail to the appropriate truck. Each placard will identify the truck and/or destination of the destinating Priority Mail to be dispatched.

**Load Sequence of Mail on the Trailer:**

The supplier must load mail containers in accordance with truck loading plans provided by USPS. The supplier must maintain the current truck load plan on the dock for ease of reference.

**6.9 Destinating First Class Mail Operation**

**General Information:**

It is the responsibility of the supplier to keep the Priority Mail and First Class Mail in separate containers for dispatch.

. . .

**Load Sequence of Mail on the Trailer:**

The supplier must load mail containers in accordance with truck loading plans provided by USPS. The supplier must maintain the current truck load plan on the dock for ease of reference.

(all emphasis and capitalization in original; omissions and alterations added).

Furthermore, Part II of the SOW included Section 7.0, titled "**Dock Operation**," (emphasis in original), which stated in part:

Platform Leads and Expediters must insure [sic] that the right mail is on the right truck at the right time.

The supplier must make every attempt to expedite the movement of the trucks from yard, to the dock, verification of the driver's information, truck information and contents, unloading and loading (if required), and the dispatching of the trucks from the dock door and yard to the roadway.

> The supplier will be responsible for having dock operations and personnel during all times of the CTHO operational hours to support the arrival and departure of trucks from USPS facilities both local and nationwide.
>
> Dock personnel must be adequate to support the timely and expeditious movement of mail to and from the staging lanes onto the trucks. Any transportation delays that results with an issuance of a PS 5466 (Late Slip), the burden for the cost will be the responsibility of the supplier during the payment reconciliation process.
>
> . . .
>
> The supplier must dispatch departing trucks at the scheduled departure times listed in the transportation schedules provided by the USPS. Any deviation from the schedule must be approved by the onsite USPS representative(s) prior to the truck departure.

(capitalization in original; alteration and omission added). Part II of the SOW also included Section 7.2, titled "**Staging of Mail for Transportation**," (emphasis in original), which stated: "The supplier will be responsible for identifying specific lanes on the workroom floor for the staging of mail for dispatch. Each destination is to have a specific lane. Appropriate signage must be used to identify the mail being staged for dispatch." Part II of the SOW also included Section 7.5, titled "**Unloading Truck/Trailers**," (emphasis in original), which contained the following: "All containers will be unloaded from inbound trucks/trailers. Based on the information found on the placard, containers will either be cross docked to the appropriate truck/staging lane or will be taken to the appropriate operation within the CTHO facility." Part II of the SOW also included Section 7.6, titled "**Loading Truck/Trailers**," (emphasis in original), which contained the following: "The supplier will load the correct containers onto the appropriate truck/trailer for dispatch to the correct USPS facility. These containers were either cross docked from another truck, or were from an operation within the CTHO facility."

Part III of the SOW was titled "**OTHER REQUIREMENTS**." (capitalization and emphasis in original). Part III of the SOW included the following pertinent sections:

> **1.0 Capital Metro Atlanta District Transportation Schedules & Distribution Matrix:**
>
> The supplier must adhere to the schedules provided. The supplier will be required to load/unload & process mail for/from late arriving/departing vehicles. The supplier is expected to move all available mail on the first available transportation.
>
> The Postal Service will provide a surface transportation schedule/matrix of trucks between the CTHO and designated nationwide USPS destinations. USPS Highway Contract Route (HRC) schedules will be provided to the suppliers before the start of the contract. HCRs are the USPS contracted tractor trailers.

The surface transportation schedule will include Postal Vehicle Service (PVS) transportation schedules. PVS is USPS owned trucks.

**2.0 Required Sorts**

The supplier will be required to sort all mail affixed with a strip label or individual unit pieces in accordance with the distribution plan provided by the Postal Service.

**3.0 Package Scanning**

The Postal Service expects 98% OEN (Origin Enroute) package scanning for all parcels and mail that contains a readable bar-coded identifier. USPS will provide the scanners and supporting equipment. Training will be provided for the use of the scanner. The supplier will be responsible for ensuring that all scan data is tracked and uploaded into the Postal SV system daily.

**Scanning Performance**: The payments due to the Supplier under this contract will be reduced by $7,500 for each week (Saturday-Friday) over which the supplier does not achieve an OEN (Origin Enroute) score of 98% or better. The CTHO liaison will provide the weekly score to the supplier for discussion.

**OEN Calculation**: The OEN will be calculated by dividing the number of pieces that the supplier scans by the number of pieces tendered to the supplier.

. . .

**4.0 Volume of Mail for Peak Operation**

The volume of mail to be processed at the CTHO by the supplier is provided in **<u>Attachment E, titled "Volume Data – 2017 and 2018 Projected</u>."**

This attachment provides the day and the number of MTEs received every day in Peak 2017.

Each type of MTE contains mail and has a conversion factor (# of pieces of mail by MTE). For instance, an APC [All Purpose Container] conversion factor is 200 pieces.

. . .

The volume projected for Dec. 2018 is expected to increase by 10% from Dec. 2017. The supplier is expected to consider this increase for proposal submission purposes.

The supplier must be capable of sorting, transferring to the trailers, and cross docking MTEs to the trailers, up to the total forecasted daily capacity.

(all emphasis in original; alteration and omissions added).

Part III of the SOW also included a "**LIST OF ACRONYMS & DEFINITIONS**," (capitalization and emphasis in original), which defined some terms relevant to the dispute currently before the court, including the capitalized terms "Dispatch Performance," "Distribution Accuracy," "Quality Dispatch," "Service Standards," "Staging of Mail," and "Transportation Network." "Dispatch Performance" was defined as "[t]he execution and completion of appointed duties ensuring that processed volumes are actually moved as planned," and "Distribution Accuracy" was defined as "[t]o precisely separate and consolidate inbound and outbound mail volumes in accordance with requirements established by the USPS." (alterations added). "Quality Dispatch" was defined as "the USPS procedure of correctly making timely dispatches, ensuring that the mail is properly labeled, and containers properly placarded and loaded in order to be transported on the planned transportation to its final destination to meet service standards," and "Service Standards" were defined as "the amount of time in which the USPS has to collect, process, transport and deliver a piece of mail." "Staging of Mail" was defined as "[h]olding mail in a secure area until it can be transported by the contractor or picked up by the Postal Service or another Postal Service contractor," and "Transportation Network" was defined as "[t]ransportation of mail by a highway contract route (HCR) using a hub-and-spoke system to transport, transfer and sort mail from origin and destination pairs." (alterations added). Significantly, as indicated above, the lowercase terms "dispatch," "dispatching," and "dispatched" were not defined in the SOW, in the Master Contract, or elsewhere in the CTHO Contract.

As indicated above, the Master Contract also included an "Attachment E - Volume Data 2017 and FY19 – 22 Projected," which indicated the actual volume of mail processed at the CTHO facility per day in fiscal year 2017, and the projected volumes of mail to be processed at the CTHO facility per day in fiscal year 2018, fiscal year 2019, fiscal year 2020, fiscal year 2021, and fiscal year 2022, respectively. Attachment E contained the following table.

**<u>Attachment E - Volume Data 2017 and FY19 – 22 Projected</u>**

| Date | Actual FY 17 | Project FY 17 | Date | Project FY18 | Crossdock | Date | Project FY19 | Crossdock | Date | Project FY20 | Crossdock | Date | Project FY21 | Crossdock | Date | Project FY22 | Crossdock |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/27/17 | 515,763 | 403,477 | 11/26/18 | 517,181 | 248 | 11/29/19 | 279,216 | 272 | 11/27/2020 | 307,138 | 299 | 11/29/2021 | 337,851 | 329 | 11/28/2022 | 371,636 | 362 |
| 11/28/17 | 628,137 | 590,222 | 11/27/18 | 639,669 | 248 | 11/30/19 | 335,059 | 272 | 11/28/2020 | 368,565 | 299 | 11/30/2021 | 405,421 | 329 | 11/29/2022 | 445,964 | 362 |
| 11/29/17 | 599,369 | 528,054 | 11/28/18 | 608,221 | 248 | | | | 11/29/2020 | | | 12/1/2021 | 574,651 | 329 | 11/30/2022 | 632,116 | 362 |
| 11/30/17 | 437,380 | 406,185 | 11/29/18 | 431,744 | 248 | 12/2/19 | 568,899 | 272 | 11/30/2020 | 625,789 | 299 | 12/2/2021 | 551,591 | 329 | 12/1/2022 | 606,750 | 362 |
| 12/1/17 | 421,486 | 416,375 | 11/30/18 | 414,419 | 248 | 12/3/19 | 703,635 | 272 | 12/1/2020 | 773,999 | 299 | 12/3/2021 | 337,851 | 329 | 12/2/2022 | 371,636 | 362 |
| 12/2/17 | 274,159 | 244,224 | 12/1/18 | 253,833 | 248 | 12/4/19 | 669,043 | 272 | 12/2/2020 | 735,947 | 299 | 12/4/2021 | 405,421 | 329 | 12/3/2022 | 445,964 | 362 |
| 12/3/17 | | | | | | 12/5/19 | 474,918 | 272 | 12/3/2020 | 522,410 | 299 | 12/5/2021 | | | 12/4/2022 | | |
| 12/4/17 | 540,864 | 594,710 | 12/3/18 | 522,741 | 248 | 12/6/19 | 455,860 | 272 | 12/4/2020 | 501,446 | 299 | 12/6/2021 | 688,368 | 329 | 12/5/2022 | 757,205 | 362 |
| 12/5/17 | 547,579 | 442,199 | 12/4/18 | 551,864 | 248 | 12/7/19 | 304,599 | 272 | 12/5/2020 | 335,059 | 299 | 12/7/2021 | 851,398 | 329 | 12/6/2022 | 936,538 | 362 |
| 12/6/17 | 432,167 | 356,127 | 12/5/18 | 425,949 | 248 | | | | 12/6/2020 | | | 12/8/2021 | 809,542 | 329 | 12/7/2022 | 890,496 | 362 |
| 12/7/17 | 464,696 | 416,160 | 12/6/18 | 461,518 | 248 | 12/9/19 | 575,015 | 272 | 12/7/2020 | 632,517 | 299 | 12/9/2021 | 574,651 | 329 | 12/8/2022 | 632,116 | 362 |
| 12/8/17 | 458,624 | 445,536 | 12/7/18 | 454,990 | 248 | 12/10/19 | 607,050 | 272 | 12/8/2020 | 667,755 | 299 | 12/10/2021 | 551,591 | 329 | 12/9/2022 | 606,750 | 362 |
| 12/9/17 | 206,673 | 265,932 | 12/8/18 | 182,340 | 248 | 12/11/19 | 468,543 | 272 | 12/9/2020 | 515,397 | 299 | 12/11/2021 | 368,565 | 329 | 12/10/2022 | 405,421 | 362 |
| 12/10/17 | | | | | | 12/12/19 | 507,669 | 272 | 12/10/2020 | 558,436 | 299 | 12/12/2021 | | | 12/11/2022 | | |
| 12/11/17 | 786,894 | 547,822 | 12/10/18 | 812,714 | 248 | 12/13/19 | 500,489 | 272 | 12/11/2020 | 550,538 | 299 | 12/13/2021 | 695,768 | 329 | 12/12/2022 | 765,345 | 362 |
| 12/12/17 | 630,913 | 520,402 | 12/11/18 | 642,695 | 248 | 12/14/19 | 218,808 | 272 | 12/12/2020 | 240,689 | 299 | 12/14/2021 | 734,531 | 329 | 12/13/2022 | 807,984 | 362 |
| 12/13/17 | 582,204 | 419,893 | 12/12/18 | 589,602 | 248 | | | | 12/13/2020 | | | 12/15/2021 | 566,937 | 329 | 12/14/2022 | 623,631 | 362 |
| 12/14/17 | 559,995 | 433,184 | 12/13/18 | 565,394 | 248 | 12/16/19 | 893,985 | 272 | 12/14/2020 | 983,384 | 299 | 12/16/2021 | 614,279 | 329 | 12/15/2022 | 675,707 | 362 |
| 12/15/17 | 625,423 | 457,018 | 12/14/18 | 636,711 | 248 | 12/17/19 | 707,564 | 272 | 12/15/2020 | 778,320 | 299 | 12/17/2021 | 605,592 | 329 | 12/16/2022 | 666,151 | 362 |
| 12/16/17 | 374,376 | 349,865 | 12/15/18 | 363,069 | 248 | 12/18/19 | 648,562 | 272 | 12/16/2020 | 713,418 | 299 | 12/18/2021 | 264,758 | 329 | 12/17/2022 | 291,233 | 362 |
| 12/17/17 | | | | | | 12/19/19 | 621,933 | 272 | 12/17/2020 | 684,126 | 299 | 12/19/2021 | | | 12/18/2022 | | |
| 12/18/17 | 929,415 | 716,849 | 12/17/18 | 938,650 | 248 | 12/20/19 | 700,382 | 272 | 12/18/2020 | 770,420 | 299 | 12/20/2021 | 1,081,722 | 329 | 12/19/2022 | 1,189,894 | 362 |
| 12/19/17 | 689,141 | 442,068 | 12/18/18 | 706,163 | 248 | 12/21/19 | 399,375 | 272 | 12/19/2020 | 439,313 | 299 | 12/21/2021 | 856,152 | 329 | 12/20/2022 | 941,768 | 362 |
| 12/20/17 | 531,940 | 358,415 | 12/19/18 | 534,814 | 248 | | | | 12/20/2020 | | | 12/22/2021 | 784,760 | 329 | 12/21/2022 | 863,236 | 362 |
| 12/21/17 | 397,463 | 321,835 | 12/20/18 | 388,334 | 248 | 12/23/19 | 575,515 | 272 | 12/21/2020 | 633,067 | 299 | 12/23/2021 | 752,539 | 329 | 12/22/2022 | 827,793 | 362 |
| 12/22/17 | 422,812 | 460,000 | 12/21/18 | 415,865 | 248 | 12/24/19 | 306,077 | 272 | 12/22/2020 | 336,685 | 299 | 12/24/2021 | 847,462 | 329 | 12/23/2022 | 932,208 | 362 |
| | 12,057,468 | 10,136,552 | | 12,058,480 | 5,693 | | 11,522,196 | 5,989 | | 12,674,416 | 6,588 | | 14,261,401 | 7,575 | | 15,687,541 | 8,332 |

On November 19, 2021, the USPS issued a delivery order for Fiscal Year 2022, which is the fiscal year performance at issue in the above captioned case. (the FY22 Delivery Order). The FY22 Delivery Order stated that it was GXO's "notice to proceed to provide services for the Peak Annex services in accordance with the master Indefinite Delivery Indefinite Quantity (IDIQ) contract 5CLOSV-19-B-001 for Atlanta, GA for FY22."

The FY22 Delivery Order was signed by USPS Contracting Officer Antoine L. Slaughter.[14] The FY22 Delivery Order indicated a period of performance from November 1, 2021 to October 31, 2022, and was Firm Fixed Price (FFP) by unit. The FY22 Delivery Order included five Contract Line Item Numbers (CLINs). Pursuant to CLIN 0001, the FY22 Delivery Order allocated a total of $5,055,600.00 in funding for “Fixed Facility Cost (Rent).” Pursuant to CLIN 0002 and CLIN 0002a, the FY22 Delivery Order allocated a total of $4,628,940.00 and $1,064,184.00, respectively, in funding for “Other Direct Facility Costs” like equipment, maintenance, utilities, and insurance. Pursuant to CLIN 0003, the FY22 Delivery Order allocated a total of $2,296,323.00 in funding for “Facility Start Up Cost.” CLINs 0004 and 0005 involved funding for GXO’s processing of mail. Pursuant to CLIN 0004, the FY22 Delivery Order indicated that the number of cross dock scan containers[15] was estimated to be 50,400 containers, with a unit price of $3.4327 per container of mail, and allocated a total of $173,008.08 in funding. Pursuant to CLIN 0005, the FY22 Delivery Order indicated that the number of working mail was estimated to be 26,500,000 pieces of mail for the fiscal year 2022 period of performance, with a unit price of $2.1108 per piece of mail, and allocated a total of $55,936,200.00 in funding. In all, the five CLINs in the FY22 Delivery Order indicated a total contract value of $69,154,255.08.

According to the FY22 Delivery Order, “all variable CLIN quantities are estimated based on forecasted volumes, and are not guaranteed.” The FY22 Delivery Order also stated: “The applicable contract attachments (issued with the master contract) are hereby incorporated into this delivery order.” The FY22 Delivery Order further stated that all other contract terms and conditions remained unchanged from the Master Contract.

On November 22, 2021, three days after the FY22 Delivery Order had been issued, USPS Contracting Officer Antoine Slaughter sent an email to GXO updating the estimated volume of mail listed in Attachment E of the Master Contract for the period November 27, 2021 to December 26, 2021, which was part of the fiscal year 2022 operational period of performance. Contracting Officer Slaughter’s November 22, 2021 email included the following table with the new estimated volume of mail for November 27, 2021 through December 26, 2021.

[14] The court notes that, over the course of GXO’s performance under the CTHO Contract, multiple individuals served as the Contracting Officer for the CTHO Contract, including, as relevant to the dispute currently before the court, Mr. Antoine L. Slaughter, Ms. Kiaira Stallworth, and Ms. Radiah Johnson-Bryant.

[15] According to the parties’ Joint Statement of Facts, “cross dock scan” refers to mail received at the Platform Inbound that was not processed by GXO through the Primary or Secondary Bullpens but, instead, was immediately moved to Platform Outbound to await pick up by an outbound truck.

**Estimated Volume of Mail for November 27, 2021 through December 26, 2021 Pursuant to Contracting Officer Slaughter's November 22, 2021 Email**

| DATE | DOW | 2022 ESTIMATE |
|---|---|---|
| 27-Nov | SAT | 195,998 |
| 28-Nov | SUN | 56,051 |
| 29-Nov | MON | 224,203 |
| 30-Nov | TUE | 212,993 |
| 1-Dec | WED | 206,603 |
| 2-Dec | THU | 206,603 |
| 3-Dec | FRI | 206,603 |
| 4-Dec | SAT | 194,795 |
| 5-Dec | SUN | 56,051 |
| 6-Dec | MON | 254,785 |
| 7-Dec | TUE | 243,046 |
| 8-Dec | WED | 236,355 |
| 9-Dec | THU | 236,355 |
| 10-Dec | FRI | 236,355 |
| 11-Dec | SAT | 203,989 |
| 12-Dec | SUN | 58,696 |
| 13-Dec | MON | 352,625 |
| 14-Dec | TUE | 334,993 |
| 15-Dec | WED | 324,944 |
| 16-Dec | THU | 324,944 |
| 17-Dec | FRI | 324,944 |
| 18-Dec | SAT | 306,372 |
| 19-Dec | SUN | 88,156 |
| 20-Dec | MON | 267,140 |
| 21-Dec | TUE | 253,783 |
| 22-Dec | WED | 246,169 |
| 23-Dec | THU | 246,169 |
| 24-Dec | FRI | 246,169 |
| 25-Dec | SAT | 0 |
| 26-Dec | SUN | 123,085 |

After receiving this revised forecast from Contracting Officer Slaughter, GXO confirmed with the USPS that the estimates for December 24, 2021 and December 26, 2021 should read as zero to account for the fact that, per the SOW, GXO would not be processing mail on those days. Subsequently, on December 21, 2021, USPS Contracting Officer Kiaira Stallworth provided GXO with a new updated estimated volume of mail for the period December 27, 2021 through February 16, 2022. The new estimated volume of mail provided to GXO by email on December 21, 2021 is listed in the following table.

**Estimated Volume of Mail for December 27, 2021 through February 16, 2022 Pursuant to Contracting Officer Stallworth's December 21, 2021 Email**

| Projection | | |
|---|---|---|
| FY2022 | Days | Volumes |
| 12/26/2021 | SUN | - |
| 12/27/2021 | MON | 141,626 |
| 12/28/2021 | TUE | 112,012 |
| 12/29/2021 | WED | 113,079 |
| 12/30/2021 | THU | 101,415 |
| 12/31/2021 | FRI | - |
| 1/1/2022 | SAT | - |
| 1/2/2022 | SUN | 29,710 |
| 1/3/2022 | MON | 149,411 |
| 1/4/2022 | TUE | 218,439 |
| 1/5/2022 | WED | 166,966 |
| 1/6/2022 | THU | 137,912 |
| 1/7/2022 | FRI | 141,848 |
| 1/8/2022 | SAT | 101,439 |
| 1/9/2022 | SUN | 48,305 |
| 1/10/2022 | MON | 146,347 |
| 1/11/2022 | TUE | 164,483 |
| 1/12/2022 | WED | 142,757 |
| 1/13/2022 | THU | 121,171 |
| 1/14/2022 | FRI | 140,691 |
| 1/15/2022 | SAT | 97,110 |
| 1/16/2022 | SUN | 46,243 |
| 1/17/2022 | MON | 98,070 |
| 1/18/2022 | TUE | 147,410 |
| 1/19/2022 | WED | 163,134 |
| 1/20/2022 | THU | 130,340 |
| 1/21/2022 | FRI | 121,765 |
| 1/22/2022 | SAT | 78,051 |
| 1/23/2022 | SUN | 37,167 |
| 1/24/2022 | MON | 123,555 |
| 1/25/2022 | TUE | 144,229 |
| 1/26/2022 | WED | 132,896 |
| 1/27/2022 | THU | 106,552 |
| 1/28/2022 | FRI | 118,149 |
| 1/29/2022 | SAT | 74,041 |
| 1/30/2022 | SUN | 35,258 |
| 1/31/2022 | MON | 134,887 |
| 2/1/2022 | TUE | 145,963 |
| 2/2/2022 | WED | 149,126 |
| 2/3/2022 | THU | 119,145 |
| 2/4/2022 | FRI | 152,649 |
| 2/5/2022 | SAT | 80,171 |
| 2/6/2022 | SUN | 38,177 |
| 2/7/2022 | MON | 141,847 |
| 2/8/2022 | TUE | 151,716 |
| 2/9/2022 | WED | 140,520 |
| 2/10/2022 | THU | 137,275 |
| 2/11/2022 | FRI | 112,919 |
| 2/12/2022 | SAT | 67,419 |
| 2/13/2022 | SUN | 32,105 |
| 2/14/2022 | MON | 123,328 |
| 2/15/2022 | TUE | 141,851 |
| 2/16/2022 | WED | 148,044 |

According to a December 15, 2021 email from Mr. Charles Sinnah-Yovonie, an Operations Specialist with the USPS Mail Processing Infrastructure & Optimization team, sent to Contracting Officer Stallworth, the USPS arrived at the updated fiscal year 2022 estimated volumes of mail by adding a 5% increase to the volume of mail that was processed at a different USPS facility in fiscal year 2019. Although Contracting Officer Slaughter's November 22, 2021 email and Contracting Officer Stallworth's December 21, 2021 email appear to have changed the estimated amount of work to be performed by GXO during the fiscal year 2022 operational period, there is no indication in the record currently before the court that the parties executed a formal contract modification to reflect those changes.[16] Nor is there any indication in the record currently before the court that the parties subsequently modified the FY 2022 Delivery Order to increase the funding for CLIN 0004 or CLIN 0005, which involved funding for GXO's processing of mail.

Following the commencement of performance by GXO pursuant to the FY22 Delivery Order, Contracting Officer Stallworth emailed GXO on February 8, 2022 "to make you [GXO] aware of some of the penalties that were incurred as a result of container delays" during the fiscal year 2022 operational period of performance. (alteration added). Contracting Officer Stallworth's February 8, 2022 email stated that the "penalties" were being imposed pursuant to the "Penalty Provision" located in Part I, Section 2.0 of the SOW. Contracting Officer Stallworth's February 8, 2022 email also stated that, as of January 19, 2022, 3,101 containers of mail had been delayed, which had resulted "in a total of $3,721,200.00 in penalties" against GXO and "this amount is likely to change once the calculations are complete through the rest of the POP." Attached to Contracting Officer Stallworth's February 8, 2022 email was an excel spreadsheet (the original "CTHO Delays By Day" spreadsheet),[17] which was prepared by a USPS employee, Mr. Richard

[16] In GXO's Motion for Summary Judgment, GXO states that "[t]he USPS routinely updated the volume forecast each year," (alteration added), and, in the parties' Joint Statement of Facts, the parties agreed that "[t]he USPS provided GXO with a forecast of the volume of mail GXO could expect to receive each calendar day in Attachment E of the Contract, which was updated periodically." (alteration added). The parties do not, however, address whether Contracting Officer Slaughter's November 22, 2021 email or Contracting Officer Stallworth's December 21, 2021 email should be considered to have formally modified the parties' obligations under the CTHO Contract.

[17] As discussed below, there are two different versions of the "CTHO Delays By Day" spreadsheet in the record currently before the court. First, the original version of the "CTHO Delays By Day" spreadsheet was attached to Contracting Officer Stallworth's February 8, 2022 email and was included with defendant's Cross-Motion for Summary Judgment. Second, as discussed below, a revised version of the "CTHO Delays By Day" spreadsheet (the revised "CTHO Delays By Day" spreadsheet) was attached to Contracting Officer Stallworth's later March 1, 2022 email and was submitted as Exhibit M to GXO's complaint. The parties have agreed that the original version of the "CTHO Delays By Day" spreadsheet submitted by the defendant was an earlier version of the spreadsheet and that the applicable version of the "CTHO Delays By Day" spreadsheet for the purposes of considering the cross-motions for summary judgment currently before

Walker,[18] and which defendant alleges documented any unprocessed mail left in the Secondary Bullpen of the CTHO facility at 4:00 A.M. from November 30, 2021 through January 19, 2022. Specifically, the original "CTHO Delays By Day" spreadsheet indicated that there was unprocessed mail left in the Secondary Bullpen of the CTHO facility at 4:00 A.M. on the following days: November 30, 2021, December 1, 2021, December 2, 2021, December 4, 2021, December 5, 2021, December 10, 2021, December 13, 2021, December 14, 2021, December 19, 2021, December 28, 2021, December 29, 2021, January 5, 2022, January 11, 2022, and January 19, 2022. In total, the original "CTHO Delays By Day" spreadsheet indicated fourteen days on which 3,101 containers of mail were allegedly delayed and indicated "penalties" in the amount of $3,721,000.00.

On March 1, 2022, at 9:09 A.M., Contracting Officer Stallworth sent an email to GXO stating: "Please see the attached spreadsheet updated with the delayed container penalty total. The total containers is 3,286, which equates to $3,943,200.00." Attached to Contracting Officer Stallworth's March 1, 2022 email was the revised "CTHO Delays By Day" spreadsheet, which also was prepared by Mr. Richard Walker, and which is reproduced immediately below.

---

the court is the revised "CTHO Delays By Day" spreadsheet submitted as Exhibit M to GXO's complaint and reproduced in this Opinion below.

[18] The parties' Joint Statement of Facts states that Mr. Richard Walker was, at the time of the events relevant to the above captioned case, a USPS employee "who manually counted the number of containers at approximately 4:00 am each morning" during GXO's performance under the CTHO Contract. Defendant's Cross-Motion for Summary Judgment states that Mr. Walker was "an operations program specialist" and "he was responsible for monitoring GXO's operations performance to ensure that the manual build/break processing operations were being performed in the timely manner required by the CTHO contract." The significance and accuracy of the data and spreadsheets prepared by Mr. Walker, including the original "CTHO Delays By Day" spreadsheet included with defendant's Cross-Motion for Summary Judgment, and the revised "CTHO Delays By Day" spreadsheet included as Exhibit M to GXO's complaint, are heavily disputed by both parties in the case currently before the court.

## Revised "CTHO Delays By Day" Spreadsheet

| CTHO Secondary to be Processed | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| lanes | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 0 | TH8 | Prime | Mixed not in Secondary yet | Container Total | Piece count | NON M | Machineable |
| 11/27/2021 4:00 | | | | | | | | | | | | 0 | - | 0 | 0 |
| 11/29/2021 4:00 | | | | | | | | | | | | 0 | - | 0 | 0 |
| 11/30/2021 4:00 | 94 | 114 | 311 | 154 | 8 | 60 | 79 | 26 | 99 | 104 | 13 | 1062 | 46,303 | 14018 | 32285 |
| 12/1/2021 4:00 | 25 | 43 | 247 | 59 | 58 | 25 | 77 | 12 | 4 | 0 | 0 | 550 | 23,980 | 7260 | 16720 |
| 12/2/2021 4:00 | 0 | 0 | 37 | 0 | 0 | 0 | 0 | 0 | 37 | 0 | 0 | 74 | 3,226 | 977 | 2250 |
| 12/3/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/4/2021 4:00 | 31 | 34 | 57 | 16 | 0 | 30 | 27 | 39 | 19 | 0 | 0 | 253 | 11,031 | 3340 | 7691 |
| 12/5/2021 4:00 | 0 | 0 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 49 | 2,136 | 647 | 1490 |
| 12/6/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/7/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/8/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/9/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/10/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 41 | 1,788 | 541 | 1246 |
| 12/11/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/12/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/13/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 17 | 25 | 1,090 | 330 | 760 |
| 12/14/2021 4:00 | 8 | 44 | 0 | 0 | 0 | 0 | 77 | 38 | 0 | 0 | 22 | 189 | 8,240 | 2495 | 5746 |
| 12/15/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/16/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/17/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/18/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/19/2021 4:00 | 114 | 154 | 0 | 113 | 0 | 35 | 76 | 73 | 0 | 0 | 0 | 565 | 24,634 | 7458 | 17176 |
| 12/20/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/21/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/22/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/23/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/24/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/25/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/26/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/27/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/28/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | 0 | 0 | 33 | 1,439 | 436 | 1003 |
| 12/29/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 87 | 26 | 61 |
| 12/30/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 12/31/2021 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/1/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/2/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/3/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/4/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/5/2022 4:00 | 0 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 62 | 0 | 109 | 4,752 | 1439 | 3314 |
| 1/6/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/7/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/8/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/9/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/10/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/11/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 13 | 567 | 172 | 395 |
| 1/12/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/13/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/14/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/15/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/16/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/17/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/18/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/19/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 61 | 0 | 136 | 5,930 | 1795 | 4134 |
| 1/20/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/21/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/22/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/23/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/24/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/25/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/26/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/27/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/28/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 1/29/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 17 | 741 | 224 | 517 |
| 1/30/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50 | 111 | 0 | 161 | 7,020 | 2125 | 4894 |
| 1/31/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/1/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/2/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/3/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 |
| 2/4/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/5/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/6/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/7/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/8/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 7 | 305 | 92 | 213 |
| 2/9/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/10/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/11/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/12/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/13/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/14/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/15/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/16/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/17/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/18/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| 2/19/2022 4:00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| | | | | | | | | | | | | 3286 | | | |
| | | | | | | | | | | | | $3,943,200.00 | | | |

As illustrated above, the revised "CTHO Delays By Day" spreadsheet identified the number of containers that were allegedly delayed as of 4:00 A.M. on each day between November 30, 2021 and February 19, 2022. Specifically, the revised "CTHO Delays By Day" spreadsheet indicated that there was unprocessed mail left in the Secondary Bullpen of the CTHO facility at 4:00 A.M. on the following days: November 30, 2021, December 1, 2021, December 2, 2021, December 4, 2021, December 5, 2021, December

10, 2021, December 13, 2021, December 14, 2021, December 19, 2021, December 28, 2021, December 29, 2021, January 5, 2022, January 11, 2022, January 19, 2022, January 29, 2022, January 30, 2022, and February 8, 2022. Therefore, in addition to the fourteen days identified in the original "CTHO Delays By Day" spreadsheet, the revised "CTHO Delays By Day" spreadsheet indicated that the USPS also imposed "penalties" against GXO for January 29, 2022, January 30, 2022, and February 8, 2022. In total, the revised "CTHO Delays By Day" spreadsheet indicated seventeen days on which 3,286 containers of mail were allegedly delayed and indicated "penalties" in the amount of $3,943,200.00. According to defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, the revised "CTHO Delays By Day" spreadsheet was prepared by Mr. Walker after he "personally counted the number of containers that remained unprocessed in the primary or secondary sort operations by conducting a visual inspection of the facility at 4 a.m., which was the end of the operational day." The USPS did not provide any other documentation to GXO, and the USPS did not include any other documentation in the record before the court, to substantiate the USPS's imposition of "penalties" against GXO on the days in question.

Also on March 1, 2022, at 12:10 P.M., GXO replied to Contracting Officer Stallworth's February 8, 2022 email and stated that "[a]fter careful consideration of the information provided and our internal records, GXO does not believe any penalties should be applicable due to GXO's performance under the CTHO service agreement with USPS." (alteration added). GXO's March 1, 2022 email is in the record before the court. GXO claimed in the March 1, 2022 email that on twelve of the days on which the USPS alleged there were containers left in the Secondary Bullpen operation at 4:00 A.M., GXO had "received a final report email from Mr. Walker showing that prior to 3:00 A.M., all mail was cleared." With respect to the mail allegedly left in the Secondary Bullpen operation at 4:00 A.M. on November 30, 2021, GXO claimed that it had processed 214,130 pieces of mail before 2:00 A.M., which, according to GXO, exceeded the VAP estimate provided by the USPS by 26% and thus had exceeded the planned volume for that day. GXO further claimed that at 4:00 A.M. on November 30, 2021, the actual volume of received mail was 251,567, which was 18% over the planned volume for that day. Consequently, GXO asserted that "[g]iven the excessive volume, no penalties should be applicable for" November 30, 2021. (alteration added). Regarding the mail allegedly left in the Secondary Bullpen operation at 4:00 A.M. on December 13, 2021, GXO claimed that because "the operation received 4,516 pieces on a late truck after 2:00 A.M, [sic] no penalties should be applicable for 12/13/2021." (alteration added). GXO also stated in its March 1, 2022 email that it disagreed with the "USPS's use of the 1046 hamper conversion rate of 42.5 pieces per container."[19] GXO stated that it understood the appropriate conversion rate

---

[19] According to the SOW, GXO used different types of mail transportation equipment (MTE) to process mail at the CTHO facility. The SOW states that "[e]ach type of MTE contains mail and has a conversion factor (# of pieces of mail by MTE)." (alteration added). According to GXO's certified claim discussed below, "1046 hampers" were used in the Primary Bullpen and had a conversion rate of 42.5 pieces of mail per one "1046 hamper," whereas "All Purpose Containers" (APCs) were used in the Secondary Bullpen and had a conversion rate of 200 pieces of mail per one APC.

should have been the All Purpose Container/General Purpose Mail Container/Eastern Region Mail Container conversion rate of 200 pieces of mail per container. Moreover, in GXO's March 1, 2022 email, GXO acknowledged receiving a separate February 28, 2022 email from the USPS, which is not in the record before the court, but which apparently indicated that the USPS would be withholding payments on GXO invoices "until the penalties for delayed containers has been resolved."

On March 22, 2022, Contracting Officer Stallworth responded to GXO's March 1, 2022 email, stating:

> During CTHO operations, USPS Representative Richard Walker sent hourly emails used by both GXO and USPS operations teams and a final report email after the last truck was dispatched from the facility. Mr. Walker's final report email was not an indication that all mail in the facility was cleared, but rather a status update based on the time it was sent. While GXO may have performed the primary scan, the secondary sort was not performed timely, causing the containers to miss intended transportation and therefore delaying the mail.

Contracting Officer Stallworth also stated in her March 22, 2022 email that "[o]n several occasions with onsite Postal management, it was noted that a lot of mail was left in the secondary sort that did not finalize in time to dispatch." (alteration added). Contracting Officer Stallworth further stated that "[g]enerally, no mail is touched after the CET of 2:00am unless GXO is trying to get ahead for the next day, in which case, once the mail is touched it has to be worked and would be counted as such, requiring primary and secondary sorts." (alteration added). Regarding GXO's conversion rate concern, Contracting Officer Stallworth stated in her March 22, 2022 email that "[a]ccording to Mail Processing,[20] the 1,046 conversion rate of 42.5 pieces per container is the standard rate of measure used to determine the number of containers that missed intended transportation. The conversion rate accounts for containers of mail not the individual pieces." (alteration and footnote added). Contracting Officer Stallworth concluded in her March 22, 2022 email that "[g]iven the above, the penalties will remain as applied. If requested, we can schedule a call to discuss." (alteration added).

On March 25, 2022, GXO responded to the USPS via email and addressed the relevance of Mr. Walker's daily email reports, which are separate from the "CTHO Delays By Day" spreadsheets prepared by Mr. Walker. In the March 25, 2022 email, GXO stated that "GXO does not agree with the Postal Service's assertion that Richard Walker's emails are not relevant to the issues at hand and that the emails do not indicate whether the

[20] The parties submitted a Joint Response to Clarify Terms at the direction of the court following oral argument on the parties' Cross-Motions for Summary Judgment. Both parties agreed that "Mail Processing" referred to "the 'Processing Operations' group at the Postal Service, which is responsible for mail processing performance. With respect to the CTHO this would have referred to personnel in the Southeast Processing organization managed by Sharon Young (Senior Director, Division Processing Operations)."

secondary sort was performed timely." GXO asserted that several of Mr. Walker's emails "explicitly state that secondary was clear on days where the Postal Service is asserting penalties." GXO further stated in its March 25, 2022 email that "[t]he remaining emails show that the operation was winding down prior to the time of the email (demonstrated by number of equipment staged and employees on clock), which indicates that all mail had been successfully cleared." (alteration added). GXO continued, "these emails [from Mr. Walker] are sufficient to refute all claims with the exception of 11/30/2021 and 12/13/2021." (alteration added). GXO also stated in its March 25, 2022 email to the USPS that:

> The spreadsheet provided by the Postal Service asserting penalties for late containers provides only a 4:00AM snapshot of mail alleged to be in secondary sort at that moment in time. The Postal Service has provided no data or documentation to substantiate (i) the information contained in the spreadsheet, or (ii) when the mail shown on the spreadsheet was actually dispatched.

GXO emphasized that "[t]he asserted penalties are based on containers that did not dispatch on time, not on mail in secondary sort, and the spreadsheet provided by the Postal Service does not contain any information regarding dispatch." (alteration added). GXO also stated that "[t]he majority of dispatch times were scheduled after 4:00 A.M., and the Postal Service has provided no evidence as to whether the mail alleged to be in secondary sort as of 4:00 A.M. was actually dispatched late." (alteration added). GXO also emphasized that "actual volume exceeded VAP by 26% on 11/30/2021. Actual volume also exceeded VAP on 12/01/2021 (15%), 12/10/2021 (12%), 12/13/2021 (1%), 12/14/2021 (6%), 12/28/2021 (97%), 12/29/2021 (74%), 1/05/2022 (22%), 01/11/2022 (37%), and 01/19/2022 (29%)." GXO pointed out that "Part III, Section 4.0 of the CTHO Statement of Work provides that 'supplier must be capable of sorting, transferring to the trailers, and cross docking MTEs to the trailers, up to the total forecasted daily capacity.'" Therefore, GXO asserted that "[o]n days when actual volume exceeded VAP, no penalties for late containers should apply." (alteration added).

Regarding the proper container conversion rate, GXO stated in its March 25, 2022 email to the USPS that

> [t]he CTHO Statement of Work does not provide a conversion rate for pieces to containers. The penalty is for containers that are not dispatched on time, and 1046 hampers are only used in the primary department on the inbound side of the CTHO operation to separate scanned mail from working mail. Therefore, the 1046 conversion rate is not appropriate to determine the number of containers (if any) for which the dispatch penalty is applicable.

(alteration added). GXO further explained in its March 25, 2022 email that

> APCs are used in secondary sorting and the containers that are dispatched are 6-foot (double stacked 3-foot) gaylords. The conversion rate should reflect the type of container used on the outbound side of the operation. At a minimum this is the 200 piece per container rate for APCs, but the rate for a 6-foot gaylord (340 pieces, using the 283.3 piece rate for 5-foot gaylords expanded to 6 feet) would be more appropriate.

GXO concluded its March 25, 2022 email by stating that, "[b]ased on the above and GXO's prior email of March 1, 2022, no penalties should be applied, and all outstanding invoices should be paid." (alteration added).

On April 5, 2022, Contracting Officer Stallworth responded to GXO's March 25, 2022 email and maintained that

> Mr. Walker's final report email was not necessarily an indication that all mail in the facility was cleared, but rather a status update based on the time it was sent.[21] Unless specifically stated in the email, receipt of his email does not mean that the facility was clear of mail.

(footnote added). Contracting Officer Stallworth also stated in her April 5, 2022 email:

> [I]t is important to mention that though Mr. Walker's final report email was sent in the early hours of the next day, the content of the email discussed the prior receiving day while the spreadsheet captures the actual day of processing. For example, if mail received on 1/10 was delayed in secondary and wasn't processed through secondary until 1/11, it will show up on the spreadsheet under 1/11. The emails specified in your response dated 12/29/21 and 01/06/2022 indicated that secondary was clear on those days; thus, the postal service <u>did not</u> apply any penalties for those dates, which is shown on the spreadsheet under 12/30/2021 and 1/7/2022.

(emphasis in original; alteration added). Contracting Officer Stallworth further stated that "Mr. Walker's email from 1/11/2022 (see attached)[22] indicated that 13 containers were delayed in secondary sort from mail received on 1/10, which is shown on the spreadsheet under 1/11/2022; thus the Postal Service <u>did</u> apply the penalty for those containers." (emphasis in original; footnote added).

---

[21] As indicated above, according to Contracting Officer Stallworth's earlier March 22, 2022 email to GXO, "[d]uring the CTHO operations, USPS Representative Richard Walker sent hourly emails used by both GXO and USPS operations teams and a final report email after the last truck was dispatched from the facility." (alteration added).

[22] The attachment referenced in Contracting Officer Stallworth's April 5, 2022 email was a January 11, 2022 email from Mr. Walker to GXO purporting to demonstrate that there were thirteen containers of mail delayed in the Secondary Bullpen on January 11, 2022.

Regarding GXO's claim that the USPS could not impose "penalties" for days on which the actual volume of mail processed by GXO exceeded the VAP estimate, Contracting Officer Stallworth stated in her April 5, 2022 email:

> GXO is responsible for handling all volume received prior to 0200 [A.M.]; however, if mail is touched after 0200 [A.M.], it must be worked. The VAP itself is neither a contractual minimum or maximum guaranteed volume, nor is it a daily forecast. The VAP is the amount of volume that is expected to arrive before 0200 [A.M.] in order to ensure timely clearance each night. As such, exceeding the VAP does not excuse the application of penalties because GXO is still responsible for handling all volume received prior to 0200 [A.M.]. The restatement of Part III, Section 4.0 of the CTHO Statement of Work is in relation to the supplier's capability to sort, transfer, and crossdock [sic] of MTE based on a forecasted daily capacity, not the VAP.

(alterations added). With respect to the issue of the proper container conversion rate, Contracting Officer Stallworth stated in her April 5, 2022 email the following:

> [T]he use of a conversion rate is irrelevant to the count of containers. In the [original "CTHO Delays By Day"] spreadsheet, the sums shown in column 'M' (Container Total) are the sums of the hourly container counts shown in columns 'B' through 'K' for the respective rows. There are no formulas in the cells in those rows to show a conversion. Though the spreadsheet provides a piece count in column 'N', the piece count is not a factor in calculating the penalties because the total penalties are calculated based on the sum of column 'M', not a conversion of pieces to containers.

(alterations added).

In response to GXO's assertion that the USPS had provided no data or documentation to substantiate the information contained in the original "CTHO Delays By Day" spreadsheet prepared by Mr. Walker, or to demonstrate when the mail identified in the original "CTHO Delays By Day" spreadsheet was actually "dispatched," Contracting Officer Stallworth's April 5, 2022 email stated:

> [T]he penalties were applied to secondary sort delays and aging primary that did not make its intended transportation (not dispatched on time). As you know, the CTHO does not use scannable MTEL [Mail Transport Equipment Labeler] on the containers staged in the secondary sort. Each hour, Mr. Walker did a physical inventory of the aging primary containers and containers in secondary that did not meet their intended transportation. The mail missed its intended transportation (not dispatched on time) because it was not processed timely either out of primary or secondary. GXO's onsite staff were aware of Mr. Walkers [sic] duty to count the containers and regularly observed him performing them. Numerous conversations were had between GXO and onsite Postal management

> about the delayed mail in the secondary sort. This was a known issue and the recent penalty communications are not GXO's first notification of such issues. The penalty requirements in the SOW have been there since the contract's inception.

(alterations added). Contracting Officer Stallworth concluded her April 5, 2022 email by stating that "the penalties will remain as applied."

On April 12, 2022, Contracting Officer Stallworth emailed GXO to inform GXO that if the USPS did not receive a response regarding the "penalties" by close of business on Friday, April 22, 2022, the USPS would "begin to make deductions in the amount owed." On April 21, 2022, GXO responded by email and stated:

> [T]he spreadsheet provided by the Postal Service shows only a 4:00 A.M. snapshot of mail alleged to be in secondary sort at that moment in time. The CTHO operation did not shut down at 4:00 A.M., and the Statement of Work does not connect any 4:00 A.M. milestones to the asserted penalty. In fact, the majority of dispatch times were scheduled after 4:00 A.M. (please see the attached transportation schedule). The spreadsheet does not indicate when the mail alleged to be in secondary sort at 4:00 A.M. was scheduled to be dispatched or whether that mail actually was or was not dispatched on time, and therefore does not support application of the asserted penalties. As the Postal Service has provided no other supporting evidence, without additional data or documentation to substantiate (i) the information contained in the spreadsheet, or (ii) when the mail shown on the spreadsheet was actually dispatched, GXO cannot accept the application of the asserted penalties.
>
> Based on the above and GXO's prior emails of March 1, 2022 and Mach [sic] 25, 2022, no penalties should be applied, and all outstanding invoices should be paid without delay. If the Postal Service continues to withhold payments, GXO will be forced to pursue payment of the past due invoices through the contract's formal claims and disputes process.

(alteration added).

On April 29, 2022, Contracting Officer Stallworth emailed GXO and stated that, "[b]ased on the discussions between both parties' executive leadership, the decision has been made to move forward with the deductions for the penalties." (alteration added). Accordingly, on May 9, 2022, the USPS issued a "Credit Memo" (the May 9, 2022 Credit Memo) against GXO's account in the USPS's iSupplier system in the amount of $3,943,200.00 based on alleged delays of 3,286 containers between November 30, 2021 and February 19, 2022. The USPS relied on the revised "CTHO Delays By Day" spreadsheet in an attempt to substantiate the number of allegedly delayed containers of mail and to calculate the $3,943,200.00 in "penalties" assessed against GXO. Pursuant to the May 9, 2022 Credit Memo, the USPS refused to pay three outstanding GXO

invoices under the CTHO Contract and withheld a total of $3,843,787.40 for work performed during the fiscal year 2022 operational period of performance as follows:

| Invoice | Invoice Date | Amount Withheld | PO Number |
|---|---|---|---|
| 41015022022 | February 18, 2022 | $1,666,588.40 | 5CLOSV-22-C-0006 |
| 41015022021 | February 25, 2022 | $1,667,217.00 | 5CLOSV-22-C-0006 |
| 41015022031 | March 29, 2022 | $509,982.00 | 5CLOSV-22-C-0006 |

In order to reach the $3,943,200.00 in "penalties" imposed against GXO under the CTHO Contract, the USPS also withheld payments totaling $99,412.60 from the following two outstanding GXO invoices under the "Salt Lake STC [Surface Transfer Center] Contract,"[23] (alteration added), which was under a separate IDIQ and Delivery Order.

| Invoice | Invoice Date | Amount Withheld | PO Number |
|---|---|---|---|
| 41014922041 | April 18, 2022 | $64,427.22 | 5CLOSV-21-C-0019 |
| 41014922042 | April 18, 2022 | $34,985.38 | 5CLOSV-21-C-0019 |

On May 25, 2022, GXO submitted a certified claim to Contracting Officer Stallworth to challenge the imposition of "penalties" by the USPS under the CTHO Contract. GXO requested that the USPS reverse the $3,943,200.00 amount in the May 9, 2022 Credit Memo and order "payment in full of all invoices due for services rendered to the Postal Service and which have not been paid according to the Postal Service's contractual obligations." In its certified claim, GXO argued that the USPS's allegation "that 3,286 containers failed to dispatch on time over the course of the 2021-2022 operating period, resulting in an asserted penalty of $3,943,200 (3,286 x $1,200 = $3,943,200)," was incorrect.[24] GXO claimed that "GXO timely performed under the Agreement." In an attempt to support its timely performance claim, GXO asserted that, "[o]n March 1, 2022, GXO provided records showing that on 12 of the 14 days GXO's performance was

[23] The "Salt Lake STC Contract" was a separate contract between GXO and the USPS for Surface Transfer Center services in Salt Lake City, Utah. The Salt Lake STC Contract is not a part of the GXO's claim currently before the court, but is relevant to the above captioned case because the USPS withheld some of the payments due to GXO under the Salt Lake STC Contract in order to satisfy the $3,943,200.00 in "penalties" imposed under the CTHO Contract.

[24] GXO also argued in its certified claim that even if the USPS were factually and contractually able to impose a "penalty" against GXO, the "penalty" amount the USPS imposed was not properly calculated because USPS had used the incorrect mail to container conversion rate. In her final decision, Contracting Officer Stallworth determined that the "penalties" assessed by USPS were not based on a conversion rate, but on the actual number of containers left in secondary sorting at 4:00 A.M. and, thus, "penalties" were correctly calculated.

purportedly untimely, it had, in fact timely performed." (alteration added).[25] GXO continued to allege in its certified claim that, despite these "records," the USPS "has maintained its position based solely on a spreadsheet allegedly showing mail in the operation's secondary sortation area at 4:00 A.M. each day." GXO argued that "[w]hether mail is in a secondary sort at 4:00 A.M. does not show that GXO failed to dispatch the mail on time because records show most of the operation's scheduled dispatch times were after 4:00 A.M." (emphasis in original; alteration added). GXO, therefore, argued that it had timely performed under the CTHO Contract and the USPS's imposition of "penalties" was improper.

Moreover, GXO argued in its certified claim that "to the extent (if any) containers were not timely dispatched, the Postal Service cannot contractually assess penalties against GXO" for six of the days[26] on which the USPS asserted "penalties" because, on those days, actual volumes of mail processed by GXO exceeded the forecasted daily capacity, and thus, according to GXO, exceeded the amount of mail GXO was contractually required to process. Specifically, GXO argued in its certified claim that "[o]n six of the days on which the Postal Service assessed penalties, actual volumes exceeded the forecasted daily capacity – (11/30/2021 (18%); 12/29/2021 (58%); 01/11/2022 (45%); 01/19/2022 (40%); 01/29/2022 (24%); and 02/08/2022 (13%)) – accounting for 1,237 of the claimed 3,286 penalized containers." (alteration added). GXO noted that, pursuant to Part III, Section 4.0 of the SOW, "[t]he Agreement provides that GXO must process mail within the daily forecasted volume." (alteration added). GXO also stated in its certified claim that "[t]he Postal Service provided GXO with several updates to the forecasted daily capacity, the most recent of which are enclosed." (alteration added).[27]

---

[25] In a footnote in GXO's certified claim, GXO stated that it "continues to dispute that it was untimely on any of the days on which the Postal Service has assessed penalties," despite, as mentioned above, only specifically addressing the timeliness for twelve days with purported delays in the body of its certified claim. The remaining two days not specifically addressed by GXO were November 30, 2021 and December 13, 2021. GXO, however, does address November 30, 2021 later in its certified claim with respect to GXO's argument that the USPS cannot assess "penalties" against GXO for the days on which the actual volumes of mail processed by GXO exceeded the forecasted daily capacity.

[26] Although, as indicated above, GXO alleged in its certified claim that actual volumes of mail processed by GXO exceeded the forecasted daily capacity on six of the days on which the USPS assessed "penalties" against GXO, GXO asserts in its submissions to this court that actual volumes of mail exceeded the forecasted daily capacity on only four, not six, of the days on which the USPS assessed "penalties:" November 30, 2021, December 29, 2021, January 11, 2022, and January 19, 2022. Therefore, in the case currently before the court, GXO does not appear to be arguing that the actual volumes of mail exceeded the forecasted daily capacity on January 29, 2022 or February 8, 2022.

[27] The court notes, however, that the copy of GXO's certified claim in the record currently before the court does not appear to include, as an enclosure, Contracting Officer

On September 30, 2022, Contracting Officer Stallworth issued a Contracting Officer's Final Decision, which denied GXO's certified claim in full. In the Contracting Officer's Final Decision, Contracting Officer Stallworth determined that GXO had failed to sufficiently support its allegation that its performance was timely. Contracting Officer Stallworth stated:

> First, in response to GXO's allegation of timely performance, the Postal Service daily submitted hour-by-hour reports detailing the container count in the various processing areas of the operation. This report was sent to various GXO and Postal staff. The report submitted for 04:00 [A.M.] would include the count of delayed containers in the various areas of processing. GXO never contested these hour-by-hour reports, and furthermore, they were used regularly by GXO staff in managing the operation.
>
> Additionally, these reports served as the basis of numerous discussions that the Postal Service had with GXO, specifically on the condition of the secondary-sort operation. At approximately 03:15 [A.M.] daily, GXO's labor resources were either sent home or moved to other areas of the operations, away from the secondary sort. This meant that any containers not processed by the time the Postal Service's container count was completed by 04:00 [A.M.] each day were not going to be processed, and indeed were not processed. Thus, any mail in these unprocessed containers in the staging areas at 04:00 [A.M.] would not make its way onto its truck, regardless of when that truck was scheduled to depart the facility. This left-behind mail was delayed.

(alterations added). Contracting Officer Stallworth further determined that GXO had "provided no evidence with its Claim that it actually timely performed the work for which it seeks money." Contracting Officer Stallworth continued, "[g]iven that containers were left behind and not processed in both the primary and secondary sort, resulting in delayed mail, GXO did not provide timely performance and the Postal Service properly assessed penalties." (alteration added).

In the Contracting Officer's Final Decision, Contracting Officer Stallworth also determined that the USPS could, and did, properly assess "penalties" for the days on which the actual volume of mail processed by GXO exceeded the forecasted volume of mail. When making this determination, Contracting Officer Stallworth relied on the language in Section 4.0 of Part III of the SOW, which, according to Contracting Officer Stallworth, "refers to estimates, not guarantees." Contracting Officer Stallworth also noted that the Schedule of Services in the FY22 Delivery Order stated: "'<u>[p]lease note that all variable CLIN quantities are estimated based on forecasted volumes, and are not</u>

---

Slaughter's November 22, 2021 email, Contracting Officer Stallworth's December 21, 2021 email, discussed above, or any other USPS-provided document updating the forecasted daily capacity of mail.

guaranteed.'" (alteration and emphasis in Contracting Officer's Final Decision). Therefore, Contracting Officer Stallworth continued:

> [T]he volumes provided are not guaranteed to the supplier and can vary, up or down. It is the supplier's responsibility to allocate the necessary resources to provide timely performance and maintain the operation under this Contract.
>
> Furthermore, GXO failed to include a key provision of Part III, Section 4.0. The SOW warns suppliers that "(t)he volume projected is expected to increase by 10% from year-to-year. The supplier is expected to consider this increase for proposal purposes."[28] The estimates referred to in the SOW are from 2017-18. The Contract went into effect for the 2018-19 fiscal year (FY19). Thus, FY22 was the fourth year of performance. Ten percent year-over-year growth beginning with estimates from 2017-18 means the FY22 volume complained of by GXO in its Claim was specifically contemplated by the Contract, even in estimate form. GXO was expected to take it into account, price its services accordingly, and perform timely using the necessary resources.

(first alteration and footnote added). Therefore, Contracting Officer Stallworth denied GXO's certified claim in full.

On December 12, 2022, GXO filed its complaint in the United States Court of Federal Claims. Defendant filed its answer and the parties subsequently engaged in, and completed, a lengthy fact discovery period.[29] As indicated above, after the close of discovery, both parties filed Cross-Motions for Summary Judgment pursuant to RCFC 56.[30]

---

[28] The court notes that the language quoted by Contracting Officer Stallworth in her Contracting Officer's Final Decision is somewhat different than the language provided in the SOW. The relevant sentence in the SOW reads as follows: "The volume projected for Dec. 2018 is expected to increase by 10% from Dec. 2017. The supplier is expected to consider this increase for proposal submission purposes."

[29] The court notes that the parties filed multiple joint motions to extend the period of fact discovery in the case currently before the court to resolve various issues related to the production of documents and the scheduling of depositions.

[30] Oddly, GXO states in its Motion for Summary Judgment that it is "presenting three distinct questions" and also that "[e]ach question is addressed in a separate Motion," (alteration added), labeled as "Motion # 1," "Motion # 2," and "Motion # 3," which is an unusual way to file a Motion for Summary Judgment. The court considers plaintiff's submission as a single Motion for Summary Judgment.

In its Motion for Summary Judgment, GXO first argues that that the "Penalty Provision" in Part I, Section 2.0 of the SOW "is unenforceable as a matter of law because it was intended to exact punishment rather than to impose liquidated damages." Second, GXO argues that the USPS "bears the burden of proof in this case because its assessment of penalties and its subsequent withholding of payment constituted a Government claim against GXO" and, according to GXO, "the Government cannot meet its burden because the evidence underlying its assessment of penalties does not actually show the number of containers that failed to dispatch on time." Third, GXO argues that, "to the extent the Court does not resolve the case based on GXO's" first and second arguments, the court should rule that "[t]he USPS cannot assess penalties for days on which the actual volume of mail exceeded the forecasted volume of mail." (alteration added).

In defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant argues that GXO is not entitled to summary judgment. First, defendant takes issue with GXO's interpretation of the "Penalty Provision" in Part II, Section 2.0 of the SOW, and argues that "the CTHO contract contains no duty requiring the Postal Service to refrain from imposing liquidated damages for GXO's failures to timely process containers out of the secondary sort operation only if containers also do not leave the facility on the last truck scheduled on each operational day." Second, defendant argues that "despite being referred to as a penalty provision, the clause contained in section 2.0 of the CTHO[31] is an enforceable liquidated damages provision." (footnote added). Third, defendant argues that "GXO has failed to establish that the Postal Service provided volumes of mail to be processed that were greater than the estimated volumes provision [sic] included in the forecasts provided by the Postal Service before performance started." (alteration added). Moreover, defendant argues that the court should grant summary judgment in defendant's favor because defendant properly imposed "liquidated damages" under the "Penalty Provision" in Part I, Section 2.0 of the SOW for GXO's failure to timely dispatch all containers of mail pursuant to the deadlines located in the table in Part II, Section 5.1 of the SOW. Thereafter, GXO filed its Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment, and defendant filed its Reply in Support of Cross-Motion for Summary Judgment.

After the parties' Cross-Motions for Summary Judgment were fully briefed and oral argument was held, the undersigned issued an Order instructing the parties to "submit a joint statement of facts." The court's Order also instructed the parties to "file a joint submission to clarify their agreed to, or separate, definitions of the word 'dispatch,' mail left 'in prime,' and 'Mail Processing,' as well as any other material words or phrases the parties think should be clarified for the court." The court's Order further instructed the parties to "file a copy of the full Credit Memo, as referenced by both parties as a joint submission," and to "explain the discrepancies between the charts," referring to the "CTHO Delays By Day" spreadsheets in the record before the court.

---

[31] Perhaps defendant's reference to "section 2.0 of the CTHO" was intended to reference Section 2.0 of the SOW.

Subsequently, the parties filed their "joint response explaining the discrepancies identified by the Court, as well as a copy of the Credit Memo," in which the parties stated:

> [T]he parties clarify that the reason for the discrepancy between the two penalty spreadsheets is that the defendant's version (Def. App'x 123–24) is an earlier version of the spreadsheet, whereas plaintiff's version (Compl. Ex. M) is the final version of the spreadsheet. Defendant sent the preliminary penalty spreadsheet (Def. App'x 121–22) on February 8, 2022, while performance was still ongoing. See Compl. Ex. B. at 6 (Transmission Email from Contracting Officer (CO) Kiaira Stallworth). Defendant later sent the updated version on March 1, 2022, after performance was complete. See Attachment B (Transmission Email from CO Stallworth, dated March 1, 2022). The discrepancy between the two spreadsheets is that the earlier version lists the alleged container counts through February 2, 2022,[32] whereas the later version includes the alleged container counts through February 19, 2022. Therefore, the Court should rely on the final version of the penalty spreadsheet submitted as Complaint Exhibit M.

(alteration and footnote added). In addition, the parties filed their "joint response to clarify the meaning of certain terms, which includes the parties' agreed upon definitions for certain terms, as well as separate statements by the parties describing their respective definitions of terms on which they disagree." As particularly relevant to the dispute currently before the court on the parties' Cross-Motions for Summary Judgment, the parties disagreed on the meaning of the term "dispatched." As discussed more fully below, in the parties' joint response, plaintiff asserted that the term "dispatched" means "[t]he step in the Christmas Terminal Handling Operation ('CTHO') when sorted mail is loaded onto an outbound truck to depart the CTHO facility," (alteration added), whereas defendant asserted that "the term 'dispatched' means that a container of mail has been moved through the processing phases outlined in the timetable found in Section 5.1 of the contract."[33] In addition, the parties later submitted their Joint Statement of Facts. The undersigned also issued an Order stating that, "[a]fter reviewing all the parties' respective briefings, the issue of which party, plaintiff or defendant, bears the burden to establish that defendant properly, or improperly, assessed 'liquidated damages' under the Christmas Terminal Handling Operation (CTHO) Contract remains unclear." (alteration added). The undersigned, therefore, instructed the parties to file supplemental briefs addressing "whether or not the government bears the burden of proving that it properly imposed 'liquidated damages' under the CTHO Contract," as well as addressing "whether, if the court should find defendant bears the burden of proof on this issue, the evidence

[32] The court notes that although the original "CTHO Delays By Day" spreadsheet includes rows with dates ranging from November 27, 2021 to February 2, 2022, the columns identifying alleged delays in the original "CTHO Delays By Day" spreadsheet are only populated from November 30, 2021 through January 19, 2022.

[33] Perhaps defendant's reference to "Section 5.1 of the contract" was intended to reference Section 5.1 of the SOW.

currently in the record before the court is sufficient to carry the government's burden of proof under both plaintiff's and defendant's proposed interpretations of the term 'dispatch,' as used in the SOW." Thereafter, both parties filed supplemental briefs.

## DISCUSSION

As indicated above, GXO and defendant have filed Cross-Motions for Summary Judgment pursuant to RCFC 56. RCFC 56 is similar in language and effect to Rule 56 of the Federal Rules of Civil Procedure. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (2026); Fed. R. Civ. P. 56(a) (2026) (alteration added); see also Dupree v. Younger, 598 U.S. 729, 731 (2025); Young v. United Parcel Serv., Inc., 575 U.S. 206, 231 (2015); Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Connecticut Yankee Atomic Power Co. v. United States, 190 F.4th 1370, 1376 (Fed. Cir. 2026); ATS Ford Drive Inv., LLC v. United States, 136 F.4th 1066, 1069 (Fed. Cir. 2025); Boyer v. United States, 97 F.4th 834, 840 (Fed. Cir. 2024); Anderson v. United States, 23 F.4th 1357, 1361 (Fed. Cir. 2022); Shell Oil Co. v. United States, 7 F.4th 1165, 1171 (Fed. Cir. 2021); Authentic Apparel Grp., LLC v. United States, 989 F.3d 1008, 1014 (Fed. Cir. 2021); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Tr. v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Ne. Health Servs., LLC v. United States, 181 Fed. Cl. 566, 574 (2026); Karp v. United States, 181 Fed. Cl. 647, 649 (2026), appeal dismissed, No. 2026-2205, 2026 WL 2592862 (Fed. Cir. Sept. 2, 2026); Davis v. United States, 181 Fed. Cl. 541, 552 (2026); Manitou Island Transit, LLC v. United States, 168 Fed. Cl. 218, 223 (2023); Loveridge v. United States, 167 Fed. Cl. 44, 47 (2023); Capitol Indem. Corp. v. United States, 162 Fed. Cl. 388, 397 (2022); King v. United States, 159 Fed. Cl. 450, 461 (2022); Desert Sunlight 250, LLC v. United States, 157 Fed. Cl. 209, 222 (2021).

A fact is material if it will make a difference in the result of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson

v. Liberty Lobby, Inc., 477 U.S. at 248); NSTAR Elec. Co. v. United States, 179 Fed. Cl. 441, 451-52 (2025); Arter v. United States, 179 Fed. Cl. 59, 62 (2025); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Arrañaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011). Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199 (1958), cert. denied, 361 U.S. 843, reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); BASF Corp. v. SNF Holding Co., 955 F.3d 958, 963 (Fed. Cir. 2020); Arter v. United States, 179 Fed. Cl. at 63; McLaughlin v. United States, 177 Fed. Cl. 1, 6 (2025); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Tr. v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. 607, 611 (2011); Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009). The court must determine whether the evidence presents a disagreement sufficient to require submission to fact finding or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Health & Hum. Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; 3rd Eye Surveillance, LLC v. United States, 151 Fed. Cl. 49, 54 (2020) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587); Snee v. United States, 180 Fed. Cl. 149, 155 (2026); MLB Transportation, Inc. v. United States, 178 Fed. Cl. 385, 391 (2025); Pfizer Inc. v. United States, 149 Fed. Cl. 711, 715 (2020) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

Summary judgment, however, will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (alteration added); see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co.

v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); Ingham Reg. Med. Ctr. v. United States, 163 Fed. Cl. 384, 396 (2022) ("'Genuine' issues exist if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248)); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; United States Capitol Police v. Office of Cong. Workplace Rts., 110 F.4th 1265, 1271-72 (Fed. Cir. 2024); Almanza v. United States, 935 F.3d 1332, 1337 (Fed. Cir. 2019); Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010), overruled in part on other grounds by Moore v. United States, 66 F.4th 991 (Fed. Cir. 2023); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Tr. v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266-67 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; Univ. S. Florida v. United States, 146 Fed. Cl. 274, 280 (2019).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Genuine Enabling Tech. LLC v. Sony Grp. Corp., 167 F.4th 1196, 1202 (Fed. Cir. 2026) ("On an issue where the nonmoving party bears the burden of proof, '[a] movant may prevail by pointing out the absence of evidence to support the nonmoving party's case.'" (alteration in original) (quoting Intellicall, Inc. v. Phonometrics, Inc., 952 F.2d 1384, 1389 (Fed. Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. at 325))); Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Communs., Inc. v. Times Fiber Communs., Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v.

Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); DJ Mfg. Corp. v. United States, 86 F.3d 1130, 1135 (Fed. Cir. 1996); Snee v. United States, 180 Fed. Cl. at 155; Kwong v. United States, 179 Fed. Cl. 382, 385 (2025); Arter v. United States, 179 Fed. Cl. at 62; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-58 (2015), subsequent determination, 129 Fed. Cl. 742 (2017), aff'd, 708 F. App'x 685 (Fed. Cir. 2018). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Fla. Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001), abrogated on other grounds by Teva Pharms. USA, Inc. v. Sandoz, Inc., 574 U.S. 318 (2015); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Cheshire Hunt, Inc. v. United States, 178 Fed. Cl. 398, 406 (2025); Spectre Corp. v. United States, 178 Fed. Cl. 1, 10 (2025), appeal dismissed, No. 2026-1087, 2025 WL 3721425 (Fed. Cir. Dec. 23, 2025); Hamilton Square, LLC v. United States, 177 Fed. Cl. 146, 154 (2025); Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006) (citing Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987); and Chem. Eng'g Corp. v. Essef Indus., Inc., 795 F.2d 1565, 1571 (Fed. Cir. 1986)); see also Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc., 522 F.3d 1348, 1363 (Fed. Cir. 2008); Colonial Chevrolet Co. v. United States, 139 Fed. Cl. 599, 610 (2018).

In a motion for summary judgment, a party asserting that a fact is not genuinely disputed must support its contention by citing to materials in the record, such as affidavits, depositions, or stipulations, or by showing that the materials cited do not establish the absence or presence of a genuine dispute of material fact. See RCFC 56(c)(1); see also Gateway Dev. Comm'n v. United States, 180 Fed. Cl. 495, 507 (2026); Gardens v. United States, 179 Fed. Cl. 413, 415 (2025); Arter v. United States, 179 Fed. Cl. at 62; BES Design/Build, LLC v. United States, 175 Fed. Cl. 187, 195 (2025); Comet v. United States, 173 Fed. Cl. 257, 262 (2024); Pressly v. United States, 172 Fed. Cl. 264, 267 (2024); Hyatt v. United States, 170 Fed. Cl. 417, 426 (2024); Nicholson v. United States, 170 Fed. Cl. 399, 408 (2024); ECC Centcom Constructors, LLC v. United States, 167 Fed. Cl. 236, 244 (2023); King v. United States, 130 Fed. Cl. 476, 492 n.27 (2017). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence" under RCFC 56(c)(2). See RCFC 56(c)(2); see also Marine Indus. Constr., LLC v. United States, 151 Fed. Cl. 349, 363 (2020); King v. United States, 130 Fed. Cl. at 492 n.27. Moreover, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." RCFC 56(c)(4) (alteration added); see also Hardy v. United States, 153 Fed. Cl. 287, 292 (2021); Bannum, Inc. v. United States, 151 Fed. Cl. 755, 762 (2021). The court will not consider an affidavit supporting or opposing a motion for summary judgment that contains statements that are legal conclusions, not based on the affiant's personal knowledge, or would otherwise be inadmissible as evidence. See Marine Indus. Constr., LLC v. United States, 151 Fed. Cl. at 365; Found. of Human Understanding v. United States, 88 Fed. Cl. 203, 228 n.19 (2009), aff'd, 614 F.3d 1383 (Fed. Cir. 2010), cert. denied, 562 U.S. 1286 (2011); Adarbe v. United States, 58 Fed. Cl. 707, 712 n.1 (2003); see also Thomas v. United States, 106 Fed. Cl. 467, 476 n.4 (2012) (disregarding an expert witness' affidavit when the affiant outlined his opinion as to whether a plaintiff owned a reversionary interest under Tennessee law).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69; Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Massey v. Del Lab'ys, Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Burby v. United States, 167 Fed. Cl. 294, 299 (2023); Aitken v. United States, 162 Fed. Cl. 356, 363 (2022); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010), aff'd, 814 F.3d 1299 (Fed. Cir. 2015); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the nonmoving party. See Almanza v. United States, 935 F.3d at 1337; see also First Com. Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); McKay v. United States, 199 F.3d 1376, 1380 (Fed. Cir. 1999) (citing Mingus Constructors, Inc. v. United States, 812 F.2d at 1390); Karp v. United States, 181 Fed. Cl. at 649; Urban v. United States, 176 Fed. Cl. 471, 481 (2025); Beard v. United States, 125 Fed. Cl. 148, 156 (2016); Two Shields v. United States, 119 Fed. Cl. 762, 775 (2015), aff'd sub nom. Ramona Two Shields v. United States, 820 F.3d 1324 (Fed. Cir. 2016).

In the above captioned case, as indicated above, GXO moves for summary judgment on three grounds, including "on the basis that the Government cannot meet its burden because the evidence underlying its assessment of penalties does not actually show the number of containers that failed to dispatch on time[ ], which was the only breach event that could trigger a penalty." (alteration added). Defendant, however, argues that it is entitled to summary judgment because it properly imposed "liquidated damages" under the contract for GXO's failures to timely dispatch all containers of mail pursuant to its dispatch performance obligations set out in the table in Part II, Section 5.1 of the SOW. The parties also dispute whether the "Penalty Provision" in Part I, Section 2.0 of the SOW is an enforceable liquidated damages provision or rather an unenforceable penalty provision. Underlying the parties' disputes is the parties' disagreement over how the terms "dispatch" and "dispatched," used in the "Penalty Provision" in Part I, Section 2.0 of the SOW, should be interpreted, when the "Penalty Provision" can be applied, and whether the evidence in the record currently before the court is sufficient to support the government's imposition of "penalties" pursuant to the "Penalty Provision."

As discussed more fully below, the record in the case currently before the court does not lead to the entry of summary judgment in favor of either GXO or defendant on their respective Cross-Motions for Summary Judgment because the record currently before the court is replete with confusion, inconsistencies, and unresolved factual matters, some of which are directly relevant to the interpretation and operation of the "Penalty Provision" in Part I, Section 2.0 of the SOW. Significantly, the parties heavily dispute the significance and accuracy of the multiple "CTHO Delays By Day" spreadsheets prepared by the USPS's employee, Mr. Richard Walker, which defendant attempts to rely on to substantiate the imposition of "penalties" in the case currently before the court. Additionally, among other issues, the record currently before the court contains possible mathematical errors in defendant's calculation of the "penalties" imposed by the USPS pursuant to the "Penalty Provision," including with respect to the proper conversion rate, if any, to apply in order to determine how many "containers" of mail failed "to be dispatched on time," and reliance by both GXO and defendant on unsworn declarations, the reliability of which cannot be determined based on the record currently before the court to date. Specifically, GXO attempts to rely on the unsworn declaration of Mr. Samer Tadros, the former Director of Operations for GXO, which recounts a conversation Mr. Tadros alleges to have had with a former USPS employee, Mr. James Karasoulis,[34] and

[34] The court notes that Mr. Karasoulis's exact role at the USPS prior to his retirement in 2017 is not clear from the record currently before the court. Mr. Tadros's unsworn declaration characterizes Mr. Karasoulis as "a USPS employee." In defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant states that Mr. Karasoulis was a "former Postal Service employee, who was not the contracting officer on the contract, and who left the Postal Service on or about September 17, 2017, well before the contract was finalized." The uncertainty regarding Mr. Karasoulis's role at the USPS prior to his retirement in 2017 raises additional questions concerning the intent behind the "Penalty Provision" in Part I, Section 2.0 of the SOW, including whether Mr. Karasoulis had authority to speak on behalf of the USPS.

which GXO argues demonstrates that the $1,200.00 per container "penalty" imposed by the USPS "was expressly intended as a penalty." Despite taking issue with GXO's attempt to rely on the unsworn declaration of Mr. Tadros, defendant likewise submits the unsworn declaration of Ms. Radiah Johnson-Bryant, who served as the USPS Contracting Officer during the final year of the CTHO Contract, in an attempt to justify the inclusion of the "Penalty Provision" in the SOW. GXO's and defendant's reliance on these unsworn declarations, which could each be potentially relevant to the intent of the parties regarding the operation of the "Penalty Provision," further demonstrates that the case currently before the court should not be decided on the parties' Cross-Motions for Summary Judgment. In addition, the record currently before the court also reflects uncertainty regarding the periods of performance at issue under the CTHO Contract, as well as inconsistency in the labeling of attachments to the CTHO Contract, including Attachment E, which may be relevant to GXO's alternative argument that the USPS may not assess "penalties" for days on which the actual volume of mail processed by GXO exceeded the forecasted volumes of mail provided to GXO by defendant. Based on the record currently before the court to date, too many genuine issues of material fact exist regarding the proper interpretation and operation of the "Penalty Provision" and, therefore, preclude the entry of summary judgment for either party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The court, however, will discuss some of the key legal issues raised by the parties, without reaching a conclusion as to which party, GXO or defendant, should ultimately prevail in the above captioned case.

Burden of Proof – Government Claim for Liquidated Damages

It is not contested that defendant bears the initial burden to establish that it properly assessed "penalties" under the "Penalty Provision" in Part I, Section 2.0 of the SOW. Courts and boards have consistently recognized that a government set-off of money owed constitutes a government claim. See Placeway Constr. Corp. v. United States, 920 F.2d 903, 906 (Fed. Cir. 1990) ("We agree that the set off asserted is a government claim . . . ." (omission added)); see also Palafox St. Assocs., L.P. v. United States, 114 Fed. Cl. 773, 783 (2014) ("The court finds that, similar to the contract balance withheld by the government in Placeway, the rent withheld by GSA here constituted a government claim." (citing Placeway Constr. Corp. v. United States, 920 F.2d at 906)); K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. 571, 587 (2012) ("As a general proposition, the government's assessment of liquidated damages is a government claim against a contractor, and can be directly appealed to the Court of Federal Claims." (citing Sun Eagle Corp. v. United States, 23 Cl. Ct. 465, 480 (1991) (stating that "Placeway should be read to encompass liquidated damages, because its reasoning applies with equal force to government claims for liquidated damages"); and Garrett v. Gen. Elec. Co., 987 F.2d 747, 749 (Fed. Cir. 1993))); M. Maropakis, Inc. v. United States, 84 Fed. Cl. 182, 204 (2008) ("[T]he Court of Appeals confirmed that a set off against the balance due for liquidated damages is a government claim." (alteration added) (citing Placeway Constr. Corp. v. United States, 920 F.2d at 906)), aff'd, 609 F.3d 1323 (Fed. Cir. 2010); In re BCI Constr. USA, Inc., A.S.B.C.A. No. 62657, 24-1 B.C.A. ¶ 38,522, at 187,255, 2024 WL 773324 (2024); In re Sammy's Delivery Serv., P.S.B.C.A. No. 6431, 13 B.C.A. ¶ 35,237, at 172,999, 2013 WL 603634 (2013); Satyadev Duggirala v. Gen. Servs. Admin., C.B.C.A. No. 463, 07-1 B.C.A. ¶ 33,489, at 165,998, 2007 WL 473745 (2007).

In Sauer Inc. v. Danzig, 224 F.3d 1340 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit stated that, generally, “a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled.” Id. at 1347 (citing Dean Constr. Co. v. United States, 188 Ct. Cl. 62, 66-68, 411 F.2d 1238, 1240-41 (1969); N. Va. Elec. Co. v. United States, 230 Ct. Cl. 722, 723 (1982); and In re Cent. Ohio Bldg. Co., P.S.B.C.A. No. 2742, 92-1 B.C.A. ¶ 24,399, at 121,824, 1991 WL 187546 (1991)). The court notes that in Central Ohio Building Co., P.S.B.C.A. No. 2742, 92-1 B.C.A. ¶ 24,399 at 121,824, 1991 WL 187546, a case cited favorably by the United States Court of Appeals for the Federal Circuit in Sauer Inc. v. Danzig, 224 F.3d at 1347, the Postal Service Board of Contract Appeals provided a more detailed explanation of the burden of proof with regard to a government claim for liquidated damages. According to the Postal Service Board of Contract Appeals, with regard to a liquidated damages claim, the government has “the ultimate burden of persuasion as well [as] the initial burden of going forward to show that the contract was not completed by the agreed contract completion date and that liquidated damages were due and owing.” In re Cent. Ohio Bldg. Co., P.S.B.C.A. No. 2742, 92-1 B.C.A. ¶ 24,399, at 121,824, 1991 WL 187546 (alteration added). The Postal Service Board of Contract Appeals in Central Ohio Building Co. explained that the government may meet its initial burden by showing that “the contract performance requirements were not substantially completed by the contract completion date and that the period for which the assessment was made was proper.” See id. The Postal Service Board of Contract Appeals in Central Ohio Building Co. also explained that, once the government satisfies its initial burden, the burden of going forward shifts to the contractor “to show that any delays were excusable and that it should be relieved of all or part of the assessment.” See id. Similarly, in Maxway, Inc. v. United States Postal Service, P.S.B.C.A. No. 6906, 2023-1 B.C.A. ¶ 38,342, 2023 WL 3504888 (2023), an appeal of a United States Postal Service decision upholding an offset from contract payments for twenty-one mail transportation contracts, the Postal Service Board of Contract Appeals determined that “[t]his is a Postal Service monetary claim, and the Postal Service has the burden of proof on whether Maxway failed to provide the required service.” Id. at 186,183 (alteration added) (citing Patrick M. Murray v. United States Postal Serv., P.S.B.C.A. No. 6635, 2018-1 B.C.A. ¶ 37,058, 2018 WL 2724959 (2018); and JM Carranza Trucking Co. v. United States Postal Serv., P.S.B.C.A. No. 6354, 2014-1 B.C.A. ¶ 35,776, 2014 WL 5343359 (2014)).

In the case currently before the court, as discussed above, defendant determined that between November 30, 2021 and February 19, 2022, GXO failed to timely dispatch 3,286 containers of mail. Using the “Penalty Provision” in Part I, Section 2.0 of the SOW, defendant imposed $3,943,200.00 in “penalties” against GXO and withheld that amount from three GXO invoices under the CTHO Contract and two GXO invoices under the Salt Lake STC Contract. This is a government claim for which defendant bears the initial burden of proving that “penalties” were due and owing. See Sun Eagle Corp. v. United States, 23 Cl. Ct. at 480; see also Sauer Inc. v. Danzig, 224 F.3d at 1347. Therefore, pursuant to the “Penalty Provision” in Part I, Section 2.0 of the SOW, defendant bears the initial burden of proving the number of containers, if any, that failed “to be dispatched on time.”

In its supplemental brief submitted to the court, defendant states that it "agrees that a claim for liquidated damages is a 'government claim' for which it carries the initial burden." Defendant, however, also argues that the interpretation of the term "dispatched," as used in the "Penalty Provision," is "the threshold legal issue in this case and must be resolved before it can be determined whether either party has met its respective burden of persuasion concerning the propriety, or impropriety, of the Postal Service's imposition of liquidated damages for GXO's performance failures." Accordingly, defendant maintains that defendant's reading of the "Penalty Provision" "is the only reasonable interpretation of that clause" and that, under defendant's interpretation, "the Government has met its burden of establishing that its imposition of liquidated damages was justified." Defendant acknowledges, however, that, if the court were to agree with GXO's interpretation of the "Penalty Provision" in Part I, Section 2.0 of the SOW, "then the existing record would be insufficient to resolve the issue of liquidated damages, and further fact finding would be required to resolve outstanding issues of material issues of fact in dispute."

In plaintiff's supplemental brief, GXO argues that defendant has "conceded" in defendant's supplemental brief that the government "bears the burden of proof for its government claim against GXO" and that "if the Court were to find that GXO's interpretation of the penalty provision controls, 'then the existing record would be insufficient to resolve the issue of liquidated damages.'" GXO maintains that the "Government's container-count data underpinning its claim against GXO is 'insufficient' to prove entitlement" and that "[t]he Government has not proffered any other evidence showing a genuine dispute of material fact exists that would tend to show the Government can prove what, if any, number of containers failed to dispatch on time—neither in opposition to GXO's motion, nor during the course of discovery." (capitalization in original; alteration added).

<u>Interpretation of the "Penalty Provision"</u>

As indicated above, although the parties agree that defendant's imposition of "penalties" under the "Penalty Provision" in Part I, Section 2.0 of the SOW, is a government claim for which defendant bears the initial burden of proof, GXO and defendant fundamentally disagree on the proper interpretation of the term "dispatched" and the phrase "fails to be dispatched on time" as used in the "Penalty Provision" in Part I, Section 2.0 of the SOW. The relevant language in the "Penalty Provision" states:

> The Postal Service expects 100% on-time dispatch performance and 100% distribution accuracy for all mail tendered to and sorted by the supplier. The USPS will be responsible for 80% VAP [Volume Arrival Profile] before 02:00 am to help insure [sic] timely clearance every night. The supplier will be penalized $1200.00 per container that fails to be dispatched on time.

(alterations added). As discussed below, it is GXO's position that the term "dispatched" means "the step in the Christmas Terminal Handling Operation ('CTHO') when sorted mail is loaded onto an outbound truck to depart the CTHO facility." GXO thus argues that the phrase "fails to be dispatched on time," as used in the "Penalty Provision," means that

a container of mail was not timely loaded onto an outbound truck and sent away from the CTHO facility. Defendant, however, argues that "dispatched" means "that a container of mail has been moved through the processing phases outlined in the timetable found in [Part II,] Section 5.1 of the contract," which is reproduced in full in this Opinion above. (alteration added). Accordingly, defendant argues that "any container of mail that is not processed onto the outbound platform in accordance with the deadlines contained in the express timetable found in [Part II,] Section 5.1 of the statement of work fails to be dispatched on time." (alteration added).

Contract interpretation is a question of law, which can pose an appropriate question for summary judgment resolution. See Anchorage v. United States, 123 F.4th 1315, 1319-20 (Fed. Cir. 2024) (citing Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1284-85 (Fed. Cir. 2008) (citing Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996))); see also Richardson v. United States, 110 F.4th 1375, 1380 (Fed. Cir. 2024) (quoting Nova Grp./Tutor-Saliba v. United States, 87 F.4th 1375, 1379 (Fed. Cir. 2023)); Hahnenkamm, LLC v. United States, 104 F.4th 1333, 1341 (Fed. Cir. 2024) (quoting Agredano v. United States, 595 F.3d 1278, 1280 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011)); Authentic Apparel Grp., LLC v. United States, 989 F.3d at 1014 ("'Contract interpretation is a question of law generally amenable to summary judgment.'" (quoting Premier Off. Complex of Parma, LLC v. United States, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (quoting Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002)))); Kiewit Infrastructure W. Co. v. United States, 972 F.3d 1322, 1328 (Fed. Cir. 2020) (quoting Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003)); First Annapolis Bancorp, Inc. v. United States, 644 F.3d 1367, 1373 (Fed. Cir. 2011), cert. denied, 566 U.S. 982 (2012); Holland v. United States, 621 F.3d 1366, 1374 (Fed. Cir. 2010), cert. denied, 565 U.S. 928 (2011); H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998) (stating that matters of contract interpretation are questions of law); Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996); Gateway Dev. Comm'n v. United States, 180 Fed. Cl. at 506; CENTECH Grp., Inc. v. United States, 175 Fed. Cl. 328, 339 (2025) ("'Contract interpretation is a question of law, which may be decided on summary judgment.'" (quoting SSA Marine, Inc. v. United States, 77 Fed. Cl. 662, 665 (2007) (citing Hughes Commc'ns Galaxy, Inc. v. United States, 998 F.2d 953, 957 (Fed. Cir. 1993)))); Schneider Elec. Bldgs. Ams., Inc. v. United States, 163 Fed. Cl. 708, 716 (2023) (quoting Premier Off. Complex of Parma, LLC v. United States, 916 F.3d at 1011); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483 (2013) (quoting Varilease Tech. Group, Inc. v. United States, 289 F.3d at 798). "However, interpretation of language, conduct and parties' intent, i.e., the question of what meaning should be given by a court to the words of the contract, may sometimes involve questions of material fact and not present a pure question of law." Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. 696, 703 (2007) (citing Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988)).

The question of breach of contract is one of contract interpretation. "Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015); see also Beacon Point Assocs. LLC

v. Dep't of Veterans Affs., 139 F.4th 1306, 1309 (Fed. Cir. 2025) (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); NOAA Md., LLC v. Adm'r of Gen. Servs. Admin., 997 F.3d 1159, 1165 (Fed. Cir. 2021); Authentic Apparel Grp., LLC v. United States, 989 F.3d at 1014; Premier Off. Complex of Parma, LLC v. United States, 916 F.3d at 1011 (citing NVT Techs., Inc. v. United States, 370 F.3d at 1159); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Mostafa v. United States, 180 Fed. Cl. 480, 489 (2026) (quoting Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); ASG Sols. Corp. v. United States, 170 Fed. Cl. 485, 496 (2024), aff'd, No. 2024-1755, 2025 WL 3627729 (Fed. Cir. Dec. 15, 2025); Schneider Elec. Bldgs. Ams., Inc. v. United States, 163 Fed. Cl. at 721; Ascendant Servs., LLC v. United States, 160 Fed. Cl. 275, 286 (2022); HCIC Enters., LLC v. United States, 147 Fed. Cl. 118, 124 (2020); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) ("The starting point for any contract interpretation is the plain language of the agreement." (citing Foley Co. v. United States, 11 F.3d at 1034)), aff'd, 855 F.3d 1344 (Fed. Cir. 2017); Beard v. United States, 125 Fed. Cl. at 158; Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. at 383-84.

The United States Court of Appeals for the Federal Circuit has stated that "contract interpretation is fundamentally a question of the contracting parties' intent[.]" Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1362 (Fed. Cir. 2009) (alteration added); see also Ralden P'ship v. United States, 891 F.2d 1575, 1577 (Fed. Cir. 1989) ("The primary objective of contract interpretation is to ascertain the intent of the parties at the time they entered into the contract." (citing Beta Sys., Inc. v. United States, 838 F.3d at 1185; and Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971))); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties."); Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347 ("Contract interpretation requires determining the intention of the parties."), recons. denied, 131 Fed. Cl. 528 (2017); Ahrens v. United States, 62 Fed. Cl. 664, 669 (2004) (stating that "the court must study the plain meaning of the contract" and "[t]he purpose of this study is to determine the intent of the parties at the time that the contract was made; this controls the contract's interpretation" (alteration added)). The United States Court of Appeals for the Federal Circuit also has stated that "[o]rdinarily when a provision is found to have a plain meaning, that is deemed to conclusively establish the parties intent." Stockton E. Water Dist. v. United States, 583 F.3d at 1362 n.35 (alteration added) (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996)).

Indeed, """[i]n contract interpretation, the plain and unambiguous meaning of a written agreement controls."'" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (alteration added) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v.

United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Manitou Island Transit, LLC v. United States, 168 Fed. Cl. at 225; Gilead Scis., Inc. v. United States, 163 Fed. Cl. 104, 121 (2022); Canpro Invs. Ltd. v. United States, 130 Fed. Cl. at 347; Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ." (omission added)). Moreover, just as courts can "look to dictionary definitions published at the time that the statute was enacted" in construing statutory language, the court may look to dictionary definitions published at the time that the contract was written to ascertain the ordinary meaning of a contractual term. See Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010); see also SUFI Network Servs., Inc. v. United States, 785 F.3d at 593; Aleynikov v. Goldman Sachs Grp., Inc., 765 F.3d 350, 360 (3d Cir. 2014) (stating that courts look to dictionary definitions "'because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract'" (citation omitted)). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (alterations in original; internal citations omitted) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and quoting Harris v. Dep't of Veterans Affs., 142 F.3d 1463, 1467 (Fed. Cir. 1998)); see also Lanclos v. United States, 40 F.4th 1352, 1355 (Fed. Cir. 2022); Coast Pro., Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014); McHugh v. DLT Sols., Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and Harris v. Dep't of Veterans Affs., 142 F.3d at 1467); Giove v. DOT, 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (citations omitted)); Gould, Inc. v. United States, 935 F.2d at 1274 (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result" (quoting Arizona v. United States, 216 Ct. Cl. 221, 235-36, 575 F.2d 855, 863 (1978))). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony . . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." Air-Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015) (alterations and omission in original); see also ASG Sols. Corp. v. United States, 170 Fed. Cl. at 496; Gilead Scis., Inc. v. United States, 163 Fed. Cl. at 121; Elevated Techs., Inc. v. United States, 160 Fed. Cl. 257, 270 (2022); Ingham Reg. Med. Ctr. v. United States, 163 Fed. Cl. at 399 ("The court 'must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'" (quoting Jowett, Inc. v. United States, 234 F.3d at 1368 (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435))); Marquardt Co. v. United States, 101 Fed. Cl. 265, 268 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)). Additionally, when different terms are used in a contract, the court may consider whether the parties intended those terms to have different meanings. See Blue Tech Inc. v. United States, 155 Fed. Cl. 229, 238 (2021) ("[T]he Court presumes that different terms imply different meanings." (alteration added) (citing States Roofing Corp. v. Winter, 587 F.3d 1364, 1370-72 (Fed. Cir. 2009))).

If this court determines that a contract is ambiguous and the contractor's interpretation is reasonable, the court can apply the rule of contra proferentem, resolving the ambiguity against the drafter of the words. See Wash. State Dep't of Licensing v. Cougar Den, Inc., 586 U.S. 347, 368 (2019) (Gorsuch, J., concurring) (Ginsburg, J., joining) (stating that "[a]fter all, the United States drew up this contract, and we normally construe any ambiguities against the drafter who enjoys the power of the pen" (alteration added)); see also United States v. Seckinger, 397 U.S. 203, 210 (1970) (stating that "the general maxim that a contract should be construed most strongly against the drafter, which in this case was the United States"); NOAA Md., LLC v. Adm'r of Gen. Servs. Admin., 997 F.3d at 1169 ("'When a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document.'" (quoting Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004))); Ysla v. United States, 171 Fed. Cl. 333, 349 (2024) (stating that the rule of contra

proferentem provides that "some ambiguities in contract language are held against the drafter" (citations omitted)); Shaw v. United States, 131 Fed. Cl. 181, 192 (2017), aff'd, 900 F.3d 1379 (Fed. Cir. 2018); Spectrum Scis. v. United States, 84 Fed. Cl. 716, 736 (2008); Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751, 760 (2003).

In order to try to interpret the term "dispatched," as used in the "Penalty Provision," the court begins with the plain language of the contract. See SUFI Network Servs., Inc. v. United States, 785 F.3d at 593. In the case currently before the court, as identified above, the disputed contract language in the "Penalty Provision" in Part I, Section 2.0 of the SOW provides that:

> The Postal Service expects 100% on-time dispatch performance and 100% distribution accuracy for all mail tendered to and sorted by the supplier. The USPS will be responsible for 80% VAP before 02:00 am to help insure [sic] timely clearance every night. The supplier will be penalized $1200.00 per container that fails to be dispatched on time.

(alteration and all emphasis added). As observed above, the terms "dispatch" and "dispatched" are not defined in the SOW or other contract documents, although the term "dispatch performance" is defined in Part III of the SOW. The court, therefore, reviews dictionary definitions to try to help discern the "plain meaning" of the terms "dispatch" and "dispatched." See SUFI Network Servs., Inc. v. United States, 785 F.3d at 593. According to Black's Law Dictionary, the term "dispatch" means "[a] prompt sending off of something," for example, "a dispatch of the letter agreement." Black's Law Dictionary (10th ed. 2014) (alteration added). Similarly, Merriam-Webster's Collegiate Dictionary 361 (11th ed. 2003) defines "dispatch" as "to send off or away with promptness or speed." Id. These two dictionary definitions, taken together or separately, could support GXO's understanding that the terms "dispatch" and "dispatched," as used in the "Penalty Provision," refer to mail being sent off or away from the CTHO facility on an outbound truck. Conversely, these same two dictionary definitions also could support defendant's understanding that the terms "dispatch" and "dispatched," as used in the "Penalty Provision," refer to mail being sent off or away from one processing operation under the CTHO Contract, such as the Secondary Bullpen operation, to the next processing operation under the CTHO Contract. Therefore, the ordinary meaning of the terms "dispatch" and "dispatched," as used in the "Penalty Provision," could possibly support either GXO's or defendant's interpretation of the terms "dispatch" and "dispatched," as used in the "Penalty Provision" in Part I, Section 2.0 of the SOW.

Although the lowercase terms "dispatch" and "dispatched" are not defined in the SOW, the capitalized terms "Dispatch Performance" and "Quality Dispatch" are defined in the SOW. Defendant argues that the court should look to the defined terms "Dispatch Performance" and "Quality Dispatch" to help interpret the disputed term "dispatched" as used in the "Penalty Provision," whereas GXO argues that "[t]he terms 'Dispatch Performance' and 'Distribution Accuracy' are terms of art that are defined in the Statement of Work" but "neither of these terms nor their respective definitions explains what it means for a container to 'dispatch.'" (alteration added). The capitalized term "Dispatch

Performance" is defined in Part III of the SOW as "[t]he execution and completion of appointed duties ensuring that processed volumes are actually moved as planned," (alteration added), which could support defendant's interpretation that the term "dispatched" refers to "a container of mail [that] has been moved through the processing phases outlined in the timetable found in [Part II,] Section 5.1 of the contract." (alterations added). The capitalized term "Quality Dispatch" is defined in Part III of the SOW as "the USPS procedure of correctly making timely dispatches, ensuring that the mail is properly labeled, and containers properly placarded and loaded in order to be transported on the planned transportation to its final destination to meet service standards," which could support GXO's interpretation that "dispatched" refers to mail leaving the CTHO facility on an outbound truck because the defined term "Quality Dispatch" refers to mail that is "loaded in order to be transported on the planned transportation to its final destination." Therefore, the defined terms "Dispatch Performance" and "Quality Dispatch" could support either GXO's or defendant's proposed interpretations of the term "dispatched" as used in the "Penalty Provision." Moreover, although the defined terms "Dispatch Performance" and "Quality Dispatch" can provide the court guidance in interpreting the meaning of "dispatched," as used in the "Penalty Provision," the court notes that "dispatched," "Dispatch Performance," and "Quality Dispatch" are each separate and distinct terms and, therefore, may have entirely different intended meanings. See Blue Tech Inc. v. United States, 155 Fed. Cl. at 238 ("[T]he Court presumes that different terms imply different meanings." (alteration added) (citing States Roofing Corp. v. Winter, 587 F.3d at 1370-72)).

The court also must initially try to interpret the SOW "in a manner that gives meaning to all of its provisions and makes sense." Massie v. United States, 166 F.3d at 1189; see also Lanclos v. United States, 40 F.4th at 1355. In addition, "an interpretation which gives a reasonable meaning to all parts [of the contract] will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." Arizona v. United States, 216 Ct. Cl. at 235-36 (alteration added). In the above captioned case, as indicated above, the term "dispatch," in its various verb tenses, is used often throughout the SOW. Sometimes, the term "dispatch" is used in the SOW in a manner that could refer to the loading of containers of mail onto waiting outbound trucks to be sent away from the CTHO facility. Other parts of the SOW, however, use the word "dispatch" in a manner that could be considered not to refer to mail leaving the CTHO facility but instead could refer more generally to GXO's processing obligations under the CTHO contract.[35]

---

[35] At this time, there is unclear language in the documents in the record before the court. For the benefit of the parties, the court also notes the possible application of the doctrine of contra proferentem as the case proceeds. See NOAA Md., LLC v. Adm'r of Gen. Servs. Admin., 997 F.3d at 1169 ("'When a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document.'" (quoting Turner Constr. Co. v. United States, 367 F.3d at 1321)); but see Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1354 (Fed. Cir. 2006)

Neither GXO's nor defendant's proposed interpretations of the term "dispatched," as used in the "Penalty Provision," is fully persuasive at this time based on the record currently before the court. Although certain principles of contract interpretation could support GXO's proposed interpretation that the term "dispatched" means "the step in the Christmas Terminal Handling Operation ('CTHO') when sorted mail is loaded onto an outbound truck to depart the CTHO facility," other applicable principles of contract interpretation could support defendant's proposed interpretation that the term "dispatched" means "that a container of mail has been moved through the processing phases outlined in the timetable found in [Part II,] Section 5.1 of the contract." (alteration added). Although contract interpretation issues can sometimes pose an appropriate question for summary judgment resolution, see Anchorage v. United States, 123 F.4th at 1319-20, the interpretation of contract language, the parties' conduct, and the parties' intent also can involve questions of material fact. See Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. at 703 (stating that the "interpretation of language, conduct and parties' intent, i.e., the question of what meaning should be given by a court to the words of the contract, may sometimes involve questions of material fact and not present a pure question of law").

As indicated above, in addition to the parties' disagreement regarding the meaning of the terms "dispatch" and "dispatched," as used in the "Penalty Provision," the parties also dispute the relevance, and accuracy, of the evidence defendant attempts to rely on to justify its imposition of "penalties" against GXO. Defendant attempts to rely on the revised "CTHO Delays By Day" spreadsheet prepared by Mr. Walker to substantiate the number of containers that GXO allegedly failed to dispatch on time and to calculate the $3,943,200.00 in "penalties" imposed against GXO pursuant to the "Penalty Provision." Defendant asserts that:

> Mr. Walker's data is relevant and highly probative of the delays at issue on the fourteen days in question because his spreadsheet is contemporaneous evidence of GXO's failures to ensure that all mail entered the outbound platform by the 4 a.m. critical entry time mandated by Section 5.1 of the contract.[36]

("When a contract is ambiguous, before resorting to the doctrine of contra proferentem, 'we may appropriately look to extrinsic evidence to aid in our interpretation of the contract.'" (citations omitted)).

[36] Further demonstrating that the case currently before the court should not be decided on the parties' Cross-Motions for Summary Judgment, the court notes that it is unclear whether the "spreadsheet" defendant refers to in the quote immediately above is the original "CTHO Delays By Day" spreadsheet or the revised "CTHO Delays By Day" spreadsheet, both of which were prepared by Mr. Walker. Throughout their briefings submitted to the court, the parties sometimes characterize the case currently before the court as involving "fourteen days" at issue. Based on the original "CTHO Delays By Day" spreadsheet, defendant initially assessed $3,721,000.00 in "penalties" against GXO for fourteen days on which GXO allegedly delayed processing 3,101 containers of mail

(footnote added). GXO, however, raises issues of credibility regarding the container count conducted by Mr. Walker, which informed the revised "CTHO Delays By Day" spreadsheet, and which was utilized by the USPS to assert "penalties" against GXO. GXO alleges that "Mr. Walker's container count has discrepancies when compared with other contemporaneous emails he [Mr. Walker] sent out, which he was unable to reconcile during his deposition." (alteration added). GXO contends that Mr. Walker "completed a final manual container count, which he then input into a spreadsheet" and GXO argues that "discrepancies between these container counts [between the "CTHO Delays By Day" spreadsheets and Mr. Walker's emails] and Mr. Walker's inability to resolve them calls into doubt all of the data the USPS used to assess penalties." (alteration added). Defendant responds:

> GXO is incorrect in claiming that the hourly emails that Mr. Walker sent each operational day contradict the spreadsheet he created after 4 a.m. each day. As we demonstrated in our cross-motion, Mr. Walker sent the hourly emails to keep track of how mail was moving through the different processing operations. Separate from that function, each operational day beginning at 4 a.m. he performed a manual count of the number of containers that remained in the primary or secondary sort lanes waiting to be processed. The daily emails did not inform the spreadsheet, thus GXO has failed to show that the daily emails establish any discrepancies in Mr. Walker's spreadsheet quantifying delayed containers.

(internal references omitted). At this time, however, the court cannot determine the probative value of the "CTHO Delay By Days" spreadsheets because, in addition to the many inconsistencies in the record currently before the court, discussed above, the probative value of the "CTHO Delays By Day" spreadsheet may also depend on a proper interpretation of the terms in the "Penalty Provision" in Part I, Section 2.0 of the SOW. Accordingly, the parties' Cross-Motions for Summary Judgment on the issue of whether defendant properly, or improperly, imposed "penalties" against GXO is premature and is denied at this time.

<u>Enforceability of the "Penalty Provision"</u>

As indicated above, GXO also argues that it is entitled to summary judgment because the "Penalty Provision" in Part I, Section 2.0 of the SOW is unenforceable as a

---

between November 30, 2021 and January 19, 2022. As discussed above, however, based on the revised "CTHO Delays By Day" spreadsheet, which both parties appear to agree is the applicable version of the "CTHO Delays By Day" spreadsheet for the purposes of considering the cross-motions for summary judgment currently before the court, defendant ultimately assessed $3,943,200.00 in "penalties" against GXO for seventeen days on which GXO allegedly delayed processing 3,286 containers of mail between November 30, 2021 and February 19, 2022. In addition to the fourteen days identified in the original "CTHO Delays By Day" spreadsheet, the revised "CTHO Delays By Day" spreadsheet indicated that the USPS also imposed "penalties" against GXO for January 29, 2022, January 30, 2022, and February 8, 2022.

matter of law. Defendant, however, argues that granting summary judgment in favor of GXO on this ground is improper because the "Penalty Provision" is actually an enforceable liquidated damages provision. As quoted above, the relevant language in the "Penalty Provision" in Part I, Section 2.0 of the SOW states:

> The Postal Service expects 100% on-time dispatch performance and 100% distribution accuracy for all mail tendered to and sorted by the supplier. The USPS will be responsible for 80% VAP before 02:00 am to help insure [sic] timely clearance every night. The supplier will be penalized $1200.00 per container that fails to be dispatched on time.

(alteration added).

As discussed below, "a liquidated damages clause will generally be upheld unless the court determines that the parties must have intended a penalty rather than liquidated damages." Safeco Credit v. United States, 44 Fed. Cl. 406, 412 (1999) (citing Wise v. United States, 249 U.S. 361, 365 (1919); United States v. Bethlehem Steel Co., 205 U.S. 105, 121 (1907); and DJ Mfg. Corp. v. United States, 86 F.3d at 1133); see also Restatement (Second) of Contracts § 356 (1981) ("Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy."). The party challenging a liquidated damages clause bears the burden of proving that the clause is unenforceable. See DJ Mfg. Corp. v. United States, 86 F.3d at 1134 (citing Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. 314, 338, 580 F.2d 400, 414 (1978); and Farmers Export Co. v. M/V Georgis Prois, Etc., 799 F.2d 159, 162 (5th Cir. 1986)); see also K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. 41, 50 (2011); M. Maropakis Carpentry, Inc. v. United States, 84 Fed. Cl. at 207. The United States Supreme Court has stated that liquidated damages "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts." Priebe & Sons v. United States, 332 U.S. 407, 411 (1947) (citing United States v. Bethlehem Steel Co., 205 U.S. at 121); see also DJ Mfg. Corp. v. United States, 86 F.3d at 1133; Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. 158, 212 (2022); K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 49; M. Maropakis Carpentry, Inc. v. United States, 84 Fed. Cl. at 206. When liquidated damages provisions "are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract," the provisions will be enforced. See Priebe & Sons v. United States, 332 U.S. at 411 (citing Wise v. United States, 249 U.S. at 365; and Sun Printing & Publ'g Ass'n v. Moore, 183 U.S. 642, 672-74 (1902)); see also Steve Kirchdorfer, Inc. v. United States, 229 Ct. Cl. 560, 565-66 (1981); Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. at 337, 580 F.2d at 413-14; Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212; K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 49; M. Maropakis Carpentry, Inc. v. United States, 84 Fed. Cl. at 206. Liquidated damages that are "plainly without reasonable relation to any probable damage which may follow a breach will not be enforced." Kothe v. R.C. Taylor Trust, 280 U.S. 224, 226 (1930); see also Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212; K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 49-50. The United States Court of Appeals for the Federal Circuit has ruled that

> [w]hen damages are uncertain or difficult to measure, a liquidated damages clause will be enforced as long as "the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression." With that narrow exception, "[t]here is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, when fairly and understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced."

DJ Mfg. Corp. v. United States, 86 F.3d at 1133 (second alteration in original; internal citations omitted) (quoting Wise v. United States, 249 U.S. at 365); see also Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212; K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 49-50; Safeco Credit v. United States, 44 Fed. Cl. at 412.

The United States Supreme Court has determined that liquidated damages provisions that cover delays and defaults which precede the time when performance is due, and which do not interfere with or cause delay in performance, are not enforceable because such delays do not cause damage. See Priebe & Sons v. United States, 332 U.S. at 410, 412-13; see also Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212-13. Liquidated damages clauses will not be enforced when they "serve only as an added spur to performance" because "[i]t is well-settled contract law that courts do not give their imprimatur to such arrangements." Priebe & Sons v. United States, 332 U.S. at 413 (alteration added); see also Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212-13. The United States Supreme Court has stated that "[a]ll provisions for damages are, of course, deterrents of default. But an exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust." Priebe & Sons v. United States, 332 U.S. at 413 (alteration added); see also Space Master Intern., Inc. v. City of Worcester, 940 F.2d 16, 18 (5th Cir. 1991) ("Liquidated damages must compensate for loss rather than punish for breach."). Liquidated damages clauses also will be unenforceable if the parties intended the damages to be penalties. See Int'l Elecs. Corp. v. United States, 227 Ct. Cl. 208, 228, 646 F.2d 496, 508 (1981); see also M. Maropakis Carpentry, Inc. v. United States, 84 Fed. Cl. at 206-07; Safeco Credit v. United States, 44 Fed. Cl. at 412.

In Higgs v. United States, 212 Ct. Cl. 146, 546 F.2d 373 (1976), the United States Court of Claims[37] ruled that the resolution of the following three inquiries can aid the court in determining whether a liquidated damages provision is an impermissible penalty:

---

[37] The decisions of the United States Court of Claims are still binding on the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006); see also First Hartford Corp. Pension Plan & Tr. v. United States, 194 F.3d 1279, 1290 n.3 (Fed. Cir. 1999); South Corp. v. United States, 690 F.2d 1368, 1369-71 (Fed. Cir. 1982).

> First, did the parties intend to provide for liquidated damages or a penalty? Second, does uncertainty in the amount and difficulty in ascertainment of damages support the provision for liquidated damages in this contract? Third, does the amount of damages bear a reasonable relationship to any actual damages that may be sustained as a result of default?

Id. at 151-52, 546 F.2d at 377 (citations omitted); see also Safeco Credit v. United States, 44 Fed. Cl. at 413-14 (finding a liquidated damages provision enforceable based on the Higgs inquiries); Nebco & Assocs. v. United States, 23 Cl. Ct. 635, 647 (1991) (finding a liquidated damages provision enforceable based on the Higgs inquiries and "[b]ecause plaintiff did not offer any evidence to support its contention that the liquidated damages provision in the contract constituted a penalty" (alteration added)); Cegers v. United States, 7 Cl. Ct. 615, 618 (1985).

Moreover, the use of the word "penalty" as opposed to the phrase "liquidated damages" in a contract is not dispositive of whether the amount imposed or deducted is a penalty or liquidated damages. See United States v. Bethlehem Steel Co., 205 U.S. at 120 (finding that the use of the word "penalty" was not "indicative of the technical and legal difference between penalty and liquidated damages"); see also Kirkland Distrib. Co. of Columbia, S.C. v. United States, 276 F.2d 138, 144 (4th Cir. 1960); Fraser v. United States, 261 F.2d 282, 286 (9th Cir. 1958). When the amount imposed is not so "extraordinarily disproportionate to the damage which might result" then it can be determined that the parties did not intend a penalty. See United States v. Bethlehem Steel Co., 205 U.S. at 121; see also Wise v. United States, 249 U.S. at 365.

The appropriateness of a liquidated damages clause is to be evaluated under the conditions present at of the time of contracting, and not under the conditions present after damages have occurred. See Priebe & Sons v. United States, 332 U.S. at 412 (citing United States v. Bethlehem Steel Co., 205 U.S. at 121); see also Steve Kirchdorfer, Inc. v. United States, 229 Ct. Cl. at 566 (quoting Priebe & Sons v. United States, 332 U.S. at 411-12); Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212 (quoting K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 50); K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 50 (citing Priebe & Sons v. United States, 332 U.S. at 412; and United States v. Bethlehem Steel Co., 205 U.S. at 119); M. Maropakis Carpentry, Inc. v. United States, 84 Fed. Cl. at 207 (citing Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. at 334, 580 F.2d at 412). Whether damages were difficult to ascertain is reviewed at the time of contracting. See DJ Mfg. Corp. v. United States, 86 F.3d at 1137 (citing Young Assocs., Inc. v. United States, 200 Ct. Cl. 438, 445, 471 F.2d 618, 622 (1973)); see also Steve Kirchdorfer, Inc. v. United States, 229 Ct. Cl. at 566; Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. at 334, 580 F.3d at 412 ("These provisions are to be judged as of the time of making the contract." (quoting Priebe & Sons v. United States, 332 U.S. at 411-12)); K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 50 (citing Priebe & Sons v. United States, 332 U.S. at 412); Cegers v. United States, 7 Cl. Ct. at 619 (citing Priebe & Sons v. United States, 332 U.S. at 412). Although courts are limited to evaluating the reasonableness of a liquidated damages clause under the conditions present at the time of contracting, courts are not prohibited from reviewing the reasonableness and

enforceability of a liquidated damages clause after the contract has been formed and after breach has occurred. See K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 51 (finding that Priebe & Sons v. United States, 332 U.S. at 412, "directs the court to examine the conditions that existed at the time of contract formation, but does not prevent the court from examining those conditions after a breach has occurred, which may be several years later"); but see P & D Contractors, Inc. v. United States, 25 Cl. Ct. 237, 241 (finding plaintiff's failure to argue the reasonableness of the liquidated damages at the time the contract was executed foreclosed the plaintiff from arguing the reasonableness of the liquidated damages before the court), aff'd, 985 F.2d 583 (Fed. Cir. 1992), reh'g denied, en banc suggestion declined (Fed. Cir. 1993).

Liquidated damages may be imposed without proof of actual damages by the nonbreaching party. See K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 50 (citing Priebe & Sons v. United States, 332 U.S. at 412; and United States v. Bethlehem Steel Co., 205 U.S. at 119); see also Steve Kirchdorfer, Inc. v. United States, 229 Ct. Cl. at 566-67; Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212 (quoting K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. at 50); Cegers v. United States, 7 Cl. Ct. at 620 (citing Steve Kirchdorfer, Inc. v. United States, 229 Ct. Cl. at 567). Even if a purported liquidated damages provision is found to be an unenforceable penalty, however, some courts, albeit not the Federal Circuit, have held that the innocent party may still recover by proving actual damages. See United States v. Reisman, 611 F.2d 325, 329 (9th Cir. 1980); In re Montgomery Ward Holding Corp., 326 F.3d 383, 390 (3d. Cir. 2003) ("[I]f the clause fixing damages is merely to secure performance of the agreement, it will be treated as a penalty and only actual damages proved can be recovered." (alteration added) (quoting Stride v. 120 W. Madison Bldg. Corp., 132 Ill. App. 3d 601, 605, 477 N.E.2d 1318, 1321 (1985))); see also 24 WILLISTON ON CONTRACTS § 65:32 (4th ed. 2026) ("[I]f a liquidated damages clause in a contract is unenforceable, the nonbreaching party may nevertheless be entitled to compensation for its actual damages." (alteration added) (citing Schroeder v. Partin, 151 Idaho 471, 259 P.3d 617 (2011); and Foreign & Acad. & Cultural Exch. Servs., Inc. v. Tripon, 394 S.C. 197, 715 S.E.2d 331 (2011))).

In its Motion for Summary Judgment, GXO argues that the "Penalty Provision" in Part I, Section 2.0 of the SOW is "unenforceable as a matter of law because it was intended to exact punishment rather than to impose liquidated damages." GXO relies primarily on two cases to support its argument that the "Penalty Provision" is an unenforceable penalty as a matter of law. First, pursuant to the three inquiries described in Higgs v. United States, 212 Ct. Cl. at 151-52, 546 F.2d at 377, GXO argues that the "Penalty Provision" is an unenforceable penalty as a matter of law because (1) "the facts establish that the intent behind the provision was for the USPS to exact penalties," (2) "there was no uncertainty in the amount or difficulty in ascertaining the damages that could have resulted from mail containers failing to dispatch on time," and (3) "the amount of damages in the penalty provision bore no relationship to any actual damages that might have been sustained as a result of containers failing to dispatch on time." Second, GXO argues that "if the Contract were interpreted as imposing penalties based on some deadline that anteceded the actual time when the last outbound trucks departed for a given day, then that interpretation would render the penalty provision unenforceable"

under the United States Supreme Court's decision in Priebe & Sons v. United States, 332 U.S. at 412-13 (emphasis in original).

In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant responds that "despite being referred to as a penalty provision, the clause contained in section 2.0 of the CTHO[38] is an enforceable liquidated damages provision," (footnote added), and that "GXO has failed to prove that the liquidated damages provision in the CTHO contract is unenforceable." With respect to the three Higgs inquiries identified above, defendant argues that (1) "GXO has failed to establish the first element of the unenforceability test because the Postal Service did not include the penalty provision merely to penalize plaintiff," (2) "GXO has also failed to establish the second element of the unenforceability test" because "there is uncertainty and difficulty in this case in ascertaining the actual damages that resulted from GXO's breaches," and (3) "GXO has failed to establish the third element of the unenforceability test" because "the stipulated amount of $1,200 per delayed container" bears a "reasonable relationship to the actual damages that the Postal Service sustains from GXO's defaults." Moreover, citing Priebe & Sons v. United States, 332 U.S. at 411-12, defendant states that "[t]here are many circumstances when actual damages are difficult or impossible to quantify, and in those circumstances a liquidated damages clause, such as the one present here, is appropriate." (alteration added).

The parties agree that GXO, as the party challenging the "Penalty Provision," bears the burden of proving that the "Penalty Provision" is unenforceable. See also DJ Mfg. Corp. v. United States, 86 F.3d at 1134. With respect to the first Higgs inquiry, which asks, "did the parties intend to provide for liquidated damages or a penalty?" Higgs v. United States, 212 Ct. Cl. at 151, 546 F.2d at 377, GXO argues that "[t]he plain language of the Statement of Work shows that the parties did not contemplate liquidated damages but rather intended for penalties because it states, '[t]he supplier will be penalized $1200.00 per container that fails to be dispatched on time.'" (second alteration in original; emphasis in original). GXO also argues that the SOW's failure to label or refer to the "Penalty Provision" in Part I, Section 2.0 of the SOW as a liquidated damages provision and defendant's repeated references "to the withheld amount as a penalty, rather than as the imposition of liquidated damages" is evidence that defendant intended the "Penalty Provision" to operate as a penalty. Moreover, GXO asserts that "the USPS had a standard clause for liquidated damages available at the time of award, Clause 2-10, Liquidated Damages (March 2006) [in the USPS Supplying Principles and Practices Manual], which the USPS could have incorporated in order to seek liquidated damages." (emphasis in original; alteration added). GXO argues that "[t]he USPS's decision to forego incorporating this standard clause—which was required for contracts contemplating liquidated damages—shows that the USPS did not actually intend for the Contract to impose liquidated damages, but rather that the USPS wanted to exact penalties." (alteration added).

[38] As indicated above, perhaps defendant's reference to "section 2.0 of the CTHO" was intended to reference Section 2.0 of the SOW.

As indicated above, GXO also claims that a conversation which allegedly occurred between Mr. Samer Tadros, the former Director of Operations for GXO, and Mr. James Karasoulis, an allegedly former USPS employee, prior to the award of the CTHO Contract, should be considered evidence that defendant intended to penalize GXO if mail was delayed. The alleged conversation between Mr. Tadros and Mr. Karasoulis is recounted to the court in an unsworn declaration from Mr. Tadros, which was submitted as an exhibit to GXO's Motion for Summary Judgment. GXO alleges that sometime before the award of the CTHO Contract, Mr. Karasoulis told Mr. Tadros that "the USPS wanted to be able to seek penalties for performance delays as a means to motivate performance" and that Mr. Karasoulis "wanted to base the penalty rate per container on three times what GXO earned sorting a container's worth of mail." GXO alleges that Mr. Tadros told Mr. Karasoulis that GXO earned approximately $400.00 in revenue per container. GXO alleges that "Mr. Karasoulis then asked Mr. Tadros if GXO would agree to a penalty rate of $1,200, and Mr. Tadros replied that GXO likely would." GXO also alleges that "[t]he Statement of Work subsequently incorporated a penalty rate of $1,200 per container." (alteration added). GXO argues that Mr. Tadros's unsworn declaration demonstrates that the penalty rate "bore no relationship to the USPS's anticipated damages for containers that might fail to dispatch on time and that the provision was expressly intended as a penalty."

In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant cites to United States v. Bethlehem Steel Co., 205 U.S. at 119-20, to argue that "[t]he mere fact that the plain language of the contract uses the word 'penalized' does not establish that the liquidated damages provision is unenforceable." (alteration added). Defendant also argues that if the CTHO Contract is read as a whole, "it is evident that the inclusion of the 'penalty' provision in Section 2.0 was intended as a reasonable protection against uncertain future litigation regarding GXO's failure to comply with its 'dispatch performance' obligations, not to penalize the company." Defendant further argues that its decision not to use its standard liquidated damages clause, Clause 2-10 from the USPS Supplying Principles and Practices Manual, does not prove that the USPS intended to impose a penalty rather than liquidated damages. Defendant asserts that Clause 2-10 is "largely applicable to construction contracts, not service contracts" and was not necessarily appropriate for use in the CTHO Contract. Defendant also notes that:

> The purported "template" [Clause 2-10] is contained in the Postal Service's Supplying Principles and Practices (SP&Ps) [Manual], which are not mandatory rules or regulations of the Postal Service, but rather are internal guidelines intended to provide for flexibility and discretion in their application to specific business situations. See 39 C.F.R. § 211.2(a). Indeed, the General Overview introducing the SP&P's explicitly state [sic] that: "the SPs and Ps, . . . are intended for internal use only to assist the Postal Service in obtaining best value and efficiently conducting its supply chain functions. These SPs and Ps are advisory and illustrative of approaches that may generally be used by Postal Service employees, but are intended to provide for flexibility and discretion in their application to specific business

> situations. Consistent with that intent, these SPs and Ps create no rights, substantive or procedural, enforceable against the Postal Service."

(omission in original; alterations added) (quoting UNITED STATES POSTAL SERVICE, SUPPLYING PRINCIPLES AND PRACTICES at 3). Despite the foregoing, defendant argues that the "Penalty Provision" in Part I, Section 2.0 of the SOW "mirrors" the purpose of Clause 2-10 because:

> [A] cursory review of the Postal Service's template liquidated damages provision shows that it is designed to impose "liquidated damages as agreed for each calendar day of delay" when the "supplier fails to complete the work, deliver the supplies or perform the services within the time specified in this contract." Similarly, the penalty/liquidated damages in the CTHO contract mirrors this explanation in stating that:
>
> > The Postal Service expects 100% on-time dispatch performance and 100% distribution accuracy for all mail tendered to and sorted by the supplier. The USPS will be responsible for 80% VAP before 02:00 am to help ensure timely clearance every night. The supplier will be penalized $1200.00 per container that fails to be dispatched on time.
>
> "Dispatch performance" requires GXO to "execute and complete its appointed duties ensuring that processed volumes are actually moved as planned," and Section 5.1 of the contract shows the times when the processed volumes are supposed to be moved. When GXO does not comply with those deadlines, the processes [sic] volumes are delayed, and the stipulated $1,200 amount is applied to those delays.

(alterations added; internal references omitted).

In addition, defendant argues that Mr. Tadros's unsworn declaration, which describes an alleged conversation between Mr. Tadros and Mr. Karasoulis, should be disregarded by the court under RCFC 56(c)(2).[39] Defendant argues that Mr. Tadros is a potential fact witness in this case and his unsworn declaration constitutes inadmissible hearsay statements made by a former USPS employee who was not a contracting officer on the CTHO Contract between GXO and the USPS. Defendant further asserts that Mr. Karasoulis retired from the USPS on or around September 17, 2017, before the CTHO Contract was finalized on November 1, 2018. According to defendant, "Mr. Karasoulis was not deposed in this case, nor has he authored contemporaneous documentation produced in discovery that either confirms or denies Mr. Tadros's hearsay statements included in his declaration." Defendant further argues that Mr. Tadros's unsworn

---

[39] RCFC 56(c)(2) provides that, in responding to a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Id. (alteration added).

declaration offers "only GXO's characterization of his [Mr. Karasoulis's] statements" and is "an inherently biased and self-serving account that lacks direct corroboration." (alteration added).

Based on the record currently before the court to date, it appears that GXO has failed to demonstrate that it is entitled to summary judgment pursuant to the first Higgs inquiry, on the ground that defendant intended the "Penalty Provision" to operate as a penalty, which squarely raises the issue of intent and remains an open question based on the record currently before the court. Just because the challenged clause in the "Penalty Provision" in Part I, Section 2.0 of the SOW uses the term "penalized," instead of the phrase "liquidated damages," is not necessarily dispositive of whether the clause is an unenforceable penalty provision or an enforceable liquidated damages provision. See United States v. Bethlehem Steel Co., 205 U.S. at 120 ("The word 'penalty' is used in the correspondence, even by the officers of the government, but we think it is evident that the word was not used in the contract nor in the correspondence as indicative of the technical and legal difference between penalty and liquidated damages."). The same applies to the use of the word "penalty" to refer to the SOW's "Penalty Provision" in communications between GXO and defendant. See id. Second, while GXO points out that defendant did not utilize its standard liquidated damages clause in the SOW, at this time, GXO has not established why defendant's decision not to use the standard liquidated damages clause in the SOW should be considered evidence that defendant intended the "Penalty Provision" in the SOW to operate as a penalty. The USPS Supplying Principles and Practices Manual also states that the supplying principles and practices in the Manual "are intended for internal use only to assist the Postal Service in obtaining best value and efficiently conducting its supply chain functions." See UNITED STATES POSTAL SERVICE, SUPPLYING PRINCIPLES AND PRACTICES at 3. The USPS Supplying Principles and Practices Manual also states it is advisory and illustrative of approaches that may generally be used by USPS employees and that the agency has the flexibility to utilize the liquidated damages clause in its discretion. See id. The USPS contracting officer who drafted the SOW was free to use his or her discretion to utilize or not utilize Clause 2-10 when drafting the SOW. Third, with respect to the unsworn declaration of Mr. Tadros, which describes a conversation Mr. Tadros alleges to have had with Mr. Karasoulis concerning the inclusion of a "penalties" clause in the SOW solely for the purpose of spurring GXO's performance, defendant is correct that, to date, it appears that Mr. Karasoulis has not been deposed in this case, nor has he produced any contemporaneous writings that describe his impressions of the alleged conversation between himself and Mr. Tadros. At this time, the record currently before the court is not sufficiently developed for the court to make a credibility finding regarding Mr. Tadros's unsworn declaration, or to evaluate the veracity of the content of the alleged conversation between Mr. Tadros and Mr. Karasoulis, based solely on Mr. Tadros's unsworn, and currently unsubstantiated, declaration. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (alteration added)). Therefore, at this time, there remain genuine disputes of material fact as to whether the USPS intended the "Penalty Provision" to operate as a penalty.

With respect to the second Higgs inquiry, which asks, "does uncertainty in the amount and difficulty in ascertainment of damages support the provision for liquidated damages in this contract?" Higgs v. United States, 212 Ct. Cl. at 151-52, 546 F.2d at 377, GXO argues that "there was no uncertainty in the amount or difficulty in ascertaining the damages that could have resulted from mail containers failing to dispatch on time." In an attempt to support that assertion, GXO argues that:

> Any delayed mail would still be delivered to the USPS customer by being dispatched on the next outbound truck and "the USPS does not issue refunds or provide other consideration to USPS customers when Priority Mail or First-Class Mail is delayed," which are the only classes of mail GXO processed. Thus, the USPS could not have anticipated damages associated with customers who might seek financial remedies for delivery delays.

(internal references omitted).

In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant argues that "GXO is incorrect in asserting that the Postal Service cannot establish damages for GXO's breach in the absence of an obligation to provide customers with refunds for delayed packages." Defendant argues that "[a]t a minimum, the Postal Service could seek reliance damages in this case," such that defendant could "recover every dollar it spent under the contract related to each delayed container, which would be approximately $626 to $887 per container."[40] (alteration added). Defendant claims the USPS "could also recover costs it incurred for replacement services at GXO's expense under Clause 2-1 of the CTHO contract" for "additional transportation costs and labor costs it potentially incurred because GXO failed on the fourteen days in question to timely process all tendered packages in accordance with the critical entry times and clearance times mandated in Section 5.1." Moreover, defendant argues that it suffers harm to its brand "when customers cannot not [sic] rely on it to deliver its packages in a timely manner, particularly during the holiday season when timely delivery is essential," and that the damages flowing from that reputational harm are "incalculable for the loss of customers during the holidays when they feel they cannot trust the Postal Service [sic] provide reliable service." (alterations added).

In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant also includes an unsworn declaration from Ms. Radiah Johnson-Bryant, who served as the USPS Contracting Officer during the final year of the CTHO Contract, to explain the types of "difficult to quantify" damages that defendant

---

[40] As discussed below, in their filings, the parties present various, confusing, and potentially incorrect, mathematical calculations regarding how many dollars defendant "spent under the contract related to each delayed container" and the amount of revenue GXO earned per container of mail processed, which provides the court another basis to find that summary judgment is not appropriate at this stage of the proceedings.

alleges justified the inclusion of the "Penalty Provision" in the SOW.[41] Defendant attempts to rely on Ms. Johnson-Bryant's unsworn declaration to demonstrate that the alleged damages resulting from GXO's failure to timely process mail are difficult to ascertain and quantify and, therefore, that the "Penalty Provision" in Part I, Section 2.0 of the SOW should be considered an enforceable liquidated damages provision under the second Higgs inquiry. See Higgs v. United States, 212 Ct. Cl. at 151-52, 546 F.2d at 377 ("Second, does uncertainty in the amount and difficulty in the ascertainment of damages support the provision for liquidated damages in this contract?"). In her unsworn declaration, Ms. Johnson-Bryant alleges that the USPS could suffer "real and substantial damages when mail and packages do not meet processing deadlines" and that "these damages are difficult to quantify" which is why the USPS relies "on payment reduction, disincentive or liquidated damages clauses in our [the USPS's] contracts with suppliers." (alteration added). In her unsworn declaration, Ms. Johnson-Bryant states:

> The Postal Service has long had established schedules for all stages of mail processing, customer service, retail, delivery, and transportation throughout the nation, which are designed to operate in alignment with one another. Delivery schedules have long been built around the Postal Service's operating plan to ensure that mail is timely transported from collection points to mail processing facilities and distribution facilities, and from there to delivery units, in compliance with service standards. For example, the Postal Service's operating plan for mail processing facilities have established schedules for when they are to begin processing mail (Critical Entry Times or CET) and for when mail processing is to be completed, and containers filled with sorted mail (Clearance Times or CT). Transportation schedules mesh with these processing facilities' schedules to meet our service standards.
>
> When any part of that process does not move as planned, e.g., if processing does not meet its Clearance Times for when it is to be completed, or Critical Entry Times for the next leg in the process, the Postal Service experiences extra transportation and labor costs.

In her unsworn declaration, Ms. Johnson-Bryant identifies three kinds of damages—extra transportation costs, increased labor costs, and reputational harm—that the USPS allegedly could incur as a result of GXO's "delayed performance" under the CTHO Contract. Concerning extra transportation costs, Ms. Johnson-Bryant states in her unsworn declaration:

> The Postal Service has negotiated agreements with surface transportation contractors that require the contractors to transport mail according to

---

[41] The court notes that defendant was critical of GXO for including the unsworn declaration of Mr. Tadros in GXO's Motion for Summary Judgment. As indicated above, both GXO's and defendant's reliance on the unsworn declarations of Mr. Tadros and Ms. Johnson-Bryant raise significant issues of credibility.

> specific schedules and service levels and provide for the contractor's submission of charges for extra trips not contemplated by the contractual transportation schedule for late charges, i.e., extra time outside the schedule that trucks have to wait for mail processing and loading to be completed. So, when determining the damages level for a supplier's failure to move mail under the established processing schedule, we anticipate increased transportation costs due to late trips while trucks wait to be loaded with late processed mail, and extra trips that must be run to collect and move mail that did not make its original transportation schedule. These are real costs to the Postal Service that could not be quantified when the Postal Service entered into the CTHO Contract with GXO.

Regarding increased labor costs, Ms. Johnson-Bryant states in her unsworn declaration:

> It is also not uncommon for the Postal Service to see increased down-the-line labor costs when processing at one facility does not move as planned – and this is true even if mail or packages ultimately arrive on time to a customer. If a truck arrives late at its next destination due to delays at the originating processing facility, the receiving facility often has to use extra work hours to complete the delivery or processing functions required to "catch up." In these circumstances, the Postal Service incurs additional labor or overtime costs, when it is required to bring in additional staffing or to having [sic] staffing work extra hours.

(alteration added). Regarding reputational harm, Ms. Johnson-Bryant states in her unsworn declaration that

> there are real, unquantifiable damages to the Postal Service when customers do not believe that their mail or packages will arrive within our service standards. Although we do not have to refund customers for delays, we suffer reputational harm that results in loss of customers and revenue. So, while customers may not receive monetary damages from the Postal Service, they may simply choose not to use our services as a result of delays, particularly during the holidays.

In its Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motions for Summary Judgment, GXO responds by arguing that "[t]he Government makes no attempt to explain how it could suffer harm from GXO missing the earlier, interim Clearance and Critical Entry Times." (capitalization in original; alteration added). GXO continues:

> The Government's proffered declaration from Ms. Johnson-Bryant also does nothing to show that the USPS could have suffered damages under the Government's interpretation, because she does not explain how any of the damages she identified could have resulted from GXO missing the

> earlier Clearance Time for the Secondary Bullpen or the Critical Entry Time for the Platform Outbound.

GXO also argues that Ms. Johnson-Bryant appears to be "referring to 'Clearance Time' as the time by when mail processing is supposed to be completely finished at a facility, and the Critical Entry Time as the time when mail begins the next part of its trip, i.e., moving to the next USPS sorting or distribution facility" and not referring to the internal deadlines listed in the table in Section 5.1 of the SOW. (emphasis in original; internal references omitted). Regarding transportation costs, GXO argues that

> the outbound trucks departed throughout the day, with multiple departures for most destinations at various times, and the vast majority of trucks dispatching mail from the CTHO facility were scheduled to arrive throughout the morning hours after the Critical Entry Time for the Platform Outbound. Thus, what Ms. Johnson-Bryant is describing is not a cost the USPS incurred if GXO missed the Clearance Time for the Secondary Bullpen or the Critical Entry Time for Platform Outbound. Rather, she is describing costs associated with mail not being ready by the time outbound trucks were scheduled to depart. It is also important to note that if mail was not ready for dispatch by the time an outbound truck was scheduled to depart, then the mail could be loaded on one of the later trucks that were headed to the same destination that day.

(emphasis in original; internal references omitted). GXO further argues that

> the only reason that the USPS would need to order additional trucks would be if the mail was not loaded onto its originally-scheduled outbound truck. The USPS would not have to order additional trucks simply because mail missed the Clearance Time for the Secondary Bullpen or the Critical Entry time for the Platform Outbound, because neither of these corresponded to the departure times for outbound mail.

Moreover, GXO alleges that

> Ms. Johnson-Bryant appears to be unfamiliar with the CTHO Contract because the Contract already included an express mechanism for charging GXO for the costs paid for trucks having to wait for processing to be completed. Specifically, the Contract provided that "[a]ny transportation delays that results [sic] with an issuance of a PS 5466 (Late Slip), the burden for the cost will be the responsibility of the supplier during the payment reconciliation process." Hence, the notion that the penalty provision might have been intended to recover for the costs associated with outbound trucks waiting to be loaded with mail is belied by the fact that the parties already had a separate mechanism for GXO to pay the USPS for any such costs.

(internal citation omitted; alterations and emphasis in original). GXO also argues that "even if the [CTHO] Contract had not included such a reconciliation mechanism, the Government easily could have calculated the costs associated with trucks waiting by adding up the total amount paid under the issued late slips." (alteration added). Further, GXO argues that the costs associated with ordering additional transportation "can be easily ascertained by compiling the information from invoices paid to third-party transportation companies and, to the extent any were used, the costs associated with deploying a postal service vehicle to dispatch the mail."

Concerning labor costs, GXO argues that Ms. Johnson-Bryant admits in her unsworn declaration that increased labor costs are "dependent on mail failing to leave the facility on the outbound trucks on time," by stating that "'[i]f a truck arrives late at its next destination due to delays at the originating processing facility, the receiving facility often has to use extra work hours to complete the delivery or processing functions.'" (emphasis in original; alteration added). GXO also argues that "neither the Clearance Time for the Secondary Bullpen operation nor the Critical Entry Time for the Platform Outbound corresponded to the point when mail left the facility on outbound trucks" and consequently, a delay in meeting either of those deadlines cannot cause defendant to incur increased labor costs as alleged by the USPS. Moreover, GXO argues that "these additional staffing costs are readily ascertainable" because "USPS need only look at the additional labor hours to calculate the increased labor costs over and above what it was due to pay."

Regarding reputational harm, GXO argues that this category of damages is "based on mail failing to actually depart the facility on time–not missing an earlier, interim Clearance or Critical Entry Time." GXO states that "it is difficult to imagine how a USPS customer could be affected (let alone know) that a contractor had missed an interim milestone that was internal to the mail-processing operation if the mail still made it onto the outbound truck on time," and that "any purported delays at the CTHO resulting in mail not making it onto the last outbound truck would, at most, be limited to one day's worth of delay." Therefore, according to GXO, "the suggestion that the USPS suffers reputational harm rings hollow, given that the classes of mail processed at the CTHO facility did not even have guaranteed delivery dates."

The second Higgs inquiry requires the court to consider whether potential damages were uncertain in amount or difficult to ascertain under the conditions present at the time of contracting, not whether damages were uncertain in amount or difficult to ascertain after a breach has occurred. See DJ Mfg. Corp. v. United States, 86 F.3d at 1137; see also Cegers v. United States, 7 Cl. Ct. at 619 (citing Priebe & Sons v. United States, 332 U.S. at 412). Based on the record before the court to date, GXO has failed to demonstrate that the USPS knew, or could have known, at the time of contracting, that GXO would limit any potential delay in moving a container of mail out of the CTHO facility to a single day, as suggested by GXO. In addition, GXO's attempts to refute the allegations made by Ms. Johnson-Bryant in her unsworn declaration calls into question the reliability of the evidence defendant relies on to justify the inclusion of the "Penalty Provision" in the SOW. Although Ms. Johnson-Bryant's unsworn declaration describes

extra transportation costs, increased labor costs, and reputational harm that, according to Ms. Johnson-Bryant, the USPS allegedly could incur as a result of GXO's "delayed performance" under the CTHO Contract, Ms. Johnson-Bryant was not the USPS Contracting Officer who negotiated and drafted the CTHO Contract or the "Penalty Provision" at issue. Similar to Mr. Tadros's unsworn declaration discussed above, at this time, the record currently before the court is not sufficient for the court to make a credibility finding regarding Ms. Johnson-Bryant's unsworn declaration, or to judge the accuracy of the alleged damages Ms. Johnson-Bryant alleges in her unsworn declaration. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (alteration added)). There remain too many genuine disputes of material fact as to whether the damages defendant may incur, as a result of a GXO breach, were certain in amount or easy to ascertain at the time of contracting. Based on the record before the court to date, it appears that GXO has failed to demonstrate that plaintiff is entitled to summary judgment at this time pursuant to the second Higgs inquiry, on the ground that the "Penalty Provision" is unsupported by uncertainty in the amount, or difficulty in the ascertainment, of damages. As the party bearing the burden of proof on this issue, GXO has failed to present affirmative evidence demonstrating that the damages the USPS may incur as a result of a GXO breach were certain in amount or easy to ascertain at the time of contracting.

With respect to the third and final Higgs inquiry, which asks, "does the amount of damages bear a reasonable relationship to any actual damages that may be sustained as a result of default?" Higgs v. United States, 212 Ct. Cl. at 152, 546 F.2d at 377, GXO argues that "the amount of damages in the penalty provision bore no relationship to any actual damages that might have been sustained as a result of containers failing to dispatch on time" because defendant "based the penalty rate on GXO's approximate revenue rate of $400 per container's worth of mail [processed by GXO] – not on any potential damage that the USPS anticipated." (alteration added). GXO again bases this argument on the unsworn declaration of Mr. Tadros, in which Mr. Tadros alleged that he informed the USPS that "GXO earned approximately $400 in revenue for each container's worth of mail that we [GXO] sorted." (alteration added). GXO argues that "there was no attempt to make this [the dollar amount in the "Penalty Provision"] proportional to any harm the USPS might have anticipated because the penalty rate was equivalent to three times" the amount of revenue that GXO allegedly earned per container of mail processed. (alteration added).

In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant states that although "GXO approximates the amount of revenue it earned under the CTHO Contract as $400" per-container, based on the unsworn declaration of Mr. Tadros, this approximation "is not dispositive of the reasonability of the stipulated damages amount." Defendant contends that "[r]egardless of how the liquidated damages amount was arrived at, the liquidated damages clause will be enforced if the amount is reasonable at the time the agreement was made." (alteration added) (citing DJ Mfg. Corp. v. United States, 86 F.3d at 1137). Defendant also argues that, based on the potential costs incurred as a result of a GXO breach discussed in Ms.

Johnson-Bryant's unsworn declaration, defendant has demonstrated "that the stipulated amount of $1,200 per delayed container is reasonable, and it is unnecessary for this Court to inquire into the process that the contracting officer followed in arriving at the liquidated damages that was agreed to in the contract." Nevertheless, defendant disagrees that it paid GXO $400.00 per container of mail processed and instead argues that it "can demonstrate that it anticipated incurring a cost under the contract of approximately $890 per container for every container delayed," albeit, the court notes that defendant has not demonstrated the cost that the USPS incurred for every container delayed, even minimally, based on the record before the court at this time.[42] Defendant continues, using the $890.00 per container figure, and

> [s]ubtracting this pro-rata cost from the $1,200 liquidated damages amount, would leave an estimated amount of approximately $310 that the USPS incurs in additional transportation costs and labor costs for each delayed container. As our analysis demonstrates, the $1,200 per container stipulated liquidated damages specified in Section 2.0 of the CTHO contract is a reasonable approximation of the harm the Postal Service incurs from delayed processing.

(alteration added).

In its Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment, GXO responds to defendant by arguing that defendant's "'back of the envelope' calculation" to prove that it paid $890.00 per container of mail does not include any substantiating evidence that defendant actually incurred additional transportation and labor costs for each delayed container of mail. GXO further argues that "the Government bases its rationale on the unsupported and incorrect assumption that it would be entitled to recover all the money it paid to GXO [under the SOW's "Penalty Provision"] for mail that was delayed" which is incorrect because "[a]ny mail that was purportedly delayed would have still been processed and sent out for delivery, i.e., the USPS still received the benefit of GXO's performance." (alterations

---

[42] Although defendant primarily relies on this $890.00 per container figure in an attempt to demonstrate that the "Penalty Provision" bore a reasonable relationship to defendant's actual damages, defendant submits nine different costs-per-container figures to this court, applying various container conversion rates, in its submissions to this court. Upon the court's independent review of the figures presented by GXO and defendant, it appears that the parties were using different, potentially incorrect, container conversion rates to determine GXO's revenue-per-container figure, which provides another basis for the court to find that summary judgment is not appropriate at this stage of the proceedings. As discussed more fully below, however, the parties' respective, differing math regarding GXO's revenue-per-container amount is not dispositive to determine whether the "Penalty Provision" is enforceable under the third Higgs inquiry, which requires the court to consider whether the $1,200.00 in liquidated damages bore a reasonable relationship to defendant's actual damages, rather than GXO's revenue-per-container amount. See Higgs v. United States, 212 Ct. Cl. at 152, 546 F.2d at 377.

added). GXO, thus, maintains that "the Government has done nothing to show that the $1,200 per container penalty rate had a reasonable relationship to any actual damage that it may have sustained as a result of the default," and that "GXO has shown that the USPS's rationale for setting the penalty provision bore no reasonable relationship to its anticipated damages."

Based on the record before the court to date, it appears that GXO, at this time, has failed to demonstrate that it is entitled to summary judgment pursuant to the third Higgs inquiry, on the ground that the "Penalty Provision" does not bear a reasonable relationship to any actual damages that may be sustained as a result of default. As an initial matter, the parties' respective arguments and speculative mathematical calculations concerning the revenue GXO received per container of mail processed, and the applicable conversion rate, apply the wrong standard. As stated above, the appropriate standard to apply when considering whether the "Penalty Provision" is unenforceable is whether the stipulated amount (i.e., $1,200.00 per container that GXO failed to dispatch on time) bears a reasonable relationship to any actual damages that defendant may sustain as a result of default, not whether the stipulated amount bears a reasonable relationship to the breaching party's revenue. See Higgs v. United States, 212 Ct. Cl. at 152, 546 F.2d at 377. Moreover, "the test is objective; regardless of how the liquidated damage figure was arrived at, the liquidated damages clause will be enforced 'if the amount stipulated is reasonable for the particular agreement at the time it is made.'" DJ Mfg. Corp. v. United States, 86 F.3d at 1137 (citing Young Assocs., Inc. v. United States, 200 Ct. Cl. at 445, 471 F.2d at 622). As the party bearing the burden of proving that the "Penalty Provision" does not bear a reasonable relationship to the USPS's actual damages, GXO has failed to present any evidence at this stage of the litigation to demonstrate that assessing a $1,200.00 "penalty" per container that GXO fails to dispatch on time does not bear a reasonable relationship to the USPS's actual damages. Instead, GXO alleges only that the USPS "based the penalty rate on GXO's approximate revenue rate of $400 per container's worth of mail [processed by GXO] – not on any potential damage that the USPS anticipated." (alteration added). The only evidence GXO relies on for its revenue argument is the unsworn declaration of Mr. Tadros, which, as discussed above, is unsubstantiated and not reliably sufficient to utilize to resolve a motion for summary judgment. At the same time, defendant relies on the unsworn declaration of Ms. Johnson-Bryant to argue that the stipulated $1,200.00 "penalty" per container of mail that GXO fails to dispatch on time is reasonable in relation to the USPS's actual damages. The resolution of the third Higgs inquiry would require the court to make credibility findings and speculate on the veracity of the content of both Mr. Tadros's and Ms. Johnson-Bryant's unsworn, and unsubstantiated, declarations, which is not appropriate based on the record currently before the court to date on the parties' cross-motions for summary judgment. Accordingly, there remain genuine disputes of material fact as to whether the "Penalty Provision" bore a reasonable relation to the USPS's actual damages pursuant to the third Higgs inquiry. In sum, at this time, GXO is not entitled to summary judgment on the ground that the "Penalty Provision" in Part I, Section 2.0 of the SOW is unenforceable as a matter of law pursuant to the three Higgs inquiries.

As indicated above, after discussing the three Higgs inquiries, GXO also argues that "if the Contract were interpreted as imposing penalties based on some deadline that anteceded the actual time when the last outbound trucks departed for a given day, then that interpretation would render the penalty provision unenforceable" under Priebe & Sons v. United States, 332 U.S. 407 (emphasis in original; alteration added). The United States Supreme Court's decision in Priebe & Sons addressed whether a specific provision in a government contract for liquidated damages should be denied enforcement on the grounds that it constituted a penalty. See id. at 408. The Supreme Court in Priebe & Sons explained that "the United States acting through agencies of the Department of Agriculture embarked on a program of purchasing dried eggs for shipment to England and Russia. Petitioner agreed to furnish a quantity of dried eggs under that program to the Federal Surplus Commodities Corporation (FSCC)." Id. The government contract at issue in Priebe & Sons required the supplier to have the dried eggs "inspected and ready for delivery by" May 18, 1942, with actual delivery set to occur within a 10-day window following May 18, 1942, at the direction of the government, to allow supplies to be loaded "whenever shipping space was available." See id. at 408-09, 411. According to the United States Supreme Court in Priebe & Sons, the contract at issue "contained two provisions respecting 'liquidated damages,'" one for delays of delivery and one for "failure to have specified quantities of dried egg products inspected and ready for delivery by the date specified in the offer." Id. at 408-09. By May 18, 1942, the dried eggs had not been inspected, however, the dried eggs were inspected and ready for delivery by May 26, 1942, the delivery date set by the government in the contract. See id. at 409. The government determined that although the dried eggs had been timely shipped, the inspections had not occurred by the date specified in the contract; consequently, the government imposed "liquidated damages" against the supplier under the theory that the supplier defaulted on the contract when the supplier failed to have the dried eggs inspected by the May 18, 1942 inspection date. See id. at 409-10. The United States Supreme Court in Priebe & Sons determined that, under the contract, the date chosen for inspection to be completed was not when "delivery was due" and that performance by the supplier was not due until the government requested, and provided instructions for, delivery. See id. at 410. Thus, the United States Supreme Court determined that the "[t]he contract was drawn . . . to make the 'liquidated damages' provisions include so-called defaults of petitioner which antedated the time when delivery was due but which in no way interfered with or caused delay in that performance." Id. (alteration and omission added). The United States Supreme Court found that when the delays of a contractor do not interfere with prompt delivery, imposition of "liquidated damages" for those delays are an impermissible penalty because the delay "plainly would not occasion damage" and, thus, "could not possibly be a reasonable forecast of just compensation for the damage caused by a breach of contract." See id. at 412-13; see also Marine Indus. Constr., LLC v. United States, 158 Fed. Cl. at 212-13.

Continuing GXO's view of the interpretation of the "Penalty Provision" in Part I, Section 2.0 of the SOW, GXO asserts that the Clearance Time for the Secondary Bullpen operation, 3:45 A.M., or the Critical Entry Time for the Platform Outbound operation, 4:00 A.M., are interim deadlines that precede the time when performance was due under the CTHO Contract, and, as such, delays in meeting these interim, antecedent deadlines are

delays which cannot occasion damages. Accordingly, GXO argues that the "Penalty Provision" in Part I, Section 2.0 of the SOW can only be applied against GXO if GXO failed to meet the Clearance Time for the Platform Outbound operation. GXO argues that, according to the ruling in Priebe & Sons,

> if one were to interpret the penalties [sic] provision as providing for penalties based on some point in time before the mail was supposed to depart the CTHO facility on the outbound trucks, then this would necessarily mean that the provision sought to apply to "so-called defaults of [GXO] which ante[ceded] the time when delivery was due but in no way interfered with or caused delay in that performance."

(second and third alterations in original; emphasis in original) (quoting Priebe & Sons v. United States, 332 U.S. at 410).

In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant only briefly refers to Priebe & Sons to support the proposition that liquidated damages are useful when damages are uncertain at the time of contracting. Defendant primarily addresses GXO's Priebe & Sons argument, however, in defendant's Reply in Support of Cross-Motion for Summary Judgment.[43] The entirety of defendant's reply to GXO's Priebe & Sons argument in defendant's Reply in Support of Cross-Motion for Summary Judgment is as follows:

> In Priebe, the issue was a liquidated damages clause that assessed damages when a supplier of dried eggs failed to have them inspected by the "delivery date" in the contract, although the Government had not yet requested delivery. Once the Government requested delivery, the supplier completed inspection and delivered the dried eggs, and thus the Government suffered no loss. That is not the case here. Failure to complete processing by the clearance time is not a separate, interim step that has no effect on mail reaching its destination on time—it is, as discussed above, an essential prerequisite to timely departure of transportation. If processing is not completed by the clearance time, mail that was meant to be moved that operational day falls into the next operational day and it fails to move as required by the contract. The two failures are inextricably linked. The

---

[43] In a footnote in GXO's Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment, GXO argues that defendant "failed to respond to GXO's argument that the Government's interpretation of the penalty provision is prohibited under" Priebe & Sons and any argument defendant makes in its Reply in Support of Cross-Motion for Summary Judgment in response to GXO's Priebe & Sons argument should be considered waived, citing Tesla Laboratories Inc. v. United States, 172 Fed. Cl. 505, 534 (2024), and Sarro & Associates, Inc. v. United States, 152 Fed. Cl. 44, 59 (2021). Plaintiff's argument is moot based on the court's conclusion to deny the parties' Cross-Motions for Summary Judgment as discussed above and below.

> liquidated damages provision accounts for the cascading operational harm caused by missed clearance times, which directly result in late deliveries, increased costs, and logistical disruptions or all three. This case is unlike the situation in Priebe, where that court noted that if the breach of the inspection deadline had involved "failure to get prompt performance when delivery was due, the Court would have had no doubt of the validity of the provision for liquidated damages when applied under those circumstances."

(quoting DJ Mfg. Corp. v. United States, 86 F.3d at 1134 (in turn quoting Priebe & Sons v. United States, 332 U.S. at 412)[44] (cleaned up by defendant)).

GXO premises its reliance on the Priebe & Sons case on the condition that the court "were to interpret the penalties provision as providing for penalties based on some point in time before the mail was supposed to depart the CTHO facility on the outbound trucks." (emphasis in original). As discussed above, however, the record currently before the court does not establish a clear basis for adopting either party's interpretation of the term "dispatched," as used in the "Penalty Provision," at this stage of the litigation. Therefore, at this stage of the litigation, it is premature to determine whether the "Penalty Provision" is unenforceable as a matter of law under Priebe & Sons. GXO's Motion for Summary Judgment, on the ground that the "Penalty Provision" is unenforceable as a matter of law, must be denied at this time.

Contractual Liability When Processed Mail Exceeded Forecasted Mail

In the alternative, GXO argues in its Motion for Summary Judgment that, to the extent the court does not resolve the case based on GXO's other arguments, the court should rule that defendant cannot assess "penalties" or "liquidated damages" for days on which the actual volume of mail processed by GXO exceeded the forecasted volume of mail provided to GXO by defendant. In support, GXO notes that Part III, Section 4.0 of the SOW stated that "[t]he supplier must be capable of sorting, transferring to the trailers, and cross docking MTEs to the trailers, up to the total forecasted daily capacity" and that "[t]he SOW also instructed that '[t]he volume of mail to be processed at the CTHO by the supplier is provided in Attachment E, titled 'Volume Data – 2017 and 2018 Projected.'" (third alteration and emphasis in plaintiff's brief). GXO asserts that "[t]he Supreme Court and the Court of Claims have consistently held that the Government cannot assess penalties or seek damages when the Government interferes with a contractor's performance." (alteration added) (citing United States v. United Eng'g & Constr. Co., 234 U.S. 236, 242 (1914); Schmoll v. United States, 91 Ct. Cl. 1, 16 (1940); Lukens Dredging & Contracting Corp. v. United States, 90 Ct. Cl. 184, 186 (1940); and Wharton Green & Co. v. United States, 86 Ct. Cl. 100, 108-09 (1937)). In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant argues that "GXO cannot prove that liquidated damages for those days [on which GXO allegedly

---

[44] The court notes that defendant incorrectly pin cites this quote from Priebe & Sons v. United States in its Reply in Support of Cross-Motion for Summary Judgment as "Priebe, 332 U.S. at 413." The correct pin cite is Priebe & Sons v. United States, 332 U.S. at 412.

processed more mail than forecasted] are inappropriate, and that the liquidated damages total must be reduced, because GXO cannot prove that the Postal Service hindered its performance." (alteration added) (citing United States v. United Eng'g & Constr. Co., 234 U.S. at 241-42).

Although both GXO and defendant cite to United States v. United Engineering and Construction Co., 234 U.S. at 241-42, for the broad proposition that the government cannot assess "penalties" or seek liquidated damages when the government interferes with a contractor's performance, the caselaw in this court, and the United States Court of Appeals for the Federal Circuit, on the subject is more nuanced. As discussed above in this Opinion, once the government has satisfied its "initial burden of going forward to show that the contract was not completed by the agreed contract completion date and that liquidated damages were due and owing," In re Cent. Ohio Bldg. Co., P.S.B.C.A. No. 2742, 92-1 B.C.A. ¶ 24,399, at 121,824, 1991 WL 187546, the party "asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." Sauer Inc. v. Danzig, 224 F.3d at 1347 (citing Dean Constr. Co. v. United States, 188 Ct. Cl. at 66-68, 411 F.2d at 1240-41; N. Va. Elec. Co. v. United States, 230 Ct. Cl. at 723; and In re Cent. Ohio Bldg. Co., P.S.B.C.A. No. 2742, 92-1 B.C.A. ¶ 24,399, at 121,824, 1991 WL 187546). Generally, in government contracting, in order to assert that a delay is excusable, the contractor must demonstrate that the delay resulted from unforeseeable causes beyond the control, and without the fault or negligence of, the contractor. See K-Con Bldg. Sys. v. United States, 131 Fed. Cl. 275, 322-23 (2017); see also MW Builders, Inc. v. United States, 134 Fed. Cl. 469, 487-88 (2017) (finding that the government was not entitled to assess liquidated damages against a contractor for 146 days of delay caused by a subcontractor which "'was beyond the Contractor's control'" (citing 48 C.F.R. § 52.249-10(b)(1))); RDA Constr. Corp. v. United States, 132 Fed. Cl. 732, 787 (2017), aff'd, 739 F. App'x 644 (Fed. Cir. 2018). "One type of excusable delay occurs when the government has delayed the project work, forcing the contractor to miss the contract completion deadline." George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 243 (2005). In the case currently before the court, the Master Contract between GXO and the USPS contained an "Excusable Delays" clause, which expressly stated that the acts "of the Postal Service in its contractual capacity" may give rise to an excusable delay:

> a. Except with respect to defaults of subcontractors, the supplier will not be in default by reason of any failure in performing the contract in accordance with its terms (including any failure by the supplier to make progress in the prosecution of the work that endangers performance) if the failure arises out of causes beyond the control and without the fault or negligence of the supplier. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the government in its sovereign capacity or of the Postal Service in its contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of the supplier.

(emphasis added). See also UNITED STATES POSTAL SERVICE, SUPPLYING PRINCIPLES AND PRACTICES at 511.

In a situation in which both the government and the contractor are responsible for the delay, it is "unsettled" in this court as to whether any government-caused delay, if proved, completely voids assessment of liquidated damages against the contractor, or whether liquidated damages can be apportioned based on each parties' respective responsibility. See Sunshine Constr. & Eng'g, Inc. v. United States, 64 Fed. Cl. 346, 372 (2005); see also George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 243; R.P. Wallace, Inc. v. United States, 63 Fed. Cl. 402, 410 (2004). As explained by a Judge of the United States Court of Federal Claims:

> "'[W]here a contractor is prevented from executing his contract according to its terms, he is relieved from the obligations of the contract [as to the time of completion] and from paying liquidated damages.'" Schmoll v. United States, 91 Ct. Cl. 1, 28, 1940 WL 4133 (1940) (quoting Levering & Garrigues Co. v. United States, 73 Ct. Cl. 566, 578, 1932 WL 2094 (1932)). When the alleged excuse for the delay is action or inaction by the government, there is some controversy as to whether any government delay to contract completion, if proved, completely voids a contract's liquidated damages provision, or whether apportionment of liquidated damages is possible where there has been concurrent delay by both parties.

George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 243 (alterations in original). These two contrasting, but apparently co-existing, rules are referred to as the "rule against apportionment" and the "clear apportionment rule," respectively. See id. at 243-44; see also Sunshine Constr. & Eng'g, Inc. v. United States, 64 Fed. Cl. at 372-73.

The "rule against apportionment" was first articulated in United States v. United Engineering and Construction Co., in which the United States Supreme Court determined:

> [W]hen the contractor has agreed to do a piece of work within a given time, and the parties have stipulated fixed sum as liquidated damages, not wholly disproportionate to the loss for each day's delay, in order to enforce such payment the other party must not prevent the performance of the contract within the stipulated time; and that where such is the case, and thereafter the work is completed, though delayed by the fault of the contractor, the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived.

United States v. United Eng'g & Constr. Co., 234 U.S. at 242 (alteration added). In Acme Process Equipment Co. v. United States, the United States Court of Claims stated and followed the "rule against apportionment." See Acme Process Equip. Co. v. United States, 171 Ct. Cl. 324, 367, 347 F.2d 509, 535 (1965) ("'[W]here delays are caused by both parties to the contract the court will not attempt to apportion them, but will simply hold that the provisions of the contract with reference to liquidated damages will be annulled.'"

(alteration added) (quoting Schmoll v. United States, 91 Ct. Cl. at 28; and citing United States v. United Eng'g & Constr. Co., 234 U.S. at 242; Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 543, 338 F.2d 81, 90 (1964); and Vogt Bros. Mfg. Co. v. United States, 160 Ct. Cl. 687, 709 (1963))), rev'd on other grounds, 385 U.S. 138 (1966). Therefore, in some cases, this court and its predecessor court have historically applied the "rule against apportionment" when both the government and the contractor are partially responsible for the delay. See Youngdale & Sons Constr. Co. v. United States, 27 Fed. Cl. 516, 565 (1993) ("[G]iven the Supreme Court's holding in this matter [United States v. United Engineering and Construction Co.], we are obliged to conclude that, although the contractor may have delayed the project, the fact that the government caused the delay with respect to the excess water condition negates the applicability of the liquidated damages clause contained in the contract, and thereby prevents the government from assessing any amount with respect to liquidated damages against Youngdale [the contractor]." (alterations added)); see also Fortec Constructors v. United States, 8 Cl. Ct. 490, 508 (1985) (finding that the government's "assessment of liquidated damages was improper" and the contractor was "entitled to remission of all liquidated damages" because the government "failed to introduce any specific evidence that the delay in project completion was caused by" the contractor) (emphasis in original), aff'd, 804 F.2d 141 (Fed. Cir. 1986); Prestex, Inc. v. United States, 3 Cl. Ct. 373, 382 (1983) ("It is true that this court's predecessor did not allow the government to assess liquidated damages when the government was partially responsible for the delay." (citing Acme Process Equip. Co. v. United States, 171 Ct. Cl. 324, 347 F.2d 509; and Schmoll v. United States, 91 Ct. Cl. 1)).

The status of the "rule against apportionment" in the United States Court of Appeals for the Federal Circuit, however, is unsettled. In Sauer Inc. v. Danzig, which was decided after Acme Process Equipment Co. v. United States, the United States Court of Appeals for the Federal Circuit upheld a decision from the Armed Services Board of Contract Appeals apportioning delay for the purpose of assessing liquidated damages. See Sauer Inc. v. Danzig, 224 F.3d at 1347. Notably, the Sauer court did not discuss, or cite to, either the United States Supreme Court's previous decision in United States v. United Engineering and Construction Co., 234 U.S. 236, or to the United States Court of Claims' previous decision in Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 347 F.2d 509. Instead, the United States Court of Appeals for the Federal Circuit stated in Sauer:

> As a general rule, a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled. See Dean Constr. Co. v. United States, 188 Ct. Cl. 62, 411 F.2d 1238, 1240-41 (1969) (affirming a Board finding that a contractor had failed to meet its burden); Northern Va. Elec. Co. v. United States, 230 Ct. Cl. 722, 723 (1982); Central Ohio Bldg. Co., PSBCA No. 2742, 92-1 B.C.A. (CCH) ¶ 24,399, at 121,824 (Aug. 30, 1991). We have affirmed the Board's finding that Sauer proved only two days of excusable delay. As a result, Sauer has not shown that it is entitled to a

> remission of liquidated damages greater than the remission already granted by the Board.
>
> Sauer cites two of this court's cases for the proposition that it was the Navy's burden to establish that Sauer was responsible for the delay in performance, but those cases are inapposite. In both William F. Klingensmith, Inc. v. United States, 731 F.2d 805 (Fed. Cir. 1984), and Blinderman Construction Co. v. United States, 695 F.2d 552 (Fed. Cir. 1982), the government's fault for delays had been established, and the court applied the rule that "[w]here both parties contribute to a delay neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." Coath & Goss, Inc. v. United States, 101 Ct. Cl. 702, 714-15 (1944); see [William F.] Klingensmith[, Inc. v. United States], 731 F.2d at 809; Blinderman [Construction Co. v. United States], 695 F.2d at 559. In this case, the Board found that Sauer failed to show more than two days of government-caused delay; those cases are therefore inapplicable.

Sauer Inc. v. Danzig, 224 F.3d at 1347 (first alteration in original). Thus, unlike the "rule against apportionment," which would annul a liquidated damages provision in a concurrent delay situation, the United States Court of Appeals for the Federal Circuit in Sauer awarded the government liquidated damages for delay, even though delay by the government had been found to have occurred during performance of the contract at issue. See id. The "clear apportionment rule" espoused in Sauer, however, would only apportion damages when there "is in the proof a clear apportionment of the delay and the expense attributable to each party." Id. (quoting Coath & Goss, Inc. v. United States, 101 Ct. Cl. at 714-15).

Although the United States Court of Appeals for the Federal Circuit in Sauer did not explicitly reject the "rule against apportionment," the "rule against apportionment" has rarely been applied or even discussed in more recent years and has received some subsequent negative treatment. See Sunshine Constr. & Eng'g, Inc. v. United States, 64 Fed. Cl. at 372-73; see also R.P. Wallace, Inc. v. United States, 63 Fed. Cl. at 411. Despite the unsettled nature of the law in the United States Court of Appeals for the Federal Circuit, under either the "rule against apportionment" or the "clear apportionment rule," the general proposition that the government may not assess liquidated damages for delays for which the government is at fault appears to hold true, as reflected in more recent decisions by Judges of the United States Court of Federal Claims. See, e.g., Slone Assocs., Inc. v. United States, 166 Fed. Cl. 771, 813 (2017) (finding that it was "improper for the government to assess liquidated damages" when the contractor's "additional work was performed at the direction of the government" and "the delay in completion was excusable as well as compensable"); see also Structural Concepts, Inc. v. United States, 103 Fed. Cl. 84, 88-91 (2012) (refusing to decide between the "rule against apportionment" and the "clear apportionment rule" on a motion for summary judgment because "[b]oth parties bear particular burdens with respect to the government's counterclaim for liquidated damages," "judicial review of a liquidated damages

assessment is fact-intensive," and "[t]he record before the court does not provide a clear enough picture . . . to determine the government's right to any amount of liquidated damages as a matter of law" (alterations and omission added)); Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 293 (2006) ("As a general matter, 'liquidated damages will not be assessed during any period in which the contractor experienced an excusable delay.'" (quoting JOHN CIBINIC AND RALPH NASH, ADMINISTRATION OF GOVERNMENT CONTRACTS 1059 (3d ed. 1995)), aff'd, 499 F.3d 1357 (Fed. Cir. 2007); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 244 (refusing to resolve the apparent conflict between the "rule against apportionment" and the "clear apportionment rule" and instead holding that the government would not be entitled to liquidated damages under either rule).

As stated above, in its Motion for Summary Judgment, GXO argues that the government may not assess "penalties" for days on which the actual volume of mail processed by GXO exceeded the forecasted volumes of mail provided to GXO by defendant. GXO notes that Part III, Section 4.0 of the SOW stated that "[t]he supplier must be capable of sorting, transferring to the trailers, and cross docking MTEs to the trailers, up to the total forecasted daily capacity" and that "[t]he SOW also instructed that '[t]he volume of mail to be processed at the CTHO by the supplier is provided in Attachment E, titled 'Volume Data – 2017 and 2018 Projected.'" (third alteration and emphasis in plaintiff's brief). GXO argues that "[t]his language established a workload baseline for GXO's ability to perform" and GXO alleges that "GXO relied on this forecast to inform how it planned the staffing and resource levels it would need to perform at the CTHO facility, as well as its pricing." (alteration added). Accordingly, GXO argues, "[t]he USPS affected GXO's performance whenever the actual volume of mail it sent to GXO exceeded the forecasted volume because the USPS was effectively requiring GXO to perform in excess of the baseline to which GXO had been required to be able to perform." (alteration added).

According to GXO, "[f]or four of the days on which the USPS assessed penalties, the actual volume of mail exceeded the estimated volume in the USPS-provided forecasts—these days involved a total of 1,213 allegedly-delayed containers or $1,455,600 in penalties," and that GXO's liability should, therefore, be reduced by $1,455,600.00. (alteration added). GXO highlights four separate days on which GXO allegedly processed more pieces of mail than forecasted, but was still assessed "penalties" by the USPS. GXO claims that, based on Contracting Officer Slaughter's November 22, 2021 email, GXO was given a forecast of 212,993 pieces of mail to be processed on November 30, 2021, but that GXO actually processed 251,567 pieces of mail on that day, which is approximately 18.1% more pieces of mail than forecasted. For November 30, 2021, the revised "CTHO Delays By Day" spreadsheet indicated that there were 46,303 pieces of mail or 1,062 containers of mail that missed its dispatch time, resulting in $1,274,400.00 in "penalties" assessed for the day (1,062 x $1,200.00 = $1,274,400.00).[45] GXO also claims that, based on Contracting Officer Stallworth's

---

[45] Defendant claims that it assessed "penalties" against GXO based on the USPS employee Mr. Walker's physical count of the containers of mail that were left in the

December 21, 2021 email, GXO was given a forecast of 113,079 pieces of mail to be processed on December 29, 2021, but that GXO actually processed 156,720 pieces of mail on that day, which is approximately 38.6% more pieces of mail than forecasted. For December 29, 2021, the revised "CTHO Delays By Day" spreadsheet indicated that there were 87 pieces of mail or 2 containers of mail that missed its dispatch time, which comes to a total of $2,400.00 in "penalties" for the day (2 x $1,200.00 = $2,400.00).[46] GXO further claims that, based on Contracting Officer Stallworth's December 21, 2021 email, GXO was given a forecast of 164,483 pieces of mail to be processed on January 11, 2022, but that GXO actually processed 181,338 pieces of mail on that day, which is approximately 10.2% more pieces of mail than forecasted. For January 11, 2021, the revised "CTHO Delays By Day" spreadsheet indicated that there were 567 pieces of mail or 13 containers of mail that missed its dispatch time, which comes to a total of $15,600.00 in "penalties"

---

Secondary Bullpen at 4:00 A.M. each day. The court notes, however, that the piece counts and the container counts indicated in the revised "CTHO Delays By Day" spreadsheet prepared by Mr. Walker calls into question whether Mr. Walker and the USPS were correctly calculating the "penalties" imposed against GXO. Specifically, if the piece count for the mail allegedly left in the Secondary Bullpen on November 30, 2021 (46,303 pieces of mail) is divided by the container count of the containers allegedly left in the Secondary Bullpen on November 30, 2021 (1,062 containers), it appears that each container allegedly left in the Secondary Bullpen on November 30, 2021 had, on average, 43.5 pieces of mail in it (46,303 pieces of mail / 1,062 containers = 43.5 pieces of mail per container). Although not identical, this 43.5 pieces of mail per container figure for November 30, 2021 resembles the conversion rate for the "1046 hampers," which, according to the SOW, were only used in the Primary Bullpen and had a conversion rate of 42.5 pieces of mail per one "1046 hamper." As indicated above, according to the SOW, GXO used All Purpose Containers, or APCs, in the Secondary Bullpen, which had a conversion rate of 200 pieces of mail per one APC. If Mr. Walker had been counting APCs left in the Secondary Bullpen on November 30, 2021, one might expect a piece count closer to 212,400 pieces of mail (1,062 containers x 200 APC conversion rate = 212,400 pieces of mail), rather than the 46,303 pieces of mail indicated in the revised "CTHO Delays By Day" spreadsheet for November 30, 2021. As indicated below, the piece counts and container counts indicated in the revised "CTHO Delays By Day" spreadsheet yield similar results for the other days on which the USPS imposed "penalties" against GXO.

[46] Similar to the footnote immediately above, if the piece count for the mail allegedly left in the Secondary Bullpen on December 29, 2021 (87 pieces of mail) is divided by the container count of the containers allegedly left in the Secondary Bullpen on December 29, 2021 (2 containers), it appears that each container allegedly left in the Secondary Bullpen on December 29, 2021 had, on average, 43.5 pieces of mail in it (87 pieces of mail / 2 containers = 43.5 pieces of mail per container). If Mr. Walker had been counting APCs left in the Secondary Bullpen on December 29, 2021, one might expect a piece count closer to 400 pieces of mail (2 containers x 200 APC conversion rate = 400 pieces of mail), rather than the 87 pieces of mail indicated in the revised "CTHO Delays By Day" spreadsheet for December 29, 2021.

for the day (13 x $1,200.00 = $15,600.00).[47] In addition, GXO claims that, based on Contracting Officer Stallworth's December 21, 2021 email, GXO was given a forecast of 163,134 pieces of mail to be processed on January 19, 2022, but that GXO actually processed 169,306 pieces of mail on that day, which is approximately 3.8% more pieces of mail than forecasted. For January 19, 2022, the revised "CTHO Delays By Day" spreadsheet indicated that there were 741 pieces of mail or 17 containers of mail that missed its dispatch time, which comes to a total of $20,400.00 in "penalties" for the day (17 x $1,200.00 = $20,400.00).[48]

As indicated above, GXO bases the forecasted figures on the updated projected volume of mail received via email from Contracting Officer Stallworth on November 22, 2021 and Contracting Officer Slaughter on December 21, 2021. GXO bases the actual processing figures on the e-mails Mr. Walker sent at the end of each processing day.[49] GXO submitted to the court the following table, which GXO created:

---

[47] Similar to the footnotes above, if the piece count for the mail allegedly left in the Secondary Bullpen on January 11, 2022 (567 pieces of mail) is divided by the container count of the containers allegedly left in the Secondary Bullpen on January 11, 2022 (13 containers), it appears that each container allegedly left in the Secondary Bullpen on January 11, 2022 had, on average, 43.6 pieces of mail in it (567 pieces of mail / 13 containers = 43.6 pieces of mail per container). If Mr. Walker had been counting APCs left in the Secondary Bullpen on January 11, 2022, one might expect a piece count closer to 2,600 pieces of mail (13 containers x 200 APC conversion rate = 2,600 pieces of mail), rather than the 567 pieces of mail indicated in the revised "CTHO Delays By Day" spreadsheet for January 11, 2022.

[48] Similar to the footnotes above, if the piece count for the mail allegedly left in the Secondary Bullpen on January 19, 2022 (741 pieces of mail) is divided by the container count of the containers allegedly left in the Secondary Bullpen on January 19, 2022 (17 containers), it appears that each container allegedly left in the Secondary Bullpen on January 19, 2022 had, on average, 43.5 pieces of mail in it (741 pieces of mail / 17 containers = 43.5 pieces of mail per container). If Mr. Walker had been counting APCs left in the Secondary Bullpen on January 19, 2022, one might expect a piece count closer to 3,400 pieces of mail (17 containers x 200 APC conversion rate = 3,400 pieces of mail), rather than 741 pieces of mail indicated in the revised "CTHO Delays By Day" spreadsheet for January 19, 2022.

[49] Specifically, GXO bases the actual processing figure for November 30, 2021, on an email from Mr. Walker, dated December 1, 2021, which indicated 251,567 "Accumulative MPEwatch Scans" as of 3:00 A.M. GXO bases the actual processing figure for December 29, 2021, on an email from Mr. Walker, dated December 30, 2021, which indicated 156,720 "Accumulative MPEwatch Scans" as of 3:00 A.M. GXO bases the actual processing figure for January 11, 2022, on an email from Mr. Walker, dated January 12, 2022, which indicated 181,338 "Accumulative MPEwatch Scans" as of 3:00 A.M. GXO bases the actual processing figure for January 19, 2022, on an email from Mr. Walker, dated January 20, 2022, which indicated 169,306 "Accumulative MPEwatch Scans" as of

| Date | Forecasted Volume (Pieces) | Actual Volume (Pieces) | Percentage Above Forecast | # of Allegedly-Delayed Containers | Associated Penalty |
|---|---|---|---|---|---|
| 11/30/2021 | 212,993 | 251,567 | 18.1% | 1,062 | $1,274,400 |
| 12/29/2021 | 113,079 | 156,720 | 38.6% | 2 | $2,400 |
| 1/11/2022 | 164,483 | 181,338 | 10.2% | 13 | $15,600 |
| 1/19/2022 | 163,134 | 169,306 | 3.8% | 136 | $163,200 |
| Total | | | | 1,213 | $1,455,600 |

In its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, defendant argues that "GXO is incorrect that the Postal Service impeded its performance" because "GXO has failed to establish that the Postal Service provided volumes of mail to be processed that were greater than the estimated volumes provision [sic] included in the forecasts provided by the Postal Service before performance started." (alteration added). Defendant argues that "GXO's reliance on 'Attachment E, titled 'Volume Data – 2017 and 2018 Projected' as a guarantee of a daily maximum amount of volume that the Postal Service could deliver daily to the CTHO facility for processing is misguided" because Attachment E "does not constitute a guarantee of the maximum volume that might be presented to GXO to process on any given day." Defendant further argues that even if the contract was "read as providing a maximum daily volume of mail to be processed, that amount would have to be derived from the delivery order issued for the 2021-2022 period of performance." Defendant states that the Master Contract included a clause, Clause 4-1, entitled "Order of Precedence," which mandated that any inconsistencies within the contract would be resolved by giving precedence first to the Delivery Order and then to the SOW and any other USPS-provided attachments. Defendant argues that the FY22 Delivery Order

> makes clear that GXO was required to be able to process 26.5 million packages during the 2021-2022 peak season. And during the 2021-2022 peak season, GXO was processing mail for approximately 65 days in total.[50] Accordingly, using the volume projected in the delivery order would

---

3:00 A.M. GXO does not define the term "Accumulative MPEwatch Scans" in its briefings submitted to the court. Moreover, the term "Accumulative MPEwatch Scans" is not defined in the Master Contract, SOW, or in any other CTHO Contract document.

50 Although defendant does not explain how it arrived at the conclusion that "GXO was processing mail for approximately 65 days in total" during the 2021-2022 peak season, defendant cites to the original "CTHO Delays By Day" spreadsheet. As discussed above, however, the parties have agreed that the original "CTHO Delays By Day" spreadsheet submitted by defendant was an earlier version of the spreadsheet and that the applicable version of the "CTHO Delays By Day" spreadsheet for the purposes of considering the cross-motions for summary judgment currently before the court is the revised "CTHO Delays By Day" spreadsheet submitted as Exhibit M to GXO's complaint and reproduced in this Opinion.

> result in GXO being required to process a daily volume of approximately 407,692 packages, assuming a consistent daily volume of mail.

(footnote added; internal citations omitted). Defendant further argues that "to the extent this number [the average daily volume of mail calculated based on the FY22 Delivery Order] may be greater than the projections included in Attachment E, relied upon by GXO, the delivery order takes precedence under the terms of the contract itself." (alteration added). Defendant maintains that "[b]ecause the Postal Service never provided an actual daily volume of mail exceeding the delivery order projection, GXO has not established its claim." (alteration added).

In its Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motions for Summary Judgment, GXO responds by first arguing that GXO processed mail for 84 days during fiscal year 2022, not the approximately "65 days in total" referenced by defendant, which would reduce the average daily volume of mail if calculated based on the FY22 Delivery Order.[51] Nevertheless, GXO argues that there is no conflict between the FY22 Delivery Order and the SOW because, according to GXO, the FY22 Delivery Order "conveys, at the time of award, that – given the amount of funding that the USPS had allocated for the CTHO Contract – 26,500,000 units was the maximum amount of mail that GXO could potentially expect to be paid to sort under the Contract," but that "the Statement of Work was stating that GXO was actually required to be able to process the USPS-forecasted amount in Attachment E." GXO maintains that "once the Government furnished a copy of the forecast to GXO for the FY 2022 after award, that forecasted amount became the required amount of mail that GXO needed to be able to process as provided in Part II [sic], Section 4.0 of the Statement of work." (alteration added).[52] Moreover, GXO argues that defendant's interpretation "would render the contract language from Part II [sic], Section 4.0 useless, inexplicable, void or superfluous" because defendant's "interpretation that the Delivery Order somehow sets the 'maximum daily amount' of mail would mean that the USPS had no reason to provide GXO with the daily forecasts in Attachment E." (alteration added).

As indicated above, it is "unsettled" in the United States Court of Federal Claims as to whether the court should apply the "rule against apportionment" or the "clear apportionment rule" when determining whether the government may impose liquidated damages against GXO for the four days on which GXO alleges that the actual volume of

---

[51] When holding the total amount of mail to be processed by GXO constant, as the total number of days of performance increases, the average daily volume of mail to be processed by GXO decreases, because the same volume of work is spread across a longer period.

[52] The court notes that the relevant language is in Part III, Section 4.0 of the SOW, which states that "[t]he volume of mail to be processed at the CTHO by the supplier is provided in" Attachment E and that "[t]he supplier must be capable of sorting, transferring to the trailers, and cross docking MTEs to the trailers, up to the total forecasted daily capacity." (alterations added).

mail processed by GXO exceeded the forecasted volume of mail provided to GXO by the USPS. See Sunshine Constr. & Eng'g, Inc. v. United States, 64 Fed. Cl. at 372; see also George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 243; R.P. Wallace, Inc. v. United States, 63 Fed. Cl. at 410. This issue regarding the applicability of the "rule against apportionment" or the "clear apportionment rule" will require further exploration in any future proceedings. At this stage of the case currently before the court, however, it is unnecessary for the court to select between the "rule against apportionment" or the "clear apportionment rule" because, under any analysis of either rule, there remain genuine disputes of material fact precluding the entry of summary judgment for either party. See Structural Concepts, Inc. v. United States, 103 Fed. Cl. at 90 ("The record before the court does not provide a clear enough picture . . . to determine the government's right to any amount of liquidated damages as a matter of law." (omission added)). Specifically, GXO and defendant dispute whether Attachment E imposed a contractual maximum on the volume of mail that GXO was required to process daily during fiscal year 2022, or whether the contractual maximum should be determined by the FY22 Delivery Order, either of which involves disputed factual matters. If the FY22 Delivery Order imposed a contractual maximum on the volume of mail that GXO was required to process daily during fiscal year 2022, the parties dispute the number of days that GXO processed mail during fiscal year 2022. If Attachment E imposed a contractual maximum on the volume of mail that GXO was required to process during fiscal year 2022, it also is unclear whether the parties may have informally modified Attachment E through a course of performance based on Contracting Officer Slaughter's November 22, 2021 email and Contracting Officer Stallworth's December 21, 2021 email. Moreover, there appear to be significant discrepancies in the data that GXO and defendant rely on to support their respective arguments. GXO bases the actual processing figures described above on the e-mails Mr. Walker sent at the end of each processing day, the accuracy of which GXO itself has called into doubt by asserting that the container count conducted by Mr. Walker "has discrepancies when compared with other contemporaneous emails he sent out, which he was unable to reconcile during his deposition." Furthermore, GXO states that the "discrepancies between these container counts and Mr. Walker's inability to resolve them calls into doubt all of the data the USPS used to assess penalties." For defendant's part, defendant's "penalty" calculations appear to be consistent with the "1046 hamper" conversion rate, rather than the APC conversion rate, which calls into question whether defendant calculated the "penalties" correctly. Accordingly, based on the record before the court at this time, there remain genuine disputes of material fact related to whether GXO processed more mail than it was contractually required to under the CTHO Contract, as well as how defendant calculated the amount of delayed containers subject to the "Penalty Provision" in Part I, Section 2.0 of the SOW. Therefore, neither GXO nor defendant are entitled to summary judgment on this issue.

## CONCLUSION

In sum, at this stage of the litigation, the record currently before the court does not establish a clear basis for adopting either party's interpretation of the terms "dispatch" and "dispatched," as used in Part I, Section 2.0 of the SOW, described by both parties as the "Penalty Provision." It also is premature to determine whether the "Penalty Provision"

is unenforceable as a matter of law. Too many genuine issues of material fact exist regarding the proper interpretation of the "Penalty Provision" and when a "penalty" can be imposed pursuant to the "Penalty Provision." Therefore, the entry of summary judgment for either party is not appropriate at this time. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Based on the above discussion, GXO's Motion for Summary Judgment is **DENIED**. Defendant's Cross-Motion for Summary Judgment also is **DENIED**. Further proceedings will be scheduled in a separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**